ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
VALENTINE S. HOY (BAR NO. 121766)
TIMOTHY M. HUTTER (BAR NO. 267949)
One America Plaza
600 West Broadway, 27th Floor
San Diego, California 92101-0903
Phone: (619) 233-1155
Fax: (619) 233-1158
E-Mail: vhoy@allenmatkins.com
       thutter@allenmatkins.com

BLANK ROME LLP
LINDA KORNFELD (BAR NO. 155765)
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
Phone: (424) 239-3824
Fax: (424) 239-3434
E-mail: lkornfeld@blankrome.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SM 10000 PROPERTY, LLC, a Delaware limited liability company and SWINERTON BUILDERS, a California Corporation,<br><br>    Plaintiffs,<br><br>    vs.<br><br>ALLIANZ GLOBAL RISKS US INSURANCE COMPANY and DOES 1 through 10,<br><br>    Defendant. | Case No. 19-cv-03054-PJH<br><br>**DECLARATION OF TED BUMGARDNER IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:   January 6, 2021<br>Judge: Hon. Phyllis J. Hamilton<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

I, Ted Bumgardner, declare as follows:

1. I am over the age of 18 and have personal knowledge of the facts set forth in this declaration. I have over 40 years of experience in building construction, construction management, and schedule analysis. I have particular expertise in the analysis of construction delays impacting high-rise construction. I have personally been a superintendent or project manager on multiple high-rise projects. In 2009, I founded Xpera Group, a construction consulting company based in San Diego. Xpera provides construction consulting and support services to builders and owners and also provides forensic and litigation support relating to construction disputes. I have qualified as an expert to provide testimony on the cause and measurement of schedule delay in state and federal courts in California. A copy of my curriculum vitae is attached to this declaration as **Exhibit 38**.

2. I was retained by the plaintiffs in this case, 10000 SM Property, LLC and Swinerton, to evaluate the schedule impact of December 2, 2015 concrete spill referred to in this case as the loss event. Based on a review of the construction records and other information I determined that the loss event caused delays to each of the project milestones, including the final milestone, which is Substantial Completion of the project as defined by the parties in their construction contract. The amount of delay caused by the loss event to each milestone is provided in the following table:

| Unit Completion Milestones | Date on which tenant occupancy would have commence but for the loss | Period of Delay | Actual date of occupancy (or date when it was possible) |
|---|---|---|---|
| Milestone 1 Leasing office/Mock up unit | Feb 12, 2016 | 140 days | Jul 1, 2016 |
| Milestone 2 Floor 1-15; 96 Units | Aug 8, 2016 | 213 days | Mar 9, 2017 |
| Milestone 3 Floor 16-31; 128 Units | Sep 7, 2016 | 225 days | Apr 20, 2017 |
| Milestone 4 Floor 32-40; 59 Units | Oct 27, 2016 | 182 days | Apr 27, 2017 |

3. I conducted my schedule analysis using critical path method (CPM) schedule analyses recommended for this purpose by the American Association of Cost Engineers (the AACE), which is the recognized authority for schedule analysis guidance throughout the United States and around the world. There are multiple CPM methods recommended for forensic use (i.e., determination of the causes and measurement of delay for claims purposes) by the AACE. These are set forth in a technical publication known as AACE International Recommended Practice No. 29R-03 Forensic Schedule Analysis, known simply as 29R-03 to the construction industry. There are five primary methods of CPM analysis, which sometimes go by different slang names and include some variations. The technical names of these methods are:

      **(i.) As Planned vs As Built**
          MIP 3.1 Observational/ Static/ Gross
          MIP 3.2 Observational/ Static/ Periodic

      **(ii.) Windows Analysis**
          MIP 3.3 Observational/Dynamic/ Contemporaneous As-Is
          MIP 3.4 Observational/Dynamic/ Contemporaneous Split
          MIP 3.5 Observational/ Dynamic/ Modified or Recreated

      **(iii.) Impacted As Planned**
          MIP 3.6 Modeled/ Additive/ Single Base

      **(iv.) Time Impact Analysis**
          MIP 3.7 Modeled/ Additive/ Multiple Base

      **(v.) Collapsed As Built**
          MIP 3.8 Modeled/ Subtractive/ Single Simulation
          MIP 3.9 Modeled Subtractive/ Multiple Base

All of the AACE recommended methods were developed, published, studied, peer reviewed and tested in court over many years. The purpose of these methods is to minimize subjectivity, judgment, mistakes, disputes and variation in the measurement and attribution of delay for purposes of claims. There are strict protocol requirements for using these methods, but the AACE recognizes that in practice it may not be feasible to follow them in every case. Usually this is because the information needed to follow strict protocols is not available. Nevertheless, the object of a schedule analysis is to follow these guidelines as best as one can, utilize multiple methods when appropriate and avoid subjectivity to the greatest possible extent. In my analysis I used three of the AACE methods and was able to follow the protocols. My opinions are set forth in a

77-page report that I prepared with the assistance of my colleague Dr. Hendrik Prinsloo. A true and correct copy of my report is attached as **Exhibit 39**.

