EXHIBIT 39







10 000 Santa Monica

# ELEVATOR SHAFT LOSS EVENT
# DELAY ANALYSIS
# REPORT

**OCTOBER 2020**

10911 Technology Place, San Diego, CA 92127

(858) 436-7770 – www.xperagroup.com


# REPORT DESCRIPTION

| CASE / PROJECT | SM 10000 Property, LLC and Swinerton Builders v. Allianz Global Risks US |
| --- | --- |
| OUR CLIENT | Allen Matkins |
| REPORT TITLE | Elevator Shaft Loss Event Delay Analysis Report |
| ISSUE DATE | 10/26/2020 |
| REPORT REFERENCE NR | XP/SM/001 |
| REPORT STATUS | Final |
| DISCLAIMER | The opinions in the report are based on our review and analysis to date. We reserve the right to update these opinions upon receipt of new information, or in rebuttal to future expert testimony. |



# CONTENT

REPORT DESCRIPTION                                                                          2

CONTENT                                                                                     3

LIST OF FIGURES                                                                             5

LIST OF TABLES                                                                              6

1.  INTRODUCTION                                                                            7

2.  STATUS OF INVESTIGATION                                                                 7

3.  PROJECT BACKGROUND                                                                      8

4.  EXECUTIVE SUMMARY                                                                       9

5.  LOSS EVENT                                                                             12

6.  ANALYSIS METHODOLOGY                                                                   16

6.1     OBJECTIVE                                                                          16

6.2     CONTEXT                                                                            16

6.3     CONSTRUCTION INDUSTRY DELAY ANALYSIS                                               17

6.4     DELAY START UP (DSU) INSURANCE CLAIMS                                              18

   6.4.1   DELAY ANALYSIS METHODS DSU CLAIMS                                                18

   6.4.2   CONCURRENT DELAYS DSU CLAIMS                                                     19

6.5     APPROACH                                                                           21

7.  REVIEW OF CONTRACTUAL INFORMATION (STEP 1)                                             22

7.1     RELEVANT CONTRACTUAL DOCUMENTS                                                     23

7.2     REVIEW OF THE RELEVANT CONTRACTUAL PROVISIONS                                      24

7.3     INFLUENCE OF THE CONTRACTUAL DOCUMENTS ON THE ANALYSIS                             28

8.  IS THE DELAY CRITICAL? (STEP 2)                                                        29


**8.1    MOST SUITABLE DELAY ANALYSIS METHOD**                                              **30**

8.1.1    AS-PLANNED VS AS-BUILT                                                                      30

8.1.2    IMPACTED AS-PLANNED                                                                         31

8.1.3    WINDOW ANALYSIS                                                                             32

8.1.4    TIME IMPACT ANALYSIS                                                                        33

8.1.5    COLLAPSED AS-BUILT                                                                          34

8.1.6    IMPACT OF SCHEDULE AVAILABILITY ON THE ANALYSIS METHOD                                      35

8.1.7    DELAY ANALYSIS METHODS CHOSEN                                                               36

**8.2    Analysis**                                                                                 **38**

8.2.1    PROJECT APPROACH                                                                            38

8.2.2    LOSS EVENT REPAIRS                                                                          41

8.2.3    SCHEDULE INTEGRITY                                                                          44

8.2.4    PROJECT COMPLETION DATES                                                                    45

8.2.5    TIME IMPACT ANALYSIS                                                                        46

8.2.6    AS-PLANNED VS AS-BUILT                                                                      49

8.2.7    WINDOW ANALYSIS                                                                             61

8.2.8    OTHER DELAYS                                                                                66

8.2.9    CALCULATION OF THE PERIOD OF DELAY                                                          73

**9.    CONCLUSIONS (STEP 4)**                                                                      **76**

**EXHIBITS**                                                                                        **77**

**REFERENCES**                                                                                      **77**



# LIST OF FIGURES

Figure 1 - Concrete Loss Incident    12

Figure 2 - Damaged support beam & Destroyed false car    13

Figure 3 - Basement: Debris from False Car, Crash Deck & Hoisting Equipment    13

Figure 4 - Basement: Suspended debris from ground floor & Damaged Equipment    14

Figure 5 - Elevator related construction deaths (CPWR)1    14

Figure 6 - Loss event: Cause and Effect    16

Figure 7 - DSU Concurrent delays6    20

Figure 8 - Analysis Approach    21

Figure 9 - Step 1: Review of Contractual Documentation    22

Figure 10 - Milestone Completion Dates (Pre-loss)    26

Figure 11 - Step 2: Determine the impact on completion    29

Figure 12 - Period of Delay    30

Figure 13 – Project Planning & Scheduling in response to Loss Event    35

Figure 14 - Loss event consequence considered in the analysis    37

Figure 15 - Project Completion Milestones    38

Figure 16 - Elevator temporary Manlift relationship    40

Figure 17 – Manlift    41

Figure 18 – Pre-loss Schedule Milestone Dates    47

Figure 19 - Corrected Concrete Fragnet    48

Figure 20 – Results of Time Impact Analysis    48

Figure 21 - Loss Event Impact on Completion (Time Impact Analysis)    49

Figure 22 - Elevator installation: Pre-loss vs As-built    50

Figure 23 - Manlift removal delay    51

Figure 24 - As Planned vs As Built Vertical Transportation    53

Figure 25 - Zipper Unit Delay    54

Figure 26 - Unit completion dates    56

Figure 27 - As-planned vs As-built (Unit Occupancy)    57

Figure 28 - Pre-loss completion dates vs As-built completion dates    60



Figure 29 - Concrete slab delay and Loss event repairs 66
Figure 30 - Loss event repairs Jan 15, 2016 to Mar 7, 2016 67
Figure 31 - Level 40 Rough-Ins Delay vs Elevator Delay (Jun 3, 2016 Schedule) 68
Figure 32 - Level 40 Rough-Ins Delay vs Elevator Delay (As-built Schedule) 69
Figure 33 - Fill in Curtain Wall, Storefront, Canopy & Covers 70
Figure 34 - Sales office loss and event repairs concurrency 71
Figure 35 - Nov 30, 2016 Pre-loss Schedule Update 74
Figure 36 - Period of Delay Calculation 75

## LIST OF TABLES

Table 1 - Post Lost Schedules 36
Table 2 - Loss Event Repair Activities 41
Table 3 - Fragnet Activity Amendment 43
Table 4 - Pre-loss Schedule Corrections 44
Table 5 - Elevator installation delay 51
Table 6 - Transport Rates: Temporary Manlift to Permanent Elevators 52
Table 7 - Zipper unit (level 20) delay 54
Table 8 -As-planned vs As-built (floor completion) 57
Table 9 - As-planned vs As-built (Unit completion) 59
Table 10 - Jan 4, 2016 Schedule Update 62
Table 11 - Feb16, 2016 Schedule Update 62
Table 12 – Mar 2, 2016 Schedule Update 63
Table 13 - Apr 11, 2016 Schedule Update 64
Table 14 - Jun 3, 2016 Schedule Update 64
Table 15 - Pre-loss Schedule Corrections 66
Table 16 - Lease Office Delay 71
Table 17 - Period of Delay Conclusion 75



# 1. INTRODUCTION

Xpera Group has been retained by the Allen Matkins law firm on behalf of Swinerton Builders and SM 10000 Property, LLC, to evaluate the impact of physical damage caused by a concrete form failure on the completion of the project and delivery of all 283 residential units for occupancy by tenants at 10000 Santa Monica Place, Los Angeles, CA. The observations and conclusions contained within the following report are those of Ted Bumgardner, a licensed General Contractor in the State of California and the owner, CEO, and RMO of Xpera Group, a California Corporation specializing in providing consulting services to the building industry. Xpera's services include construction management, market research, quality assurance, cost estimating, building envelope consulting, forensic expert witness services and technical consulting on a wide variety of construction specialties. This report was prepared with the assistance of Hendrik Prinsloo, PhD and Brian Hill of Xpera.

Over the past 40 years Mr. Bumgardner has actively managed and provided consulting services in regard to hundreds of projects involving schedule delays and associated damages. He is familiar with the standards governing construction scheduling, and contractual requirements relating to construction delay claims.

Mr. Bumgardner's Curriculum Vitae (CV), rate sheet and case list(cases in which he has provided expert testimony under oath within the past four years) is included in Exhibit A of this report along with the CV's for Dr. Hendrik Prinsloo and Mr. Brian Hill. Attached as Exhibit B is a list of the publications that Mr. Bumgardner has authored over the last four years or more.

# 2. STATUS OF INVESTIGATION

Over the course of our investigation Xpera reviewed numerous project job files from the SM 10000 Property, LLC, Swinerton Builders, and critical subcontractors and attended live and virtual meetings with SM 10000 Property, LLC, Swinerton, Schindler Elevator, and Conco Concrete. Xpera reviewed and performed analysis of Swinerton's progress schedules, and reviewed the reports and document files prepared by J.S. Held & Co., a consultant to Allianz Global Risks US Insurance Company (Allianz). A complete index of documents reviewed by Xpera is included in Exhibit C.



# 3. PROJECT BACKGROUND

On November 14, 2013, SM 10000 Property LLC (Owner), contracted with Swinerton Builders (Contractor) to construct the high-rise luxury rental property known as TEN THOUSAND, located at 10000 Santa Monica Place, Los Angeles, CA 90067. The contract required that substantial completion be achieved by no later than May 10, 2016.

The project includes a 40-story structure with 283 apartment units, extensive amenities, and two stories of underground parking. The tower is constructed of reinforced concrete, with a curtain wall glazing system.

To provide expedient vertical transportation for the building's occupants, the design called for a Schindler 7000 series elevator system capable of traveling in excess of over 1,500 feet per minute. The elevator system consisted of four passenger cars located in one bank of elevator shafts, and a separate freight elevator located in separate shaft.

Allianz provided a Contractors Installation/Builders Risk Insurance and Delayed Opening Insurance policy to the Owner that provided coverage to the Owner and Swinerton for a period that began on October 1, 2013 and was ultimately extended through December 31, 2016 (the "Builder's Risk policy").


# 4. EXECUTIVE SUMMARY

The project commencement date was April 2, 2014. Approximately halfway through the project, on December 2, 2015, the concrete subcontractor Conco was placing concrete elevator shaft walls at the 36th level. Toward the end of the work day a wall form failure allowed concrete to escape from the form into the elevator shaft. The form failure resulted in at least two tons of fluid concrete cascading down the elevator shaft though a temporary "crash deck" that had been constructed to protect workers and equipment, and down the shaft to the basement destroying the elevator installation that had already progressed to the 15th floor. Remedial action included the removal of damaged equipment and debris, the implementation of safety measures to secure the area, an assessment of the damage to identify equipment/material to be replaced and or repaired, ordering replacement equipment and undertaking a lengthy repair process. Following the loss event, insurance claims were submitted to Allianz by Swinerton and the Owner seeking reimbursement of expenses and payment of losses resulting from the loss event as allowed by the policy.

The purpose of this report is to provide an analysis and opinion of the time impact of the loss event on the completion of the project. The approach to the analysis included the following steps: (1) Assessing applicable contractual documentation and determination of policy provisions relevant to the analysis; (2) analyzing the delay to determine the impact on start-up of the project, and (3) developing final conclusions.

The assessment of the contractual documentation revealed that the policy document is the primary agreement that will inform the analysis. It was further determined that the concrete loss event meets the requirement for coverage set forth in the policy agreement. Therefore, the insured would be entitled to recover damages for a delay caused by a loss event to the extent the loss event delayed the start-up of the project.

No specific method of delay analysis is prescribed by the policy agreement for determining the length of a delay caused by a covered direct physical loss or damage and the policy language provides no specific guidance on how concurrent insured and uninsured delays should be analyzed. In absence of any prescriptive requirements in the policy language, industry accepted methods were utilized in the delay analysis.



An analysis of available writings on the subject revealed that very limited industry guidance specifically relating to delayed start up (DSU) insurance claims exists. The limited literature available provides some guidance on how the common construction industry delay analysis methods are applied to DSU claim analysis and how concurrent delays should be dealt with. We concluded that established and well-known construction delay analysis methods recognized by professional organizations are well suited to the task of analyzing construction delay in the context of builder's risk insurance claims and can be utilized for calculating the impact of delay in DSU claims. These methods should be used for that purpose to minimize the influence of subjective judgment and the risk of conflict and controversy. After consideration of the availability of contemporaneous schedule updates and considering the advantages and disadvantages of various established delay analysis methods it was determined that the combined application of the following methods would provide the most accurate view of the impact of the delay on completion of the project:

- Time Impact Analysis,
- As-planned vs As-Built Analysis, and,
- Window Analysis.

The Time Impact Analysis showed that the loss event would have delayed final completion of Floors 1 to 15 (TCO #2) by 129 days and Floors 16 to 31 (TCO #3) by 128 days and Floors 33 to 40 (TCO #4) by 128 days.

The As-planned vs As-built analysis concluded that the late completion of the permanent elevator installation compromised vertical transportation and delayed the completion of the units. The first 96 units (TCO#2) were delayed by 213 days, the next 128 units (TCO#3) were delayed for 225 days and the final 59 units (TCO#4) were delayed for 182 days.