4. I have studied the reports prepared by J.S. Held for Allianz Global Risk US Insurance in this matter. The method used by J.S. Held to reach their opinion that the loss event caused "no additional delay" to the completion of the project is not recommended by the AACE. I have never seen or heard of the method being used before. I also read the transcripts of the depositions of J.S. Held personnel, including Lisa Enloe, Jonathan Perry, Jonathon Held and Granger Stuck. They refer to their method as either an "As-Built-But-For" method or a "But For" method of analysis. The term But For analysis is a slang term for an AACE recommended method more commonly known as the Collapsed As Built method. The method used by J.S. Held is not, however, the same as a Collapsed As Built or But For method as known in the construction industry. All AACE methods are designed to identify the critical path of the work and measure the delay to the project caused by an identified event or set of circumstances. In this case J.S. Held did not identify the critical path of the work or measure delay to the completion date caused by any event or set of circumstances. According to the deposition testimony of Granger Stuck, the delay expert for Allianz, on page 126 of his transcript stated that "…the but-for analysis isn't really a critical path analysis."

5. J.S. Held's method is not a method of measuring delay to the completion of a project caused by an event or set of circumstances. What their method entails, is the review of project records to identify delays to scheduled activities that occurred before and after the loss event. Without measuring the impact of these delays on the completion date, the J.S. Held analyst forms a judgment or opinion about whether the delays to activities that were identified would have delayed the completion of the project as much as the loss event did assuming if the loss event had not occurred, i.e., "but for the loss event."

6. If the question to be answered for purposes of the Delayed Opening insurance coverage is whether the loss event caused delay to the project, the answer provided by the critical path schedule analysis is yes. J.S. Held's method does not attempt to answer that question, however. J.S. Held claims that its analysis can tell us whether a project would have been

completed earlier but for a loss event. I do not believe J.S. Held's method does that either, as I will explain. To know whether a project would have been completed earlier but for a loss event, one must make assumptions about post-loss event decisions that would have been made if the loss event had not occurred.

7. In delay analysis, two independent delays occurring at or near the same time are referred to as concurrent delays. AACE advises in Section C. Pre-Requisite Findings Concerning the Delays Being Evaluated for Concurrency that: *Before evaluation of concurrency…, The delayed work must be substantial and not easily curable.* AACE further explains in C.4 that *"This requirement comports with common sense. If one of the delays is associated with a minor element of work that could easily be performed, that work should not create a concurrent delay.* Float is the amount of time that an activity can be delayed without causing a subsequent delay to the project completion date. When a concurrent activity is delayed within the float created by the controlling or parent delay due to decisions made because of the float, that is referred to as a pacing delay. Per AACE Section 4.2 F, *"Pacing delay is a real-life manifestation of the principle that work durations expand to fill the time available to perform them."* In Section 3. Method Implementation which outlines the process for each of the nine different analyses protocols for the five major delay analyses methods sub-section H. Identification and Quantification of Concurrent Delays and Pacing provides checklists for the identification of critical and near-critical paths and requires that, *"For each suspected pacing delay event, evaluate whether enough resources could have been realistically employed to perform the paced activity within its original planned duration."*

8. In this case, as one would expect whenever a catastrophic event or accident happens during a project, the Loss Event changed the critical path of the work and created schedule float. On a complex project that was only about halfway finished at the time of the loss event, such as Ten Thousand, it would not be reasonable for a schedule analyst to assume the owner and contractor would have made the same decisions and allocated resources the same way had the loss event not occurred. In fact, because the loss event shifted the critical path it is virtually certain that they would not have done everything the same way. Work that is on the

critical path is work that, if delayed, may delay the completion of the Project. Work that is not on the critical path can be delayed without impacting the scheduled completion date of the project. For that reason, contractors and owners make different decisions about work that is on or near the critical path than they would about work not near the critical path. Contractors focus attention and resources on the work that is near the critical path. They will sometimes spend extra money to expedite that work, particularly if there are bonuses for finishing early and penalties for finishing late, as there were in this case. In order to answer the question of what would have happened but for the loss event, one would have to form opinions about each individual activity that was delayed after the loss event happened in order to determine whether that delay was avoidable and whether avoidance would have been likely if the loss event had not occurred. According to the descriptions provided by Lisa Enloe, Jonathan Perry and Granger Stuck in their depositions, J.S. Held's method does not attempt to do that. The reports authored by J.S. Held in this case contain no analysis consistent with AACE Section 4.2C, AACE Section 4.2F, or the recommendations contained in sub-section H of the method implementation protocols.

9. J.S. Held's failure to consider concurrency and pacing in the manner described above will often, if not always, result in an opinion that is biased against the contractor and owner. Project stakeholders will be charged with delays to the completion of work that was shifted off the actual critical path by the occurrence of the loss event regardless of the likelihood that such work would have been completed on time had it been on the actual critical path. A schedule analysis that fails to consider concurrency and pacing as recommended by the AACE and described above falls below the construction industry standard of care for schedule analysis. By assuming that the work would have progressed the same way had the loss event not occurred, J.S. Held's analysis also fails to tell us whether the project would probably have completed earlier but for the Loss Event.