The Window Analysis revealed that significant delay to the elevator installation resulted in delay to the manlift removal, which in turn delayed the completion of the "zipper units" which provided weather enclosure on 32 floors.

From the Window Analysis, other potentially concurrent delays were identified and analyzed to determine the controlling delay. It was concluded that the loss event was the controlling delay and primary cause of the overall project delay. The Window Analysis was not utilized to determine the number of days project completion was delayed.



In conclusion, all 3 industry recognized delay analysis methods utilized in the analysis showed that the loss event had a significant impact on the completion of the project and delayed occupancy of the units. The analysis methods applied were utilized to calculate the period of delay of the loss event. The calculations show that TCO#1 was delayed by 140 days, TCO#2 by 213 days, and TCO#4 by 182 days. Although there were other delays encountered after the loss event, none of those delays were found to have been the controlling cause of the overall delay.



## 5. LOSS EVENT

The incident occurred while casting the concrete sheer walls for the elevator shaft on the 36th floor on December 2, 2015. At least 2 tons of fluid concrete escaped through formwork that was utilized to cast the shear walls of the concrete elevator shaft. The failure went unnoticed and the leaked concrete gathered on a temporary crash deck that had been installed to protect workers and equipment in the elevator shaft.



*Figure 1 - Concrete Loss Incident*

After some time, the weight of the concrete exceeded the carrying capacity of the crash deck. The crash deck collapsed resulting in the concrete plummeting to the basement



destroying the elevator installation that had already progressed to the 15th floor and damaging the elevator installation equipment. The following photographs shows some of the resulting damage:




*Figure 2 - Damaged support beam & Destroyed false car*




*Figure 3 - Basement: Debris from False Car, Crash Deck & Hoisting Equipment*





*Figure 4 - Basement: Suspended debris from ground floor & Damaged Equipment*

It was fortunate that the loss event took place after hours when the elevator installation crew were not present in the elevator shaft. The "near-miss" incident led to serious safety concerns and caused repercussions in the elevator industry nationally. According to the Center for Construction Research and Training (CPWR) the rate of elevator related construction deaths, doubled from 2003 to 2016, with a peak of 37 in 2015.[1] There was a concerted effort underway by elevator unions to try and curb elevator related accidents. This incident, along with the increasing frequency of construction related fatalities associated with elevator work, lead to nationwide changes to improve worker safety.



*Figure 5 - Elevator related construction deaths (CPWR)[1]*



The elevator sub-contractor, Schindler Elevator Co., was not able to re-commence work in the elevator shaft until the safety concerns were resolved to the satisfaction of its national safety officer and the International Union of Elevator Constructors (IUEC) to which its workers belong. The loss event required extensive remedial action as well as the implementation of worker safety provisions and included the following activities:

- Damaged equipment and debris had to be removed from the bottom of the shaft, and at various locations within the elevator shaft and adjacent areas.

- Safety measures had to be implemented to provide for worker safety in the shafts and adjacent areas. Existing safety barriers had to be redesigned and replaced or repaired and safety netting on various floors had to be replaced.

- The damage had to be carefully assessed to identify which equipment/material to be replaced and which equipment/material could be repaired.

- New equipment and material had to be ordered.

- Repairs had to be executed and replacement equipment and material had to be installed.



# 6. ANALYSIS METHODOLOGY

## 6.1   OBJECTIVE

The main objective of the analysis is to determine the effect of the loss event on the planned start of commercial operations and the substantial completion of construction. Delay analysis considers the impact of a delay from a cause and effect perspective. In this case, the concrete loss event (cause) impacted the elevator installation and downstream activities (effect). The analysis will determine whether and to what extent the loss event delayed elevator and related activities and effected the planned occupancy of the project:



*Figure 6 - Loss event: Cause and Effect*

## 6.2   CONTEXT

When determining the methodology for analysis it is important to consider the context of the claim. This particular claim is for the delayed start of commercial operations in terms of an insurance policy. Given the context the following should be determined:

- Can the recognized construction industry delay analysis methods be utilized for the analysis?

- Would construction industry standard practice relating to concurrent delays and float ownership apply?  "Float" is the time an activity can be delayed before it's delay affects the next subsequent activity and the project completion.



## 6.3   CONSTRUCTION INDUSTRY DELAY ANALYSIS

Delay analysis methods utilized in the construction industry are formalized in best practice guides such as the American Association of Cost Engineers (AACE) Forensic Schedule Analysis Practice Note and the Delay and Disruption Protocol by the UK based Society of Construction Law. All of the industry recognized delay analysis methods involve various techniques in the review of project schedules to determine the effect of a delay on project completion.

Project plans (rereferred to as project schedules) are developed using the critical path method (CPM). The critical path method was developed in the 1950s and is now commonly used with all forms of projects. The benefits of the CPM are:

- It provides a concise project plan in the form of a schedule that depicts the activities required to complete a project graphically.
- It shows timeframes for each activity.
- It shows dependencies between activities.
- It highlights the most critical activities by showing the critical path. Any delay to activities on the critical path will delay the project completion.
- It allows for tracking and reporting project progress in terms of the planned date for project completion

There are 5 core methods commonly utilized to analyze CPM schedules and assess  the impact of delays on project completion:

- As-planned vs As-built
- Impacted As-planned
- Collapsed As-built
- Window Analysis
- Time Impact Analysis

Practice notes published by construction industry organizations like the AACE and others provide guidance on how to execute these methods.


## 6.4    DELAY START UP (DSU) INSURANCE CLAIMS

Very limited industry guidance specifically relating to delay start up (DSU) insurance claims is in existence. Two organizations provide some degree of guidance:

- IMIA, a network of experts in Engineering Insurance from around the world that acts as a discussion forum and produces papers on topics of Engineering Insurance. [2]

- LEG, a consultative body for insurers of engineering class risks produces various industry recognized papers, coverage clauses and guidance notes. Membership is drawn from the various insurance and re-insurance companies who are actively involved in underwriting risks within the engineering classes. [3]

IMIA and LEG collectively produced a practice note on Delay in Start Up Insurance. The 2-page practice note generally deals with insurance related matters like coverage, indemnity and deductibles. [4]

### 6.4.1   DELAY ANALYSIS METHODS DSU CLAIMS

The practice note does not discuss methods to be utilized to determine the delay to commercial operations in DSU claims. Literature on methods to calculate the impact of a delay in the context of DSU claims is extremely limited. An article appearing on the Lexology website (the most comprehensive source of international legal updates, analysis and insights), titled:  Delay in Start Up insurance and Delay Analysis Techniques, reviews the common construction delay analysis methods when applied in DSU claims. The article utilizes standard DSU policy wording to review the common construction delay analysis methods to determine the most suitable delay analysis method.[5]

The objective of the delay analyses supporting delay claims made in terms of a construction agreement between the owner and contractor is to calculate the number of days an event delayed project completion. Similarly, the objective of the analysis of a DSU claim is to determine the number of days a loss event delayed the planned start of commercial operations. In most projects the project completion date is when commercial operations commence, or could commence. It is clear that the delay analysis methods utilized in construction contract claims can be utilized for DSU claims because the objectives are in essence the same.



When a delay is analyzed in projects where a CPM schedule is utilized to plan and execute construction, accurate results can only be obtained if CPM delay analysis methods are utilized. To achieve verifiable and reliable results in the context of a complex construction schedule, industry recognized delay analysis methods are the only methods that can or should be used to determine the number of days planned occupancy was delayed by a loss event in DSU claims.

### 6.4.2 CONCURRENT DELAYS DSU CLAIMS

Concurrent delays during a construction project occur when a contractor delay happens at the same time or overlaps with an owner delay. In the context of DSU claims, concurrent delays will have to be addressed when an insured delay takes place at the same time as, or overlaps with, an uninsured delay.

The DSU practice note does not address concurrent insured and uninsured delays. Literature on concurrent delays relating to DSU claims is exceptionally limited. To address this knowledge gap, the world's second largest reinsurer, Swiss Reinsurance Company Ltd., commonly known as Swiss Re, produced a brochure to assist underwriters and the parties involved in large construction projects to provide some fundamentals for start-up insurance.[6] The diagram below summarizes the approach to concurrent delay in the brochure.




*Figure 7 - DSU Concurrent delays[6]*

The approach to address concurrent delays contained in the brochure is consistent with the approach described in construction industry guidance documents. In claims made in terms of construction agreements the contractor is only entitled to be compensated for delays that are categorized as an owner's risk. Similarly, DSU insurance agreements only indemnify for insured delays (delays related to the loss event). This guidance indicates that construction industry best practices in dealing with concurrent delays are also applicable in DSU claims.



## 6.5   APPROACH

To provide structure to the analysis the step-by-step approach explained below was followed to reach final conclusions.



**APPROACH**

**STEP 1** Review contractual documents → Opine on how contractual documents informs analysis

- Review contractual documents
- Identify relevant provisions that will influence the analysis
- Formulate opinion on how contractual documents informs the analysis

**STEP 2** Determine whether the loss delayed the start up → Opine on criticality

- Determine the most suitable delay analysis methods to accurately reflect the effect of the delay
- Apply the chosen delay analysis methods
- Opine on whether the delay event impacted the planned start up date of commercial operations and to what extent

**STEP 3** Consider findings of Step 1 - 3 → Final conclusions

- Distill findings into final conclusions
- Draft and review report
- Submit report

*Figure 8 - Analysis Approach*



# 7. REVIEW OF CONTRACTUAL INFORMATION (STEP 1)

The methodology followed for step 1, the review of the contractual information, is described in Figure 9.



**Figure 9** - *Step 1: Review of Contractual Documentation*


## 7.1  RELEVANT CONTRACTUAL DOCUMENTS

The following contractual documents were considered to determine how and to what extent they influence the analysis:

- Allianz Insurance Policy No. ATO 3014509 (AGRUS00006301)
- Construction Agreement (SB30008891) and AIA General Conditions (SB30008932)

| Contractual documentation | Comments |
|---|---|
| 1. Allianz Policy (parties: SM 10000 Property, LLC & Allianz Global Risks US Insurance Company) (SM0056512)<br><br>2. Agreement Between Owner and Contractor for Construction where the basis for payment is the COST OF THE WORK PLUS A FEE with a negotiated Guaranteed Maximum Price (parties: SM 10000 Property, LLC & Swinerton) (Owner Contractor Agreement)<br><br>3. AIA A201 2007 General Conditions  (parties: SM 10000 Property, LLC & Swinerton) (AIA A201) | • The insurance policy is the first agreement that will inform the delay analysis because the claim is an insurance claim under the policy.<br><br>• The Delayed Opening Insurance extension part of the Insurance Policy is the relevant coverage as it relates to incidents delaying the start of commercial operations.<br><br>• The insurance policy was issued in reference to  work performed under the terms of the construction contract. Therefore, the construction agreement is relevant to  the  purpose of the insurance and the interest insured by the insurance policy. |


## 7.2  REVIEW OF THE RELEVANT CONTRACTUAL PROVISIONS

The following provisions of the Allianz insurance policy and the Delayed Opening Insurance Extension (SM0056512) are relevant:

| Provision |
|---|
| **10.**  **BASIS OF INDEMNITY:**<br><br>Subject to the Limit of Liability specified in the Schedule, the Insured will be indemnified for:<br><br>A.  Delayed Start-Up Expenses, during the Period of Delay, to the extent that such expenses are actually and necessarily incurred, to enable the Insured to commence commercial operations in the manner originally planned.<br><br>B.  Loss of Gross Earnings and / or Loss of Rental Income which, but for the delay, would have been derived from the Insured Project, during the Period of Delay.  Loss of Gross Earnings and / or Loss of Rental Income shall be adjusted, as may be necessary, to provide for market trends or special circumstances.  The amount thus adjusted shall represent as near as may be reasonably practicable the Loss of Gross Earnings and / or Loss of Rental Income. |

1. The insurance policy indemnifies for:

   a) Delayed-Start-Up Expenses during the **Period of Delay** to enable the insured to commence commercial operations in the **manner originally planned.**

   b) Loss of Rental Income which, **but for the delay**, **would have been derived** from the Insured Project during the **Period of Delay**

| |
|---|
| B.  "Period of Delay"<br><br>Period of Delay shall mean the period of time between the Scheduled Date of Completion and the actual date on which commercial operations or tenant / owner occupancy commenced or could have commenced; however, not exceeding such delay as would result if the loss or damage were repaired or replaced with the exercise of due diligence and dispatch, but in no event exceeding the Period of Indemnity stated in the Schedule for all indemnifiable Occurrences combined.  The Period of Delay shall not be terminated by the expiration or cancellation of the Policy with respect to indemnity payable hereunder in direct consequence of insured loss or damage occurring prior to such expiration or cancellation. |

2. The **Period of Delay** is defined as the period of time between:

   a) The **Scheduled Date of Completion** and

   b) The **Actual Date** when commercial operations and/or tenant occupancy commenced or could have commenced



<table>
<tr><td><strong>12.</strong></td><td colspan="2"><strong>DEFINITIONS:</strong></td></tr>
<tr><td></td><td>A.</td><td>"Scheduled Date of Completion"</td></tr>
<tr><td></td><td></td><td>Scheduled Date of Completion shall mean the later of the following:</td></tr>
<tr><td></td><td>(i)</td><td>The date stated in the Schedule; or</td></tr>
<tr><td></td><td>(ii)</td><td>The date on which, but for the insured loss or damage, commercial operations or tenant/ owner occupancy would have commenced.</td></tr>
</table>