10. In this case there are several examples of activities that were delayed after the Loss Event which probably would not have been delayed but for the Loss Event. My rebuttal report describes some of these activities and explains how the delays could have been avoided, and

probably would have been avoided if the loss event had not already delayed the project. A true and correct copy of my rebuttal report is attached as **Exhibit 40.**

11. J.S. Held's reports make important factual mistakes, each benefitting the insurance company. Some of these are described in my rebuttal report. An example of an important factual mistake J.S. Held made was its determination that all damage caused by the loss event was repaired and Schindler could resume contract work inside the passenger elevator shaft three months after the Loss Event. The documentary evidence, consistent with eyewitness testimony, shows that the repair and replacement of damaged materials and equipment was not completed until another two months later. Then the loss event occurred on December 2, 2015, damaging equipment and parts in the shaft. On February 4, 2016, after safety measures were introduced and safe access to the elevator shaft was possible, Schindler began the clean-up and repair of damaged equipment inside the passenger elevator shaft, completing nearly all of that work by February 26. Before it could return to doing contract work in the shaft, however, it had to replace elevator clips at floors 1 through 17 and a piece of equipment known as the Guide Rail Installation Kit (GRIK), which were damaged by the concrete spill. A March 29, 2016, a Schindler email to Swinerton transmitting a proposed change order for the replacement of the clips states that the damaged clips had not yet been replaced. A true and correct copy of the email with attachments is attached as **Exhibit 41**. Swinerton's As Built schedule shows the clips were replaced between April 1 and April 8, 2016. The information in the Swinerton schedule has been confirmed by eyewitnesses. Despite clear evidence to the contrary, J.S. Held insists the clips were replaced before February 26, 2016. The GRIK was an essential component of Schindler's system for setting elevator rails. It is a customized part that was custom fabricated for this project. A new GRIK was ordered after the original one was destroyed by the loss event. The projected delivery date for the new GRIK was March 11, 2016, but witnesses reported that it was actually delivered in late April. The first mention of the new GRIK in the construction records is April 25, 2016. This would have been the last activity in the repair and replacement sequence. It is inexplicable to me that J.S. Held reports that the repair and replacement activities were completed two months earlier.

12. In addition to my delay analysis, I worked with my team at Xpera to identify and categorize Swinerton's damages resulting from the Loss Event, including change orders and other billing documentation. These were costs documented in Swinerton's project files that had been produced in this case. Working with Swinerton's project personnel, primarily the project manager Keith Dancey, we identified the expenses claimed by Swinerton, many of which were documented in subcontractor change orders. Working with Swinerton's counsel we created categories for those expenses, that were intended to align with categories identified in the Policy. Then we assigned the expenses to the categories and presented the information in a spreadsheet. In the spreadsheet source documents were identified with the name of the vendor and the document number – for example, "All Area Plumbing CO No. 13050092-007-024" was a change order accounting for $262,852 of Swinerton's extra expense. Other components of that change order were deemed unrelated, and are reflected as additional costs not directly attributable to the loss event, and therefore $55,852 was excluded from Swinerton's claim. In my deposition in this case I was asked about Exhibit 280, which is a version of the spreadsheet that included another column listing the Bates numbers of the source documents. A true and correct copy of deposition Exhibit 280 is attached as **Exhibit 42** to this declaration. I subsequently prepared a further update to the spreadsheet that includes General Notes at the end to further explain the information. A true and correct copy of the updated deposition Exhibit 280 spreadsheet is attached as **Exhibit 43** to this declaration. Exhibits 5 and 6 are supplemental to my original damages report. The vast majority of the cost items in my spreadsheets were previously included in submittals made directly by Swinerton to Allianz prior to litigation. The additional cost items were obtained from Bates labeled documents from Swinerton's production that were identified to us as Loss Event related by Swinerton's project manager.

I declare under penalty of perjury under the laws of the state of California and the United States that the foregoing is true and correct and that this Declaration was executed by me on this 16th day of December, 2020 at Bainbridge Island, Washington.

*/s/ Ted Bumgardner*
Ted Bumgardner

BUMGARDNER DECLARATION IN SUPPORT OF OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT - Case No. 19-cv-03054-PJH
-8-
905285 /SD

## TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE NO |
|---|---|---|
| Exhibit 38 | Curriculum Vitae of Ted Bumgardner, Xpera Group | 2 |
| Exhibit 39 | October 2020 Elevator Shaft Loss Event Delay Analysis Report prepared by Xpera Group | 4 |
| Exhibit 40 | November 16, 2020 Elevator Shaft Loss Event Response To J.S. Held Report prepared by Xpera Group | 7 |
| Exhibit 41 | March 29, 2016 email from Christopher Lape, Schindler Elevator to Keith Dancey, Swineton Builders, with attachment | 7 |
| Exhibit 42 | Xpera Group Analysis of Swinerton Damages (Deposition Exhibit 280) | 8 |
| Exhibit 43 | Xpera Group Analysis of Swinerton Damages - Amended | 8 |