3. The Scheduled Date of Completion is in turn defined as the later of:

   a) The Date in the Schedule; or

   b) The Date when **tenant occupancy would have commenced but for the insured loss**

The word "Schedule" in this provision refers to the Policy Schedule. January 1, 2016 is reflected in the Policy Schedule as the Scheduled Date of completion. The commencement of commercial operations or the tenant occupancy date would be used as the Scheduled Date of Completion if it occurs later than the Date in the Schedule



The following provisions of the construction agreements between the Owner and Swinerton for construction are relevant:

| Provision and Interpretation |
| --- |

**ARTICLE 4     DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION**

**4.1     Contract Time.**

4.1.1     <u>Contract Time for the Work</u>. Assuming start of construction on or before **November 18, 2013**, the Contractor shall achieve Substantial Completion of the entire Work no later than **May 10, 2016**, subject to adjustments of this Contract Time as provided in the Contract Documents. It is agreed that Contractor will work diligently with Owner to obtain early occupancy of agreed-upon portions of the Work. The Construction Schedule, subject to Owner-approved updates, is attached hereto as **Exhibit E.**

4.1.2     <u>Completion Deadlines/Milestones</u>. The Contractor shall achieve the following Completion Deadlines:


> (1)  **Milestone 1**. Completion of: (a) the Leasing Office; (b) one "mock-up" unit on the lower floor, as described in Paragraph **14.13** herein and elsewhere in the Contract Documents; and (c) additional Work described in **Exhibit J**, no later than **September 4, 2015** (as such may be extended in accordance with the Contract Documents);
>
> (2)  **Milestone 2**. Substantial Completion of all Work called for in the Contract Documents for **Floors 1-15 (96 units)**, including all amenities and common areas, a proportionate share of parking spaces, support areas, and elevators plus ancillary spaces required by code (e.g., boilers, generator, etc.) no later than **March 1, 2016** (as such may be extended in accordance with the Contract Documents);
>
> (3)  **Milestone 3**. Substantial Completion of all Work called for in the Contract Documents for **Floors 16-31 (128 units)**, including a proportionate share of parking spaces, support areas, and elevators plus ancillary spaces required by code (e.g., boilers, generator, etc.) no later than **March 29, 2016** (as such may be extended in accordance with the Contract Documents); and
>
> (4)  **Milestone 4**. Substantial Completion of all Work called for in the Contract Documents for **Floors 32-40 (59 units)** and the balance of the Project, including all remaining parking spaces, support areas, elevators and roof top gardens no later than **May 10, 2016** (as such may be extended in accordance with the Contract Documents).

1.  The Owner Contractor Agreement provides for early occupation of portions of the work. Early occupation is formalized by introducing a milestone project completion process. The milestone completion will allow a phased occupation of the building. The contractual completion dates for each milestone at the time of the loss event is reflected below:



*Figure 10 - Milestone Completion Dates (Pre-loss)*



> 4.1.3     Definition of Substantial Completion.   As provided in Section 9.8 of the General Conditions, Substantial Completion is defined to mean the stage in the progress of the Work when:
>
>          (1)     the Work is sufficiently complete in accordance with the Contract Documents as determined by the Owner and certified by the Architect and lender's consultants so that the Owner can fully occupy and utilize the Work, or portions thereof, for its intended use;
>
>          (2)     a temporary certificate of occupancy ("TCO") (or equivalent inspection sign-off) has been issued by the applicable governing agency for the entire Project or designated portion thereof (Contractor shall endeavor to provide Owner **one hundred twenty (120) calendar days** advance notice of receiving a TCO for Owner's planning purposes), except to the extent the TCO is not issued due to factors that are not Contractor's responsibility under the Contract Documents;
>
>          (3)     all systems included in the Work are operational as designed and tested;
>
>          (4)     all final finishes required by the Contract Documents for Work are in place;
>
>          (5)     all common areas and building-wide systems necessary for occupancy, or portions thereof including, but not limited to, the pool, landscaping, parking and elevators, are in move-in condition;
>
>          (6)     units are in move-in condition; and
>
>          (7)     Contractor has submitted to Owner a written certification, to the best of Contractor's knowledge at the time, that: (i) all remaining Work, including all Punch List Work, has been or will be completed within the number of days determined by mutual agreement of Owner and Contractor as specified in the Certificate

2. The definition of substantial completion further enforces the approach to complete the project in portions to make some units available while construction is still underway. Seven requirements must be met to reach substantial completion. Three are particularly significant:

- a temporary certificate of occupancy issued by the applicable governing agency

- the requirement that the units need to be in move-in condition

- and all building systems should be operational.

> **§ 9.8.4** When the Work or designated portion thereof is substantially complete, the Architect will prepare a Certificate of Substantial Completion that shall establish the date of Substantial Completion, shall establish responsibilities of the Owner and Contractor for security, maintenance, heat, utilities, damage to the Work and insurance, and shall fix the time within which the Contractor shall finish all items on the list accompanying the Certificate. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion.

3. According to provision 9.8.4 of the AIA A201 2007, when the 7 requirements referred to in the definition of Substantial Completion are met, the Architect will issue a Certificate of Substantial Completion. The Substantial Completion Certificate shall establish the date of Substantial Completion.


## 7.3    INFLUENCE OF THE CONTRACTUAL DOCUMENTS ON THE ANALYSIS

The analysis will be influenced by the contractual documentation in terms of the following:

### OBJECTIVE OF THE ANALYSIS

According to the policy, the insured is indemnified for:

- Delayed-Start-Up Expenses during the **Period of Delay** to enable the insured to commence commercial operations in the **manner originally planned.**
- Loss of Rental Income which, **but for the delay**, **would have been derived** from the Insured Project during the **Period of Delay**

The **Period of Delay** is defined as the period of time between the **Scheduled Date of Completion** and the **Actual Date** when tenant occupancy commenced or could have commenced.

The objective of the analysis is to determine Period of Delay, the number of days the planned occupancy of the units was delayed due to the loss event.

### METHOD OF THE ANALYSIS

- No specific method of analysis is prescribed by the policy agreement. An industry recognized analysis method that will be able to achieve the objective of the analysis should be utilized.

- No guidance is provided in the policy documents on how concurrent insured and uninsured delays should be dealt with. Industry accepted methods dealing with concurrent delays should be utilized.


# 8. IS THE DELAY CRITICAL? (STEP 2)



*Figure 11 - Step 2: Determine the impact on completion*

Step 2 of the analysis sets out to determine whether the delay is critical. Critical delays are delays that impact the critical path of a project. When the critical path is impacted the completion date of the project will be delayed.

Some contractual agreements would prescribe the use of one of the industry recognized delay analysis methods. When deciding on a delay analysis method the contract document should be reviewed to determine whether a specific method is prescribed. The contractual document review done as part of step 2 revealed that the policy



document does not prescribe an analysis method to be utilized to determine the extent of the delay to the occupancy date.

## 8.1 MOST SUITABLE DELAY ANALYSIS METHOD

In absence of any prescribed delay analysis method in the policy the five common delay analysis methods were assessed to determine which method or methods will be the most suitable in context of the claim. The policy language was considered to help identify the most appropriate method.

The review of the contractual documentation during step 2 concluded that the delay analysis method utilized should be able to determine the Period of Delay.

The **Period of Delay**, as defined in the policy, can be summarized as follows:



*Figure 12 - Period of Delay*

To determine the Period of Delay the following will have to be determined:

- The date when tenant occupancy would have commenced if the loss did not occur.
- Actual date of occupancy or date when tenant occupancy was possible.

The policy objectives were utilized to evaluate common delay analysis methods with the objective to determine which method or methods will be the most suitable to accurate establish the Period of Delay.

### 8.1.1 AS-PLANNED VS AS-BUILT

| Description: |
|:---:|
| A comparison of critical path activities on the as-planned (baseline) schedule with the same activities on the as-built schedule to establish the net impact on the completion date. |
| **Requirements to utilize this method:** |


- Baseline Schedule
- As-built Schedule

| Advantage and Disadvantage: |
| --- |

**Advantage:**
- This method reduces uncertainty and subjectivity because actual activity durations are utilized in the analysis.

**Disadvantage:**
- It will be difficult to determine the date when occupancy would have occurred but for the loss because the collective impact of all delays and the effect of acceleration are reflected in the as-built schedule.

| Review of Suitability: |
| --- |

As-Planned vs As-Built method would be useful to compare durations of pre-loss and post loss activities. However, it would be difficult to isolate the impact of the loss event delay using this method on its own because the impact of other delays and acceleration have affected the as-built schedule.

## 8.1.2  IMPACTED AS-PLANNED

| Description: |
| --- |

Determine the effect on the project completion date by incorporating the delay into the initial as-planned (baseline) schedule.

| Requirements to utilize this method: |
| --- |

- Baseline Schedule with critical path
- Delay event information

| Advantage and Disadvantages: |
| --- |

**Advantage:**
- This method is able to determine the impact of a delay on completion without being influenced by post delay sequence changes and acceleration.

**Disadvantages:**
- This method is a prospective method that forecasts what the impact would have been if activities were not re-sequenced or accelerated. The method is limited in that it does not consider acceleration and other delays that might have occurred after the delay.
- This method only relies on the as-planned schedule, any deficiencies in this schedule will influence the accuracy of the analysis.



- Delays that occurred prior to the loss event are not taken into account because the baseline schedule is utilized.

| Review of Suitability: |
|---|
| Some delays occurred prior to the loss event. If the Impacted As-Planned method is to be utilized, the impact of the pre-loss delays would in addition to the loss event contribute to the overall delay to the completion date. This would make it difficult to isolate the impact of the loss event on completion as required by the policy. |

### 8.1.3  WINDOW ANALYSIS

| Description: |
|---|
| Determine the effect on a project completion date by analysing the delays within a specific windows of time. |

| Requirements to utilize this method: |
|---|
| • Baseline Schedule with critical path<br>• Delay event information<br>• Regular schedule updates<br>• As-built schedule |

| Advantage and Disadvantages: |
|---|
| **Advantage:**<br>• This method can provide information on how delays impacted progress throughout the project and can reflect changes in the critical path.<br>**Disadvantages:**<br>• Regular schedule updates are required to fully apply this method. The accuracy to determine the overall impact on completion will be negatively influenced if regular schedule updates are not available.<br>• The results of the methods only indicate the delays within the time window in question. |

| Review of Suitability: |
|---|
| The application of the Window Analysis will be limited by the number of schedule updates that are available after the loss event. However, this method would be useful to pinpoint delays that were experienced for the windows of time for which schedules are available. |



### 8.1.4 TIME IMPACT ANALYSIS

| Description: |
| --- |
| Determine the effect on the project completion date by incorporating the delay into a contemporaneous schedule. |

| Requirements to utilize this method: |
| --- |
| • Baseline Schedule with critical path<br>• Contemporaneously updated Baseline Schedule<br>• Delay event information |

| Advantage and Disadvantages: |
| --- |
| **Advantage:**<br>• This method is able to determine the impact of a delay on completion without being influenced by post delay sequence changes and acceleration.<br>**Disadvantage:**<br>• This method is a prospective method that forecasts what the impact would have been if activities were not re-sequenced or accelerated. The method is limited in that it does not consider acceleration and other delays that might have occurred after the delay period under consideration.<br>• This method only relies on the updated baseline schedule; any deficiencies in this schedule will influence the accuracy of the analysis. |

| Review of Suitability: |
| --- |
| The Time Impact Analysis makes use of a schedule that is contemporaneous at the time of the delay (loss event). The impact of the pre-loss event delays would be reflected in the contemporaneous schedule and would not influence the analysis of the loss event. An added benefit of the Time Impact Analysis is that it is not influenced by the re-sequencing of activities and the impact of acceleration on completion. Significant resequencing of activities occurred after the loss event to reduce the impact on completion. This method would be able to provide accurate results in this type of scenario but would not reflect downstream resequencing and acceleration. |



## 8.1.5  COLLAPSED AS-BUILT

| Description: |
|---|
| Determine the effect on the project completion date by eliminating delays from the as-built schedule. |

| Requirements to utilize this method: |
|---|
| • As-built schedule with critical path<br>• Delay event information |

| Advantage and Disadvantages: |
|---|

**Advantage:**
- This method is executed retrospectively and has the benefit of hindsight when assessing the impact of the delay. In some scenarios, this might translate into more accurate results.

**Disadvantages:**
- Errors in the as-built schedule would influence the accuracy of results obtained when applying this method.
- An as-built schedule with accurate logic and critical path is required to apply this method. This type of schedule is seldom available since it is a common practice for contractors to update with actual start and finish dates independent of and without making logic corrections as the project progresses.
- It will be difficult to get an accurate view of what the completion date would have been but for the delay by using a schedule that includes logic and decisions made based on the response to the loss event.

| Review of Suitability: |
|---|

This analysis method is highly dependent on an as-built schedule with accurate logic. Most as-built schedules do not include accurate schedule logic because the activity update process would normally eliminate the schedule logic. Unfortunately, after assessing the as-built schedule for the project it appears that the schedule logic was impacted by the update of the activities with actual information, as is typical. It will not be possible to make use of this method unless the entire as-built schedule is reconstructed. With more than 7000 activities in the schedule reconstruction of the as-built schedule logic will be not only extremely time consuming but will add elements of subjectivity that all accepted methods are intended to minimize.


## 8.1.6 IMPACT OF SCHEDULE AVAILABILITY ON THE ANALYSIS METHOD

To be able to make an informed choice on which delay analysis method to use the number, type and quality of schedules available should be considered.

The loss event influenced the project planning and scheduling approach followed. The original project baseline schedule utilized was replaced with a recovery (mitigation) schedule after the loss event. After the occurrence of the loss, efforts were made to minimize the impact of the loss on project completion by the re-sequencing and acceleration of activities. The re-sequencing was captured in the recovery schedule that was produced on February 16, 2016. No project schedule updates were done in the final months of the project. During this period, it appears that an Excel Spreadsheet replaced the Primavera P6 project schedules as main planning tool for the project. This spreadsheet, titled: 10 000 Move In Matrix provided completion dates for all units. It appears, that the completion dates of the units were prioritized in terms of leasing of units by tenats.



***Figure 13 – Project Planning & Scheduling in response to Loss Event***

The post loss duration was 19 months starting on December 3, 2015 and ending on July 1, 2017. The first occupancy was January 1, 2017. During the period between December 2015 and January 2017, 8 schedules were produced:

- 3 Schedules reporting on the Pre-loss Baseline Schedule
- 1 Recovery Schedule



- 2 Schedules reporting on the Recovery Schedule
- 2 As-built schedules

No P6 schedule updates were produced after June 2016.

***Table 1 - Post Lost Schedules***

| # | Date | Schedule Name | Type |
|---|------|---------------|------|
| 1 | Nov 30, 2015 | S51K | Pre-loss; Update of baseline |
| 2 | Jan 4, 2016 | S53K | Update of baseline |
| 3 | Feb 16, 2016 | S54K | Recovery Schedule |
| 4 | Mar 2, 2016 | S56K | Update of baseline |
| 5 | Apr 11, 2016 | S58K | Update on Recovery Schedule |
| 6 | May 31, 2016/ Jul 5, 2016 | As-built | As-built |
| 7 | Jun 3, 2016 | S60L | Update on Recovery Schedule |
| 8 | May 31, 2017 | As-built | As-built |

After the occurrence of the loss event, 2 schedule updates (January 4, 2016 & March 2, 2016) still reported progress in terms of the pre-loss baseline schedule. During February 2016 a recovery schedule was produced. The recovery schedule was a new schedule that incorporated the re-sequencing of activities and acceleration with the goal to provide a plan to still achieve the intended pre-loss completion date. The April 11, 2016 schedule update and the June 3, 2016 schedule update reported progress on the recovery schedule.

The re-sequencing added a layer of complication to the analysis due to the difficulty in separating the impact of the loss event from the effect of acceleration when drawing conclusions from the comparison of the planned completion dates of pre-loss activities with the actual post loss completion dates.

### 8.1.7   DELAY ANALYSIS METHODS CHOSEN

After considering the availability of schedules and evaluating the advantages and disadvantages of each of the standard analysis methods an informed choice of method could be made.


The loss event had several consequences (depicted in Figure 14) that make the analysis very complex:

- The loss event introduced new repair and recovery activities into the schedule.
- A large number of activities in the schedule were impacted by the loss event
- To minimize the impact of the loss event, activities had been re-sequenced.
-  A large number of activities were accelerated in an attempt mitigate the effect of the loss event on the planned pre-loss completion date.
- It is possible that independent delay (delays not directly related to the loss event) occurred.
- A new schedule with re-sequenced activities was introduced in response to the loss event.



*Figure 14 - Loss event consequence considered in the analysis*

Because of the complexity, more than one analysis method was utilized to produce the most accurate and reliable results. The time impact analysis is helpful to determine the impact of the loss event without being influenced by the re-sequencing of activities, acceleration and the occurrence of independent delays. The main limitation of the time impact analysis is that it does not take into account actual activity execution after the loss event.  This shortcoming can be addressed by performing an as-planned vs as-built analysis. The as-planned vs as-built analysis is limited by the fact that the results would provide the overall project delay without isolating the impact of independent delays and acceleration.  Those independent delays can be identified and address by applying the Window Analysis. Therefore, combining these 3 delays analysis methods will produce the most accurate results.



## 8.2   Analysis

### 8.2.1   PROJECT APPROACH

#### a)  The Owner's Requirements

The owner planned to make 283 apartments available to the high-end rental market.



*The dates reflect the TOC dates in the Pre-loss Schedule (S51K; Nov 30, 2015)

***Figure 15 - Project Completion Milestones***

10911 Technology Place, San Diego, CA 92127

(858) 436-7770 – www.xperagroup.com



To make units available for occupation as soon as possible the owner group's intention was to follow a phased construction process. This approach would enable lower floor units to be made available for occupation while construction was still underway of the units located on the floors above. The image above depicts the phased approached formalized by means of the construction completion milestones stipulated in the Owner Contractor Agreement.

### b) Construction Approach

Numerous constraints are faced in the construction of high-rise buildings. Perhaps the most significant is the limited working and storage space available on the job site. To address this constraint a just-in-time production process is normally followed. This calls for equipment and material to be delivered to site, just in time for the installation process. Because limited storage is available on the job site it is important that the material is immediately transported to the floor where it is needed.

Another constraint is access to the large number of floors that are not on ground level. An effective vertical transportation system is required to facilitate material movement and workers access the upper floors swiftly.

The project schedules and documentation reveal that the construction execution approach was to commence with the tower concrete structure closely followed by the elevator installation. The elevator installation was sequenced to allow elevator work to commence in parallel but marginally lagging the concrete tower construction.

This approach would assist to complete the internal elevator system as quickly as possible to be able to use it for vertical transportation during construction. To facilitate access to the upper floors in the interim a temporary external hoist (referred to in the schedule as a manlift) was fixed to the façade of the building to be utilized until the internal elevator installation was functional.

The extract of the pre-loss schedule (S51K; Nov 30, 2015) shows that the intention was to remove the temporary manlift on May 9, 2016 when Jump 3 of the elevator installation was completed.



| Activity ID | Activity Name | Start | Finish | Predecessors |
|---|---|---|---|---|
| T.ML.205 | Double Man lift Down | | 09-May-16 | T.ML.215, EV-T-324, T.M... |
| T.ML.215 | Remove Manlift | 04-May-16 | 09-May-16 | EV-T-324 |

| Jump 3 (29 - 40 | | 09-Feb-16 | 11-May-16 |
|---|---|---|---|
| EV-T-312 | Build Car Frames | 09-Feb-16 | 17-Feb-16 |
| EV-T-313 | Rope Car and GOV. AND HOIST CWT. FRAMES | 18-Feb-16 | 02-Mar-16 |
| EV-T-315 | Install Hall Fixtures | 09-Feb-16 | 10-Feb-16 |
| EV-T-316 | Install T.C. | 03-Mar-16 | 04-Mar-16 |
| EV-T-317 | Remove False Cars | 07-Mar-16 | 08-Mar-16 |
| EV-T-318 | Install Compensation | 09-Mar-16 | 22-Mar-16 |
| EV-T-319 | Pipe and Wire Hatch/Install MCKEE SYSTEM | 09-Mar-16 | 22-Mar-16 |
| EV-T-320 | Install Facia | 21-Mar-16 | 25-Mar-16 |
| EV-T-321 | Install Vanes, SNAGS, ETC. | 28-Mar-16 | 01-Apr-16 |
| EV-T-322 | Build and Wire Cab | 28-Mar-16 | 15-Apr-16 |
| EV-T-323 | Adjust Car | 18-Apr-16 | 22-Apr-16 |
| EV-T-324 | Inspect Elevator - TEMP CARS | 02-May-16 | 03-May-16 |
| EV-T-325 | STATE INSPECTIONS - FINAL | 04-May-16 | 11-May-16 |

*Figure 16* - *Elevator temporary Manlift relationship*

Once the manlift was removed, work to complete the closing in of the section of the external glass façade where the manlift was situated could commence. This would fully weatherproof the building allowing all internal finishes to be completed and the required commissioning and performance testing of building systems to take place.

Although this approach would be beneficial to achieve the phased completion requirement, the downside is that the completion of the apartments next to the manlift (referred to as zipper units in the schedule) could only take place once the manlift was removed.





*Figure 17 – Manlift*

Having the permanent elevator installation available early was a prerequisite to achieve the staged completion requirement where floor 1 to 15 (96 units) would be completed and made available first for occupancy. This would be followed by the completion and handover for occupancy of floor 16 to 32 (128 units). The final stage of completion would include floor 32 to 40 (59 units) and all areas that had not already been completed.

## 8.2.2  LOSS EVENT REPAIRS

Repair and recovery activities that were undertaken as a result of the loss event were summarized in a schedule fragnet by Swinerton. A fragnet is a fragmentary schedule network that is used to show the sequencing of new activities proposed to be added to an existing schedule. To test the accuracy of the fragnet each activity was reviewed to substantiate the dates provided.

### Table 2 - Loss Event Repair Activities

| ID | Description | Dates | Comments |
|----|-------------|-------|----------|
| A13310 | Replace Safety Netting | 12/08/15 01/06/16 | Several references are made to this activity in the Schindler daily reports and Schindler email dated Feb 2, 2017. |
| X.1000 | Concrete Blowout Incident | 12/02/15 | Loss event date is captured in the Schindler daily reports and several other documents. |


| X.1010 | Cleanup Concrete and Crash Deck Debris | 12/03/15 12/07/15 | The Schindler daily reports and several other documents makes reference to the cleaning activities. |
|--------|-----------------|-----------|-------------------|
| X.1020 | Suspend Elevator Work | 12/03/15 | Confirmed by the Schindler daily reports. |
| X.1030 | Schindler Initial Damage Evaluation of Temp Equipment | 12/08/15 12/11/15 | Schindler daily reports refers to the assessment of damage. |
| X.1040 | Crash Deck Design | 12/14/15 01/14/16 | The crash deck design is the topic of several emails between Swinerton and Schindler. |
| X.1050 | Procure Damaged Elevator Equipment | 12/14/15 02/03/16 | Several Schindler daily report entries refer to equipment delivery. |
| X.1060 | Procure Crash Deck Material | 01/15/16 01/25/16 | Confirmed by email correspondence between Swinerton to Schindler. |
| X.1070 | Build Crash Decks to Start Repair Work | 01/25/16 01/28/16 | Confirmed by email correspondence between Swinerton to Schindler. |
| X.1080 | Dismantle Core Forming System & Placing Boom | 01/29/16 02/03/16 | Captured in the CONCO daily reports |
| X.1090 | Rebuild False Cars | 02/04/16 02/12/16 | Captured in Schindler daily reports (false cars referred to as skips) |
| X.1100 | Schindler Cleanup | 02/04/16 02/17/16 | Reflected in Schindler daily reports |
| X.1110 | Schindler Inspect Shaft for Damage | 02/16/16 02/17/16 | Schindler Head office damage report dated Feb 18, 2016 |
| X.1120 | Schindler Internal Engineer's Evaluation/ Report | 02/18/16 | Schindler Head office damage report was issued on Feb 18, 2016 |
| X.1130 | Dried in Machine Room | 04/08/16 | Email for Peter Ruiz (Swinerton) sent on Friday, April 8, 2016 to Ralph Testa Jr (Schindler) confirms completion of machine room |
| X.1140 | Complete Hoistway Work from Level 17 Down | 03/11/16 03/31/16 | Not in Schindler diaries – search for any substantiating docs? |
| X.1150 | Re-establish Target Lines | 04/18/16 04/28/16 | Reflected in Schindler daily reports |
| X.1160 | Replace Damaged Elevator Clips / Damaged Rails | 04/01/16 04/08/16 | Schindler Change Order 7 makes reference to this work. |
| X.1170 | Complete Rails from Level 18 through 40 | 04/29/16 06/01/16 | Confirmed by Schindler daily reports |
| X.1180 | Complete Front from Level 18 through 40 | 06/02/16 07/01/16 | Work on the elevator fronts level 18 through 40 took place between April 8, 2016 and May 3, 2016 |
| X.1190 | Restart Elevator Work | 07/05/16 | This date reflects Swinerton's interpretation of the date when normal elevator activities could commence. |
| X.1200 | Schindler Internal Review of Damage Report/ Labor Union/ Safety | 02/19/16 03/10/16 | Email correspondence captured the exchange between Swinerton and Schindler on safety requirements. |
| X.1210 | Clean Rails | 02/26/16 03/10/16 | Confirmed by Schindler daily reports |
| X.1220 | Build New Crash Decks for Final Jump | 04/11/16 04/15/16 | Email correspondence from Swinerton to Schindler refers to crash decks |

The review and verification of the concrete blowout activities included in the fragnet showed that minor amendments were required to utilize the fragnet for analysis purposes.


Table 3 below provides a summary of the amendments and the reasons for the amendments.

*Table 3 - Fragnet Activity Amendment*

| # | Amendment | Duration | Predecessor | Successor |
|---|-----------|----------|-------------|-----------|
| 1 | **Remove activity:**<br>X1170 Complete Rails from Level 18 through 40 | | | |
| | **Reason for correction:**<br>The rail installation was impacted by the loss event but activities for the installation of the rails are part of the jump 2 and jump 3 elevator activities in the pre-loss schedule. It is therefore not necessary to include the rail activities in the fragnet. | | | |
| 2 | **Correct activity start and finish:**<br>X. 1880 Complete Front from Level 18 through 40 | | | |
| | **Reason for correction:**<br>The time when this activity occurred was incorrectly captured in the fragnet. Work on the elevator fronts level 18 through 40 took place between April 8, 2016 and May 3, 2016 not between June 2, 2016 and July 1, 2016. | | | |
| 3 | **Update Predecessor for:**<br>X.1150 Re-establish Target Lines | | **Add:**<br>X.1220 Build new crash deck for Final jump<br>**Remove:**<br>X. 1880 Complete Front from Level 18 through 40 | |
| | **Reason for correction:**<br>The target lines could only be re-established after a new crash deck was installed. The correct predecessor is therefore the crash deck (X. 1220) and not the completion of the fronts (X. 1880) | | | |
| 4 | **Updated Successor for:**<br>X.1150 Re-establish Target Lines | | | |
| | | | | **Add:**<br>EV-T-205 Install Main Rails to 27 |
| | **Reason for correction:**<br>The correct successor for this activity is the installation of the main rails. | | | |
| 5 | **Updated Successor:**<br>X.1190 Restart Elevator Work | | | **Add:**<br>X.1150 Re-establish Target Lines<br>**Remove:**<br>EV.T-205 Install main Rails to 27 |
| | **Reason for correction:**<br>The elevator work re-started with the re-establishment of the target lines and not when with the installation of the main rails. | | | |



### 8.2.3   SCHEDULE INTEGRITY

Prior to applying any of the delay analysis methods the schedules required for the analysis were reviewed to ensure the accuracy of the schedule logic.

The final schedule update that was done prior to the loss event on December 2, 2015 is the November 30, 2015 (S51K) schedule. A review of this schedule showed that three activities require correction. Table 4 below provides a summary of the corrections and the reasons for the corrections.

*Table 4 - Pre-loss Schedule Corrections*

| # | Correction | Duration | Predecessor | Successor |
|---|---|---|---|---|
| 1 | **Added new activity:**<br>EV-T-335 Install Main Rails to 40 | 7 WD | **Add:**<br>EV-T-205 Install Main Rails to 27 | **Add:**<br>EV-T-340 Install Counterweight Rails to 40 |
| | **Reason for correction:**<br>The pre-loss schedule did not include an activity for the installation of elevators main rails for jump 3 (floor 29 – 40)<br>**Duration calculation:**<br>• The same activity for 16 floors in jump 1 had a duration of 8 WD (0.5 WD / floor)<br>• The same activity for 13 floors in jump 2 had a duration of 8 WD (0.62 WD / floor)<br>• The average duration per floor of jump 1 & 2 is 0.56 WD. If this average is applied to the 12 floors of jump 3 the duration is 6.69 WD ≈ 7 WD | | | |
| 2 | **Added new activity:**<br>EV-T-340 Install Counterweight Rails to 40 | 7 WD | **Add:**<br>EV-T-335 Install Main Rails to 40 | **Add:**<br>EV-T-306 Install Main Rails to 41 |
| | **Reason for correction:**<br> The pre-loss schedule did not include an activity for the installation of counterweight rails for jump 3 (floor 29 – 40)<br>**Duration calculation:**<br>• The same activity for 16 floors in jump 1 had a duration of 8 WD (0.5 WD / floor)<br>• The same activity for 13 floors in jump 2 had a duration of 8 WD (0.62 WD / floor)<br>• The average duration per floor of jump 1 & 2 is 0.56 WD. If this average is applied to the 12 floors of jump 3 the duration is 6.69 WD ≈ 7 WD | | | |
| 3 | **Updated Predecessor for:**<br>EV-T-306 Install Main Rails to 41 | | | |
| | **Reason for correction:**<br>• The original pre-loss schedule did not include an activity for the installation of counterweight rails for jump 3 (floor 29 – 40) | | | |


### 8.2.4 PROJECT COMPLETION DATES

The Owner Contractor Agreement identifies seven requirements that must be met to achieve substantial completion of each contract milestone (section 6.2):

(1) A temporary certificate of occupancy issued by the applicable governing agency.

(2) Units need to be in move-in condition.

(3) All building systems should be operational.

(4) All finishes to be completed.

(5) All common areas and building-wide systems necessary for occupancy are in move-in condition.

(6) Written declaration that all punch list items are complete or will be completed.

(7) The work is sufficiently complete and certified by the architect that the owner can fully occupy and utilize it for its intended use.

In accordance with the AIA A201 A201 General Conditions document attached to the Owner Contractor Agreement, the Architect will issue a Substantial Completion Certificate when these requirements are met. No substantial completion certificates were issued by the architect for any of the four project milestone completion dates. The actual completion dates for each milestone can, however, be determined from construction records.

The project schedules utilize the term "TCO" to signify the completion milestones described in the Owner Contractor Agreement. TCO dates in the Swinerton baseline schedule tie out to the contractual dates for substantial completion of the corresponding milestone, as defined by section 6.2 of the Owner Contractor Agreement. The Swinerton schedules show no activity occurring or continuing beyond the completion of TCO#4, indicating that all contract Work was expected to be completed on that date. TCO is an abbreviation of Temporary Certificate of Occupancy (TCO), which is one of the seven requirements of project milestone completion. The TCO dates in the initial baseline schedule reflected the project milestone dates. For instance, "TCO#2 – Life Safety Core and Shell; Interior through 15 (Aug 1, 2015)" denotes the achievement of milestone #2 in Swinerton's schedule.


A review of project documentation shows that construction work to complete the units continued for a period of months after the TCO dates in the as-built schedule. It is clear that the TCO dates reflected in the As-built Schedule are not an accurate reflection of, and cannot be utilized as, project milestone completion dates.

The date when units were ready for occupancy is important for the analysis because the Policy also considers this date in determining the Period of Delay. In absence of substantial completion certificates other means were used in the analysis to determine when the units were ready for occupancy.

During the final months of construction, an Excel Spreadsheet replaced the Primavera P6 project schedules as main planning tool for the project. This spreadsheet, titled: 10 000 Move In Matrix provided completion dates for all units. This project document in conjunction with rent roll information can be utilized to pinpoint completion dates of all the units for analysis purposes.

### 8.2.5  TIME IMPACT ANALYSIS

The Time Impact Analysis is especially suited for this type of claim as the analysis isolates the impact of the loss event on the completion date. The following steps (based on the recommended steps contained in the AACE 29R-03) were followed to execute this method:

a)  Schedule S51K dated Nov 30, 2015 was utilized as the basis of the analysis. This was the final schedule update completed before the loss event. This schedule included all extensions of time granted up to that date, and showed a project completion date of October 27, 2016.

b)  A review of this schedule showed that a small number of activities required correction to improve the accuracy of the Pre-loss Schedule. Refer to section 8.3.3 for a summary of the corrections made.

c)  The concrete blowout fragnet prepared by Swinerton was utilized as starting point to capture the delayed activities. The accuracy of the fragnet activities was reviewed. The review and verification of the concrete blowout activities included in the fragnet showed that minor amendments were required. The amendments are summarized in section 8.3.2 of the report.

d) By making use of the Primavera P6 scheduling software a new schedule was created by inserting the fragnet activities into the corrected Pre-loss Schedule (S51K; Nov 30, 2015).

e) To verify that there is no added logic in the fragnet that creates a delay, the test recommended by the AACE practice note was executed. This test involved zeroing out the durations of all activities in the added fragnet and verifying there is no change to the completion date.

f) The impact of the loss related activities (concrete fragnet) on the project completion date was determined by comparing the project completion date of the impacted and un-impacted schedules.

## ANALYSIS

The following excerpt from the Pre-loss Schedule (S51K; Nov 30, 2015) shows the milestone completion dates as they appear in this schedule.

| Activity ID | Activity Name | Original Duration | Start | Finish | Total Float |
|---|---|---|---|---|---|
| 10000 Santa Monica  S51K; 30Nov15 | | 932 | 31/Jan/13 A | 27/Oct/16 | 0 |
| Executive Summary (calendar days) | | 1354 | 7/Oct/13 A | 27/Oct/16 | 0 |
| Project Summary | | 1354 | 7/Oct/13 A | 27/Oct/16 | 0 |
| PS.100 | Execute GMP; Notice To Proceed | 178 | 7/Oct/13 A | 2/Apr/14 A | |
| PS.110 | Start Project-Construction | 0 | 2/Apr/14 A | | |
| PS.120 | Construction Duration - 905 calendar days; 29.7 months | 1156 | 2/Apr/14 A | 27/Oct/16 | 0 |
| PS.160 | TCO #1 - Sales Office (2/9/16) | 0 | | 12/Feb/16* | -3 |
| PS.140 | TCO #2 - Life Safety Core and Shell; Interior through 15 (8/1/16) | 0 | | 8/Aug/16* | -7 |
| PS.150 | TCO #3 - Unit Interiors for levels 16 - 31 (8/29/16) | 0 | | 7/Sep/16* | -9 |
| PS.130 | TCO #4 - Unit Interiors for levels 32 - 40 (10/27/16) | 0 | | 27/Oct/16* | 0 |

*Figure 18 – Pre-loss Schedule Milestone Dates*

The following corrected concrete fragnet was introduced into the Pre-loss Schedule to determine the impact of the concrete loss event on the completion:



| ID | Description | Original Duration | Start | Finish |
|---|---|---|---|---|
| A13310 | Replace Safety Netting | 16 | 12/07/15 | 12/28/15 |
| X.1000 | Concrete Blowout Incident | 0 | 12/02/15 | |
| X.1010 | Cleanup Concrete and Crash Deck Debris | 2 | 12/03/15 | 12/04/15 |
| X.1020 | Suspend Elevator Work | 0 | 12/03/15 | |
| X.1030 | Schindler Initial Damage Evaluation of Temp Equipm | 3 | 12/07/15 | 12/09/15 |
| X.1040 | Crash Deck Design | 18 | 12/10/15 | 01/04/16 |
| X.1050 | Procure Damaged Elevator Equipment | 28 | 12/10/15 | 01/18/16 |
| X.1060 | Procure Crash Deck Material | 6 | 01/05/16 | 01/12/16 |
| X.1070 | Build Crash Decks to Start Repair Work | 3 | 01/12/16 | 01/14/16 |
| X.1080 | Dismantle Core Forming System & Placing Boom | 3 | 01/15/16 | 01/19/16 |
| X.1090 | Rebuild False Cars | 6 | 01/20/16 | 01/27/16 |
| X.1100 | Schindler Cleanup | 7 | 01/20/16 | 01/28/16 |
| X.1110 | Schindler Inspect Shaft for Damage | 2 | 01/28/16 | 01/29/16 |
| X.1120 | Schindler Internal Engineer's Evaluation/ Report | 1 | 02/01/16 | 02/01/16 |
| X.1130 | Dried in Machine Room | 1 | 03/11/16 | 03/11/16 |
| X.1140 | Complete Hoistway Work from Level 17 Down | 12 | 02/18/16 | 03/04/16 |
| X.1150 | Re-establish Target Lines | 7 | 03/18/16 | 03/28/16 |
| X.1160 | Replace Damaged Elevator Clips / Damaged Rails | 5 | 03/07/16 | 03/11/16 |
| X.1180 | Complete Front from Level 18 through 40 | 18 | 04/08/16 | 05/03/16 |
| X.1190 | Restart Elevator Work | 0 | 03/18/16 | |
| X.1200 | Schindler Internal Review of Damage Report/ Labor | 12 | 02/02/16 | 02/17/16 |
| X.1210 | Clean Rails | 8 | 02/08/16 | 02/17/16 |
| X.1220 | Build New Crash Decks for Final Jump | 4 | 03/14/16 | 03/17/16 |

*Figure 19 - Corrected Concrete Fragnet*

The introduction of the concrete fragnet resulted in the following changes in the milestone dates:



| | ID | Description | Original Duration | Start | Finish | Total Float |
|---|---|---|---|---|---|---|
| Executive Summary (calendar days) | | | | | | |
| Project Summary | | | | | | |
| | PS.100 | Execute GMP; Notice To Proceed | 178 | 10/07/13A | 04/02/14A | |
| | PS.110 | Start Project-Construction | 0 | 04/02/14A | | |
| | PS.120 | Construction Duration - 905 calendar days; 29.7 months | 1068 | 04/02/14A | 03/04/17 | N/A |
| | PS.130 | TCO #4 - Unit Interiors for levels 32 - 40 (10/27/16) | 0 | | 03/04/17 | -128 |
| | PS.140 | TCO #2 - Life Safety Core and Shell; Interior through 15 (8/1/16) | 0 | | 12/15/16 | -136 |
| | PS.150 | TCO #3 - Unit Interiors for levels 16 - 31 (8/29/16) | 0 | | 01/13/17 | -137 |
| | PS.160 | TCO #1 - Sales Office (2/9/16) | 0 | | 02/12/16 | -3 |

*Figure 20 – Results of Time Impact Analysis*

The inclusion of the concrete fragnet resulted in a delay to all milestone (TCO) completion dates except for TCO #1. Figure 21 summarizes the impact on the project milestone completion dates determined by the time impact analysis.



*Figure 21 - Loss Event Impact on Completion (Time Impact Analysis)*

## CONCLUSION

The following conclusions can be drawn from the results of the Time Impact Analysis:

a) The time impact analysis shows a delay to all milestone (TCO) completion dates except for TCO #1.

b) Floor 1 to 15 (TCO #2) would have suffered a delay of 129 days if the project was not re-sequenced and accelerated.

c) The completion of TCO #3, floors 16 to 31 would have been delayed for 128 days without any intervention.

d) The loss event would have delayed final completion of the project by 128 days.

e) As a result of the loss event the first occupancy of the units would only have been possible after December 15, 2016 approximately 4 months and 9 days (129 days) after the intended date of August 8, 2016.

### 8.2.6   AS-PLANNED VS AS-BUILT

The As-planned vs As-built analysis method is especially helpful to determine the impact a delay had on specific activities. The following steps were followed to apply this method:

a) The pre-loss schedule was utilized as the as-planned schedule because it provided the most up to date plan to reach completion prior to the loss event. The Nov 30, 2015 Schedule S51K was utilized because it was the final schedule update


completed before the loss event of December 2, 2015. This schedule is an update of the original baseline accepted by both parties.

b) The schedule updates discussed in the previous section were utilized to identify the activities that were delayed during the construction process.

c) The initial construction approach and activity sequence were utilized to identify the main path of delay. The activities as part of this delay path were analyzed first. Activities that were independent of the main path were analyzed in the next section of the report.

d) The analysis compared activity start dates, completion dates and durations in the as-planned (pre-loss schedule) and the as-built schedule.

e) The May 31, 2017 Schedule was utilized as the as-built schedule for the analysis.

f) To determine the relative delay to the activities analyzed the delay to the completion dates were considered. To ascertain the forecasted delay on completion, float was also considered where applicable.

g) Concurrent delays were identified and considered independently (section 8.3.7).

## ANALYSIS

### A. ELEVATOR INSTALLATION DELAY

The loss event repair activities mainly impacted the elevator installation. As-planned v As-built analysis was utilized to determine the impact on the elevator installation.



***Figure 22 - Elevator installation:  Pre-loss vs As-built***

The pre-loss schedule (S51K; Nov 30, 2015) shows that the elevator installation was expected to be completed on May 11, 2016 but was actually completed 146 working


days later on Nov 29, 2016 (As-built Schedule; May 31, 2017). When the elevator installation is considered in isolation, taking into account the 75 day float period, the delayed elevator activities had a 71 working day (99 days) impact on the completion of the project. This does not take into account the impact on the zipper unit and closing the building, which further delay project completion.

*Table 5 - Elevator installation delay*

| Elevator Installation Pre-loss Completion (As-planned) | | | |
|---|---|---|---|
| **Activity** | **Start** | **Finish** | **Duration** |
| **Elevator Installation** | Jul 13, 2015 | May 11, 2016 | 217 WD (a) |
| **Elevator Installation Actual Completion (As-built)** | | | |
| **Activity** | **Start** | **Finish** | **Duration** |
| **Elevator Installation** | Jul 13, 2015 | Nov 29, 2016 | 362 WD (b) |
| **Effect on Completion** | | | |
| **Elevator Installation delay** | 146 WD (b) – (a) | | |
| **Float** | 75 WD | | |
| **Impact on Completion** | 71 WD | | |

## B. MANLIFT REMOVAL DELAY

One of the consequences of the delayed elevator installation was that the manlift had to remain operational for 89 days after the intended date of removal.



*Figure 23 - Manlift removal delay*

The late removal of the manlift was analyzed to assess the impact on vertical transportation during construction. The analysis (summarized in table 6), calculates the transport capacity for the two temporary hoist cabs to the first 2 permanent elevators



that went into service replacing the temporary hoist, which consisted of one passenger elevator and one freight elevator. The transport rate was calculated based on floor area of elevator cars, volume of elevator cars and weight carrying capacity for the car speed the to the mid-point of travel.

*Table 6 - Transport Rates: Temporary Manlift to Permanent Elevators*

| Attribute | Temp Hoist | Total 2 Temp Cars | Permanent Passenger (A) | Permanent Freight (E) | Total 2 Permanent Cars (A)&(E) | Delta | 2 Permanent Elevators Compaired to Temporary Service |
|---|---|---|---|---|---|---|---|
| Inspection Date | | | 8/29/16 | 7/27/16 | | | |
| Qty of Cars | 2 | 2 | 1 | 1 | 2 | 0.00 | 0 |
| Cab Width | 6.67 | | 6.82 | 11.08 | | | |
| Cab Depth | 4.67 | | 4.72 | 5.71 | | | |
| Cab Height | 12.33 | | 10.01 | 10.1 | | | |
| Cab Area (SF) | 31.15 | 62.30 | 32.19 | 63.27 | 95.46 | 33.16 | 153% |
| Cab Volume (CF) | 384.07 | 768.13 | 322.23 | 638.99 | 961.22 | 193.09 | 125% |
| Capacity (LBS) | 3,114 | 6,228 | 3,000 | 4,500 | 7,500 | 1,272 | 120% |
| Speed (FPM) average | 300 | 300 | 800 | 700 | 750 | 450 | 250% |
| Mid point of travel (FT) | | 240 | 240.00 | 240.00 | 240 | | |
| **Transport Rate to Midpoint of Travel** | | | | | | | |
| Based on Floor Area (SF/Min) | | 78 | 107 | 185 | 292 | | 375% |
| Based on Volume (CF/Min) | | 960 | 1,074 | 1,864 | 2,938 | | 306% |
| Based on Weight (LB/Min) | | 7,785 | 10,000 | 13,125 | 23,125 | | 297% |
| Average Increase in Transportation Rate | | | | | | | 326% |

The size of the permanent equipment (cars E and A) was about 53% larger in floor area, would hold about 25% more volume, and carry 20% more weight than the temporary equipment, but the most significant difference is that the permanent elevator travel, on average, about 2.5 times faster.

As shown by the calculations, the transport rate for the 2 permanent elevators (E and A) was approximately 3 times the transport rate for the temporary hoist based on floor area, volume and weight. In effect, the two permanent elevators have the capacity to transport approximately 3 times the personnel and/or materials as the temporary equipment.

The permanent freight elevator E was first put into service with an inspection date of July 27, 2016 followed by permanent passenger elevator A on August 28, 2016. Subsequently, permanent elevator B was inspected on November 7, 2 2016 followed by C and D on December 5, 2016.



The As-Planned as compared to As-Built vertical transportation capacity over time stated in cubic feet per minute (CF/Min) is shown on the chart below:



*Figure 24 - As Planned vs As Built Vertical Transportation*

### C. ZIPPER UNIT DELAY

The late removal of the manlift in turn caused a delay to the zipper units. Prior to the loss event the contractor was on track to complete the finishes of the last zipper unit on July 21, 2016 (S51K; Nov 30, 2015). A comparison of the pre-loss and as-built completion dates of the zipper units revealed that all the zipper units were delayed. The delays ranged from 60 to 168 days (45 to 120 working days).

The zipper unit on level 20 suffered the most significant delay. According to the As-built Schedule (As-built; May 31, 2017) this zipper unit was only completed on December 12, 2016. If the float of 8 working days of this particular unit is considered the impact on the project completion is 157 days (112 working days).



*Figure 25 - Zipper Unit Delay*

The impact the loss event had on the original construction approach is evident in the above assessment of the critical components of this approach.

*Table 7 - Zipper unit  (level 20) delay*

| Zipper Unit Completion Impact on completion | | | | | |
|---|---|---|---|---|---|
| **Activity** | **Planned Finish** (Nov 30, 2015 Schedule) | **Actual Finish** (May 31, 2017 Schedule) | **Late** | **Float** | **Completion Delay** |
| **Zipper Unit** (level 20) | Jun 28, 2016 | Dec 12, 2016 | 120 WD | 8 WD | 112 WD |


## D.  MILESTONE COMPLETION DELAYS

The As-planned vs As-built analysis method is ordinarily effective to determine the actual delay to project completion milestones. The review of project milestone completion dates in section 8.3.4 revealed that the TCO completion dates in the As-built Schedule do not accurately reflect the milestone completion dates, nor do they reflect the delay period consistent with policy language which identifies the end of the delay period as the date when the insured is able to "commence commercial operations in the **manner originally planned**" because they represent only the dates when temporary occupancy certificates were issued and not when units were ready for occupancy.  For the purpose of this claim, and in order to be consistent with the terms of the DSU insurance policy, the date when units were actually completed and available for occupancy must be considered.

The unit completion dates were determined by assessing relevant project records and documentation.  The unit completion dates for milestone 2, 3 and 4 could be determined by utilizing the Move-in Matrix supported by the rent roles. A leasing office and a mock-up was included in the construction agreement for Milestone 1 (TCO#01) completion. The project schedules only included the leasing office for completion of Milestone 1. The first temporary certificate of occupation was issued on July 1, 2016. No conclusive date for the completion of a mock unit could be established but it would not have been possible to utilize the mock up unit for its intended purpose without a certificate of occupancy.  The issue date of the first temporary certificate occupation was taken as the milestone 1 (TCO#1) completion date in the analysis.

Figure 27 indicates the completion dates for each unit. To conclude the As-planned vs As-built analysis the actual completion dates were compared to the as-planned completion dates.

Figure 28 compares the intended unit completion dates with the actual unit completion by superimposing the completion dates on an image of the building.



*Figure 26 - Unit completion dates*




*Figure 27 - As-planned vs As-built (Unit Occupancy)*

The analysis shows that the intended approach to completion of floors 1-15, followed by floors 16-31, and finally floors 32-40, was not implemented. Figure 27 graphically shows



that the planned upward progression did not happen. On fourteen floors the units were completed within the same month, whereas on the other floors units were completed at different times.

The completion of the units commenced in January 2017 and the final unit was completed by July 1, 2017. 93% of the 283 units were completed by April 27, 2017. Only 8 units were completed from May 1, 2017 to July 1, 2017. It is clear that the slow-down of unit completion from approximately 90 units per month in March and April 2017 to approximately 3 per month in the final couple of months was not production driven. It is likely that these units did not have the prospect to be occupied soon because of the normal market uptake of units, eliminating the immediate urgency of their completion. The impact of the delay on completion would be overstated if the completion of the 8 units in the final months is considered in determining the final completion date. To void overstating the impact of the delay we used April 27, 2017, the date when the bulk of the units were completed, as the milestone 4 completion date.

Milestone #1 called for the completion of the leasing office and a mock-up unit. A comparison of the Milestone #1 pre-loss completion date (Feb 12, 2016) with the completion date reflected in the as-built schedule (Jul 1, 2016) shows a delay of 140 days. We were advised by the contractor that the delay to completion of the leasing office and mock-up unit were the result of resequencing of work after the elevator shaft incident. After the loss event occurred, the contractor focused on the later milestone dates that would have financial impact on the owner. That is a plausible explanation and we found no documentation or information to contradict it. Once the occupancy dates were jeopardized by the loss event, making the scheduled completion date for the leasing office and mock-up unit would have been relatively insignificant and potentially of no value to the owner.

It is logical to conclude that the timing of completion of the leasing office and mock up unit was tied to the delivery of units for occupancy by tenants. From the baseline schedule one can see that the owner planned to have the leasing office and mock up unit available approximately six months before the first units would be available for occupancy. That relationship between delivery of the leasing office and delivery of the first tenantable units appears to have been maintained. We had no documentation that confirmed the delivery dates of the mock up unit or leasing office. In absence of this



information and given that TCO#1 had no financial significance to the owner in relation to the other 3 milestones, the analysis did not further consider the TCO#01 delay.

Because the intended phased completion approach was not followed, the typical direct comparison between as-planned and as-built milestone completion dates had to be approached differently to ensure a sensible comparison can be made. To address the requirements of milestone completion, two approaches were followed for the comparison:

- A floor-based comparison and,
- A unit-based comparison

In the floor-based comparison, the date when the last unit for the floors that forms part of the milestone was taken as the completion date

*Table 8 -As-planned vs As-built (floor completion)*

| Completion Milestone | Completion date of last unit |
|---|---|
| Milestone 2 - Floor 1-15 | May 2, 2017 |
| Milestone 3 - Floor 16-31 | May 2, 2017 |
| Milestone 4 - Floor 32-40 | Jul 1, 2017 |

When the requirements of this claim are considered a unit based comparison might be more suitable as it relates directly to the actual occupancy of units.

*Table 9 - As-planned vs As-built (Unit completion)*

| Completion Milestone | Completion date of total number of units of the milestone |
|---|---|
| Milestone 2 - 96 Units | Mar 9, 2017 |
| Milestone 3 – 128 Units | Apr 20, 2017 |
| Milestone 4 - 59 Units | Jul 1, 2017 ≈ April 27, 2017 |

The first 96 units were completed by March 9, 2017. Therefore, this date can be taken as the Milestone 2 completion date. To achieve Milestone 3, a total of 224 units (96 units for Milestone 2 + 128 units for milestone 3) should have completed, this was done by April 20, 2017. Milestone 4 required all units to be complete. The last unit was completed on July


1, 2017. As explained above, April 27, 2017, the date when 93% of units were completed is taken as the completion date to avoid results being skewed by the non-production driven delivery of 8 units in the last couple of months.

To conclude the analysis actual unit completion dates were compared with the planned unit completion dates.



*Figure 28 - Pre-loss completion dates vs As-built completion dates*

If the actual delay is considered in terms of the delay to commercial operations as described in the DSU Policy, it is clear that the planned completion of the units was extensively delayed.

## CONCLUSIONS

The following conclusions can be made when the information produced by the As-planned vs As-built is considered:

a) The late completion of the elevator installation negatively affected progress in a number of ways.

b) Vertical transportation was severely compromised. For approximately a 6-month period the internal elevators were not available for construction use as intended. The two permanent elevators have the capacity to transport approximately 3 times the personnel and/or materials as the temporary equipment.

c) The analysis showed that a 99 day delay to the elevator installation and the resulting impact on vertical transportation caused a 157 days day delay to the completion of the zipper units.



d) The completion milestones were extensively delayed:

Milestone 1 was delayed from Feb 12, 2016 to Jul 1, 2016 **140 Days**

Milestone 2 was delayed from August 8, 2016 to March 9, 2016 **213 Days**

Milestone 3 was delayed from September 7, 2016 to April 20, 2017 **225 Days**

Milestone 4 was delayed from October 27, 2016 to July 1, 2017 **182 Days**

## 8.2.7  WINDOW ANALYSIS

One of the benefits of the Window Analysis is that it highlights delayed activities within the window period under consideration. Despite the fact that a limited number of schedules updates are available, valuable information on the impact of delays at certain periods of time during construction can still be gleaned by applying this method. The following steps (based on the recommended steps for MIP 3.3 contained in the AACE 29R-03) were followed to execute this method:

a) The first schedule update utilized for the analysis process included all contract time extensions granted at that stage of the project.
b) All delayed activities in each update were identified to determine the impact on the critical path.
c) All available schedule updates were considered independently.
d) The impact on the 4 project milestones were considered where applicable.
e) Where possible schedules updates for adjoining periods were compared.
f) Float was considered to identify the controlling activities.
g) Changes to the project completion date based on the critical path activities were considered.
h) During February 2016 a recovery schedule was produced that re-sequenced activities and changed the schedule logic. Updates to the baseline schedule and recovery schedule had to be considered independently.
i) Activities that showed as delayed were identified.
j) The analysis focused on the specific delays within the update period under consideration. It was not possible to consider net losses over the entire period because of the limited number of schedules available.


## ANALYSIS

**JAN 4, 2016 SCHEDULE (update of pre-loss schedule)**

The first schedule update after the occurrence of the loss event was done on January 4, 2016, approximately a month after the less event. The activities that were most significantly delayed at that stage were the punch list & final agency inspection to reach TCO#1 (7 days behind), the pour of level 40 (6 days behind) and the manlift removal (5 days behind).

*Table 10 - Jan 4, 2016 Schedule Update*

| JAN 4, 2016 SCHEDULE UPDATE | S53K |
|---|---|
| **Most Significant Delays** | **Days behind\*** |
| 1.  TCO #1 Punch list, final agency inspection | -7 |
| 2.  Tower Level 40 Pour | -6 |
| 3.  Manlift | -5 |

*\* Reporting on baseline schedule*

The impact of the loss event on the elevator installation was not yet recognized as critical, but the impact of the loss event on the manlift removal started to become critical.

**FEB 16, 2016 RECOVERY SCHEDULE (new schedule)**

A recovery schedule was produced on February 16, 2016. A large number of activities were re-sequence in an attempt to minimize the impact of the loss event. It appears that with the mitigation measures introduced, the aim was to still attempt to achieve the pre-loss final completion date of the project (TCO#4). TCO#2 and TCO#3 were forecasted to be 3 working days late. The target completion date for TCO#1 was April 1, 2016, substantially later than the pre-loss completion date of February 12, 2016.

*Table 11 - Feb16, 2016 Schedule Update*

| FEB 16, 2016 SCHEDULE UPDATE | S53K |
|---|---|
| **Activity** | **Days behind** |
| 1. TCO #1 Punch list, final agency inspection | -21 |
| 2. Manlift | -1 |



| | |
|---|---|
| 3. Level 4 – 36 Zipper Units | -1 |
| 4. Elevator Jump 2 (20 -40) Build Car Frames – Inspect | -1 |
| 5. Machine Room Fly Machine – Drop line | -1 |

The most extensive delay reflected in the recovery schedule is the completion of TCO#1. The manlift, level 4-36 zipper units, elevator jump 2 and the machine room were on the critical path with a -1 day float. In reviewing the results of the February 2016 window, it is important to consider that the recovery schedule incorporates acceleration, duration compression, and logic changes that would mask the actual delay due to the loss event that was being felt on the project.

**MAR 2, 2016 SCHEDULE (update of pre-loss schedule)**

The March 2, 2016 schedule update is the last update that was done using the pre-loss schedule as a basis to measure progress. In this schedule update the impact of the loss event on progress became clearly evident. The schedule reflected a large number of activities with a negative float. The activities that suffered the most extensive delays are summarized in table 12. The extended duration of the elevator installation has resulted in delay in the removal of the manlift. This has in turn delayed the completion of the zipper units on 32 different floors. As a result, the commissioning, punch activities and inspections on these floors were also delayed. Like the other activities mentioned, the weather allowance and the level 42 slab also showed a negative float of 15 days.

*Table 12 – Mar 2, 2016 Schedule Update*

| MAR 2, 2016 SCHEDULE UPDATE | S56K |
|---|---|
| **Activity** | **Days behind** |
| 1. Elevator Jump 2 (20-40) | -15 |
| 2. Machine Room | -15 |
| 3. Manlift | -15 |
| 4. Zipper Units level 5 -31 | -15 |
| 5. Commissioning; Punch; Inspections | -15 |
| 6. Weather allowance | -15 |
| 7. Pour Level 42 | -15 |



**APR 11, 2016 SCHEDULE (update of recovery schedule)**

The April 11, 2016 Schedule update appears to utilize the February 16, 2016 recovery schedule as basis to report progress. According to this update most recovery schedule activities were on track except for a slight delay to finishes, inspection and the weather allowance.

*Table 13 - Apr 11, 2016 Schedule Update*

| APR 11, 2016 SCHEDULE UPDATE | S58K |
|---|---|
| **Activity** | **Days behind** |
| 1.   Level 19 -35 Interior Rough-in, Wood Floorings | -1 |
| 2.   Level 40 Finishes | -1 |
| 3.   TCO #4 Punch list, inspection | -1 |
| 4.   Weather allowance | -1 |

**JUN 3, 2016 SCHEDULE (update of recovery schedule)**

The final schedule update was done on June 3, 2016. This update also appears to report on the February 16, 2016 recovery schedule.

*Table 14 - Jun 3, 2016 Schedule Update*

| JUN 3, 2016 SCHEDULE UPDATE | S60L |
|---|---|
| **Activity** | **Days behind** |
| 1.   Level 40 Interior Rough-Ins and Interior Build Out | -13 |
| 2.   Elevator Jump 2 (20-40) | -12 |
| 3.   P-03 Main Entry Glass Storefront - Main Entry Canopy | -12 |
| 4.   P-06 Column Covers Main Entry Level 1 – Layout & Clips | -12 |

At this stage of the project the Level 40 Interior Rough-Ins and Interior Build Out were behind schedule. The elevator jump 2 was still not completed and was 12 days behind. The main entry storefront glass and column covers were also 12 days behind. The impact of these delays is further considered in section 8.3.8.



## CONCLUSIONS

The following conclusions can be drawn based on the findings of the Window Analysis:

a) All the schedule updates based on the pre-loss schedule shows significant delays to the elevator installation and the consequential delay to the manlift removal activity.

b) The late removal of the manlift in turn delayed the completion of the zipper units on 32 different floors. It appears that the delayed zipper units impacted the punch and inspection activities. The delayed completion of the glass façade at the zipper units impacted the building commissioning and system performance testing activities because a fully enclosed building is required to do some of the commission tests.

c) These delays are a clear indication of the knock-on effect of the loss event.

d) The schedule updates also show that the level 40 and 42 slabs were poured later than planned, along with delays to the main entry storefront and column cover on level 1. The impact of these delays is considered in section 8.2.8.


## 8.2.8   OTHER DELAYS

The Windows Analysis was utilized to identify delays that appear not to be related to the loss event. In this section the impacts of these independent delays are considered.

### A.  CONCRETE TOWER DELAYS

The review of the contractual documents showed that changes to the penthouse units delayed the pouring of the slabs on level 40, 41 and 42. The level that was impacted the most was level 42. This level was delayed for 37 working days. If the float is taken into account, the forecasted impact on completion is 29 working days. It appears that the impact of this delay on completion was mitigated to a large extent. The contractor submitted a claim for 8 working days as a result of this delay to the owner. The owner offered 5 working days but it seems that ultimately no extension to the contract period was officially granted.

*Table 15 - Pre-loss Schedule Corrections*

| Tower Concrete Impact on completion | | | | | |
|---|---|---|---|---|---|
| **Activity** | **Planned Finish** (Pre-loss Schedule) | **Actual Finish** (As-built Schedule) | **Late** | **Float** | **Impact on completion** |
| **Pour Level 40 Slab** | Jul 13, 2015 | May 11, 2016 | 18 WD | 8 WD | 8 WD |
| **Pour Level 41 Slab** | Jan 11, 2016 | Feb 22, 2016 | 31 WD | 8 WD | 23 WD |
| **Pour Level 42 Slab** | Jan 15, 2016 | Mar 7, 2016 | 37 WD | 8WD | 29 WD |

The level 42 slab delay was concurrent with the loss event repairs delay. When the principles of dealing with concurrent delays in DSU insurance claims (explained in section 5.3.2) are applied the insured delay (the loss event repairs) is indemnified notwithstanding the occurrence of the uninsured delay.



**Figure 29 - Concrete slab delay and Loss event repairs**

In the construction industry concurrency is often considered by determining the controlling delay. If this approach is followed, the loss event repairs will be the driving


delay as it started before and continued after the level 42 slab delay. In this approach, the driving delay takes precedence and entitlement is established for the full extent of the driving delay.

## B. CONCRETE TOWER RELATIONSHIP WITH THE MACHINE ROOM

The elevator machine room is located on level 41 with the level 42 helipad slab forming the roof of the machine room.

If the concurrency is reviewed from a sequencing perspective it is clear that even if the level 42 slab was completed by the planned completion date of January 15, 2016 it would not have reduced the project duration.

A large number of clean up and repair activities were still taking place during the period the level 42 slab was delayed (Jan 15, 2016 to Mar 7, 2016). Even if the machine room was ready shortly after the planned completion date (Jan 15, 2016) of the level 42 slab work on the elevator installation could not have continued as clean up and repair activities continued well into April 2016. Figure 31 shows the relationship between the level 42 slab delay and the repair activities.



*Figure 30 - Loss event repairs Jan 15, 2016 to Mar 7, 2016*


## C. LEVEL 40 INTERIOR ROUGH-INS AND BUILD OUT

The June 3, 2016 schedule shows that several interior mechanical, electrical and plumbing (MEP) rough-in activities and one build out activity might be delayed on level 40. The forecasted delays ranged from 8 to13 days. Based on the available schedule updates, it was not possible to track these activities for the final months of the project to determine whether the delay did materialize. It is likely that this delay was a result of the vertical transportation challenges experienced due to the impact of the loss event on the elevator installation, creating a bottleneck in timeous delivery of material and workers to the top floor.

Assessing the potential level 40 Interior rough-ins delay in relation with other delays it revealed that this delay was concurrent with the elevator installation delay. Figure 32 shows the relationship between the level 40 interior rough-ins activities and elevator activities.



*Figure 31 - Level 40 Rough-Ins Delay vs Elevator Delay (Jun 3, 2016 Schedule)*



The As-built schedule shows that the elevator delay persisted for much longer than the level 40 delay. Figure 33 provides the completion dates of the activities as reflected in the As-built Schedule. If the activity with latest completion date from this group of level 40 activities is compared with the activity with latest completion date from the elevator activities it is evident that the elevator delay persisted for almost 2 months longer.

- T.INT40.205  Prime & Paint – **Oct 6, 2016**
- A13410 State Inspection Passenger Cars  – **Nov 29, 2016**

When the principles of dealing with concurrent delays in DSU insurance claims (explained in section 5.3.2) are applied the insured delay (the loss event repairs) is indemnified notwithstanding the occurrence of the uninsured delay.

| Activity ID | | Activity Name | Current Duration | Actual Start | Actual Finish |
|---|---|---|---|---|---|
| | **Passenger Elevators** | | 129d | 20-Jul-16 | 29-Nov-16 |
| | A13330 | Build Car Frames | 6d | 20-Jul-16 | 27-Jul-16 |
| | A13350 | Remove False Cars | 2d | 28-Jul-16 | 29-Jul-16 |
| | A13430 | Complete & Adjust Remaing Passenger Cars | 5d | 30-Jul-16 | 26-Nov-16 |
| | A13360 | Install Compensation | 5d | 01-Aug-16 | 05-Aug-16 |
| | A13370 | Install Facia | 4d | 04-Aug-16 | 09-Aug-16 |
| | A13380 | Install Vanes, SNAGS, ETC. | 5d | 10-Aug-16 | 16-Aug-16 |
| | A13390 | Build and Wire Cab | 3d | 16-Aug-16 | 18-Aug-16 |
| | A13400 | Adjust (1) Passenger Car | 5d | 19-Aug-16 | 25-Aug-16 |
| | A13420 | State Inspection - (1) Passenger Car | 2d | 26-Aug-16 | 29-Aug-16 |
| | A13410 | State Inspection - Remaining Passenger Cars | 5d | 28-Nov-16 | 29-Nov-16 |
| | **Interior Build Out  (Prime Paint - Finishes) - Post Curtain Wall** | | 107d | 23-Jan-16 | 20-Dec-16 |
| | T.INT40.510 | Owner Curtains | 5d | 23-Jan-16 | 26-Jan-16 |
| | T.INT40.520 | Corridor Electrical and Low Voltage Trim | 2d | 23-Aug-16 | 24-Aug-16 |
| | T.INT40.210 | Shower Pans | 4d | 31-Aug-16 | 06-Sep-16 |
| | T.INT40.495 | Waterproof Showers | 5d | 31-Aug-16 | 06-Sep-16 |
| | T.INT40.500 | Flood test Showers | 2d | 06-Sep-16 | 07-Sep-16 |
| | T.INT40.315 | Corridor Signage | 2d | 12-Sep-16 | 13-Sep-16 |
| | T.INT40.240 | Door Install | 5d | 14-Sep-16 | 20-Sep-16 |
| | T.INT40.245 | Door Hardware | 5d | 15-Sep-16 | 22-Sep-16 |
| | T.INT40.305 | Install Corridor Fire Doors | 3d | 21-Sep-16 | 23-Sep-16 |
| | T.INT40.205 | Prime & Paint | 5d | 30-Sep-16 | 06-Oct-16 |

*Figure 32 - Level 40 Rough-Ins Delay vs Elevator Delay (As-built Schedule)*

## D.  FILL IN CURTAIN WALL, STOREFRONT AND CANOPIES

The June 3, 2016 schedule update shows that the activities associated with the curtain wall, storefront, main entry canopy and column covers on level P-03, P-04, P-06 & P-07 were delayed. The delays range from 7 to 12 working days. The schedule further shows that the predecessor or activity that had to be completed before the work on the delayed activities could commence is activity T.ML.215 Remove Manlift – refer to the schedule extract (Figure 34).


The removal of the manlift was delayed by the impact of the late completion of the elevator installation as a result of the loss event. The delay to the curtain wall, storefront, main entry canopy and column covers on level P-03, P-04, P-06 & P-07 is, therefore, a direct consequence of the loss event. If the loss event did not delay the driving activity of this group of delayed activities it would have been possible to complete them on time.



***Figure 33 - Fill in Curtain Wall, Storefront, Canopy & Covers***

## E. TCO #1 PUNCH LIST, FINAL AGENCY INSPECTION

The February 16, 2016 recovery schedule assessed as part of the Window Analysis showed a delay of 21 working days to activities relating to the completion of the leasing office (referred to as sales office in the schedule). In the project schedules the TCO#1 milestone completion date is determined by the sales office completion. The schedules show that the activity: T.INT01.340 Sales Office Build Out, a predecessor to the completion activities


(punch list and final agency inspection), delayed the sales office completion activities. Before the loss event it appears that the sales office build out was progressing well. The sales office build out showed a slight delay of 3 working days in the Nov 30, 2015, pre-loss schedule. TCO#02 , TCO#3 and TCO#4 showed 9, 7 & 0 working delay respectively in this schedule. Schedule updates were reviewed to assess progress of the sales office build out activity after the occurrence of the loss event:

*Table 16 - Lease Office Delay*

| Schedule | Sales Office Build Out Start | Sales Office Build Out End | Float |
|---|---|---|---|
| **Nov 30, 2015 (Pre-loss Schedule)** | Nov 30, 2015 | Jan 26, 2016 | -3 |
| **Feb 16, 2016 (Recovery Schedule)** | Nov 30, 2015 | Mar 14, 2016 | -20 |
| **Apr 11, 2016 (Schedule update)** | Nov 30, 2015 | Apr 22, 2016 | -64 |
| **May 31, 2017 (As-built Schedule)** | Nov 30, 2015 | Apr 22, 2016 | -64 |

The schedules do not indicate what caused the delay to the sales office build out activity but it appears that progress to this activity started to become significantly delayed when the loss event occurred. In the first two month after the loss event the sales office build out was delayed by 17 working days. In the subsequent two and a half months the sales office was delayed by a further 44 working days. A comparison of the sales office build out delay with the elevator repair delay revealed that these two delays were concurrent.



*Figure 34 - Sales office loss and event repairs concurrency*

No contemporaneous documentation that shed light on the question whether the loss event impacted progress of the sales office could be located. To further investigate the matter a meeting was arranged with the Swinerton project staff that were involved at that stage of the project. In the meeting it was revealed that as a result of the loss event



numerous activities had to be re-sequencing and accelerated. In the mitigation process priority was given to the completion of the rental units to minimize the potential risk of financial loss. This approach is confirmed by the February 16, 2016, recovery schedule. The recovery schedule, the mitigation plan developed to address the consequences of the loss event, provided for the completion of milestone 2, 3 and 4 by the pre-loss completion dates but only provided for a completion date of TCO#1 20 working days after the pre-loss completion date.

In addition, the access to the lobby area of the sales office was severely restricted as a result of the re-sequencing of activities. Safe access to the sales office was a requirement to obtain a temporary certificate of occupation. The completion of external paving to provide access to the leasing was impacted by the re-sequencing and acceleration of activities. These circumstances would not have occurred if it was not for the loss event. It is evident that although the loss event did not directly impact the sales office the mitigating action taken to address the impact of the loss event did indeed impact the progress of the sales office build out. Therefore, the principles employed to deal with concurrent delays in DSU insurance claims (explained in section 5.3.2) can also be utilized in this instance. When these principles are applied the insured delay (the loss event repairs) is indemnified notwithstanding the occurrence of the uninsured delay.



## 8.2.9 CALCULATION OF THE PERIOD OF DELAY

The policy provide coverage for the impact of the loss event during the Period of Delay. According to the policy the Period of Delay should be calculated as follows:



### ACTUAL DATE OF OCCUPANCY

The as-planned vs as-built analysis provides an accurate reflection of the actual date of project completion or the date when occupancy of the units was possible. The project milestone dates determined by the as-planned vs as-built analysis were utilized as the end dates for the Period of Delay for each milestone analyzed.

### OCCUPANCY BUT FOR THE LOSS

The starting point of the Period of Delay is the date on which occupancy would have commenced but for the loss. The final pre-loss schedule update reflects the date on which the project would have completed but for the loss. The final pre-loss schedule update was done on Nov 30, 2015, 2 days before the loss event. This schedule update takes into account all delays experienced prior to the loss event.

Figure 36, an extract from the pre-loss schedule, shows that the delays experienced prior to loss event would impact the milestone completion dates as follows:

- TCO#1 – 3 working days, delaying the milestone completion until Feb 12, 2016
- TCO#2 – 7 working days, delaying the milestone completion until Aug 8, 2016
- TCO#3 – 9 working days, delaying the milestone completion until Sep 7, 2016
- TCO#4 – no delay, the completion milestone remains Oct 27, 2016



| Activity ID | Activity Name | Start | Finish | Total Float |
|---|---|---|---|---|
| **10000 Santa Monica  S51K; 30Nov15** | | 31-Jan-13 A | 27-Oct-16 | 0 |
| **Executive Summary (calendar days)** | | 07-Oct-13 A | 27-Oct-16 | 0 |
| **Project Summary** | | 07-Oct-13 A | 27-Oct-16 | 0 |
| PS.100 | Execute GMP; Notice To Proceed | 07-Oct-13 A | 02-Apr-14 A | |
| PS.110 | Start Project-Construction | 02-Apr-14 A | | |
| PS.120 | Construction Duration - 905 calendar days; 29.7 months | 02-Apr-14 A | 27-Oct-16 | 0 |
| PS.130 | TCO #4 - Unit Interiors for levels 32 - 40 (10/27/16) | | 27-Oct-16* | 0 |
| PS.140 | TCO #2 - Life Safety Core and Shell; Interior through 15 (8/1/16) | | 08-Aug-16* | -7 |
| PS.150 | TCO #3 - Unit Interiors for levels 16 - 31 (8/29/16) | | 07-Sep-16* | -9 |
| PS.160 | TCO #1 - Sales Office (2/9/16) | | 12-Feb-16* | -3 |

*Figure 35 - Nov 30, 2016 Pre-loss Schedule Update*

The policy only provides coverage for the loss event and the consequential delay but does not provide coverage for any independent delays. The Window Analysis was utilized to identify the critical delays that occurred after the loss event. All the delays identified were assessed to determine whether they are loss related (section 8.3.8). The assessment revealed that only the tower concrete delay on level 42 was not directly related to the loss event. The contractor requested a 8 working day contract period but it seems that ultimately no extension of the contract period was officially granted.

Further analysis showed that the level 42 delay was concurrent with the loss related elevator delay. When the principles of dealing with concurrent delays in DSU insurance claims (explained in section 5.3.2) are applied, the insured delay (the loss event repairs) is indemnified notwithstanding the occurrence of an uninsured non loss related delay. When the concurrency is evaluated from a construction industry perspective, the elevator delay was the driving delay and therefore takes precedence.

It is not possible to establish whether level 42 delay would have occurred if the loss event did not take place. The analysis shows that the change to the penthouse level that resulted in the level 42 delay took place within the float period created by the loss event, eliminating any possibility that the level 42 delay will impact the completion date. It is unclear if the decision to make change to the penthouse level would have been made but for the loss event. In considering all these factors it is evident that an adjustment of the date of occupancy but for the loss to accommodate the level 42 delay is not justifiable.

Figure 37 shows how the Period of Delay was calculated utilizing the results of the analysis.




*Figure 36 - Period of Delay Calculation*

Table 17 provides the results of the analysis expressed as the Period of Delay as defined by the policy.

*Table 17 - Period of Delay Conclusion*

| Unit Completion Milestones | Date on which tenant occupancy would have commence but for the loss | Period of Delay → | Actual date of occupancy (or date when it was possible) |
|---|---|---|---|
| Milestone 1<br>Leasing office/Mock up unit | Feb 12, 2016 | 140 days | Jul 1, 2016 |
| Milestone 2<br>Floor 1-15; 96 Units | Aug 8, 2016 | 213 days | Mar 9, 2017 |
| Milestone 3<br>Floor 16-31; 128 Units | Sep 7, 2016 | 225 days | Apr 20, 2017 |
| Milestone 4<br>Floor 32-40; 59 Units | Oct 27, 2016 | 182 days | Apr 27, 2017 |


# 9. CONCLUSIONS (STEP 4)



- The objective of the analysis is to determine Period of Delay, the number of days the planned occupation of the units was delayed due to the loss event. The Period of Delay should be determined.
- No guidance is provided in the policy documents on how concurrent insured and uninsured delays should be dealt with. Standard industry practice would apply.



The findings of 3 industry recognized delay analysis methods applied are summarized below:

**Window analysis:**
- Significant delays to the elevator installation caused a delay to the manlift removal. This in turn delayed the critical closing of the curtain wall weather barrier by 97 days and affected completion of the zipper units on 32 different floors.
- These delays are an indication of the knock-on effect of the loss event.

**As-planned vs As-built analysis:.**
- The analysis showed that a delay to the elevator installation and the resulting impact on vertical transportation caused a 182 day delay to the completion of the project. 93% of the units had been turned over for occupancy by April 27, 2017
- The milestone completion dates were extensively delayed. Milestone 1 was delayed for 140 days, Milestone 2 was delayed for 213 days, milestone 3 was delayed for 225 days and milestone 4 was delayed for 182 days

**Time Impact Analysis:**
- The loss event would have delayed final completion of the project by 129 days resulting in a delay to the commencement of unit occupation from August 8, 2016 to after December 15, 2016



The analysis methods applied were utilized to calculate the **Period of Delay** of the loss event.
- The calculations show that TCO#1 was delayed by 140 days, TCO#2 by 213 days, and TCO#4 by 182 days



## EXHIBITS

**Exhibit A** – CV's for Mr. Bumgardner, Dr. Hendrik Prinsloo and Mr. Brian Hill; Rate Sheet & Mr. Bumgardner's case list

**Exhibit B** – Publications by Mr. Bumgardner

**Exhibit C** – List of documents reviewed

## REFERENCES

1. https://www.constructiondive.com/news/report-elevator-related-construction-deaths-on-the-rise/548008/
2. https://www.imia.com/about-imia/
3. https://www.londonengineeringgroup.com
4. https://www.imia.com/wp-content/uploads/2013/10/LEG-DSU-An-Overview-1358955726.pdf
5. https://www.lexology.com/library/detail.aspx?g=814a2f33-9e51-4a0d-8e9e-432c550c8940
6. https://www.swissre.com/dam/jcr:b76d1bbf-2d0b-47f1-911a-509232761aaf/pub_delay_in_startup_insurance_en.pdf