# EXHIBIT 40







# ELEVATOR SHAFT LOSS EVENT

## RESPONSE TO J.S. HELD REPORT

**November 16, 2020**

10911 Technology Place, San Diego, CA 92127
(858) 436-7770 – www.xperagroup.com

**REPORT DESCRIPTION**

| | |
|---|---|
| **CASE / PROJECT** | SM 10000 Property, LLC and Swinerton Builders v. Allianz Global Risks US |
| **OUR CLIENT** | Allen Matkins |
| **REPORT TITLE** | Elevator Shaft Loss Event - Review of J.S. Held Report |
| **ISSUE DATE** | November 16, 2020 |
| **REPORT REFERENCE NR** | XP/SM/002 |
| **REPORT STATUS** | For submission |
| **DISCLAIMER** | The opinions in the report are based on our review and analysis to date. We reserve the right to update these opinions upon receipt of new information, or in rebuttal to future expert testimony. |

# CONTENT

**1. INTRODUCTION 4**

**2. RESPONSES TO JSH OPINIONS 4**

**3. REVIEW OF METHODOLOGY IN CONTEXT OF INDUSTRY BEST PACTICE 13**

**3.1 INDUSTRY BEST PRACTICE 13**

**3.2 J.S. HELD ANALYSIS IN CONTEXT OF INDUSTRY BEST PRACTICE 13**

A. FAILURE TO CONSIDER INFORMATION ESSENTIAL FOR ACCURATE ANALYSIS 14
B. UNPROVEN METHOD NOT KNOWN BY INDUSTRY UTILIZED 14
C. METHODOLOGY FOLLOWED FAILED TO DETERMINE WHAT WAS REQUIRED 15
D. CRITICAL REQUIREMENTS FOR ACCURATE DELAY ANALYSIS NOT CONSIDERED 17

**4. CONCLUSION 18**

# TABLE OF FIGURES

FIGURE 1 - TOWER CONCRETE LOSS EVENT RELATIONSHIP 6
FIGURE 2 - ELEVATOR FRONT FLOAT 9

## 1. INTRODUCTION

We have reviewed the Expert Report prepared by J.S. Held (JSH) dated October 26, 2020 and have identified aspects of their report where we disagree with the JSH methodology and/or opinions. The following response is not intended to include every opinion related to the JSH report, but to provide a summary of some of the primary substantive areas where we believe that the evidence is contradictory to the JSH opinions and where we believe that the JSH methodology is inappropriately applied to reach their conclusions.

## 2. RESPONSES TO JSH OPINIONS

**JSH Opinion 1**. The repair work to the elevators as a result of the loss event was completed by February 26, 2016.

**Response:** As of the date of the loss event, Schindler was nearing completion of their Jump 1 and, in addition to having completed certain permanent installations within the passenger elevator shaft, had working and functional temporary cars, crash decks, and Guide Rail Installation Kit (GRIK) tool for each of the passenger elevator cars A, B, C and D. Due directly to the loss event, a considerable amount of permanent installations and virtually all of the temporary equipment in the affected shafts including the GRIK tool had to be replaced.[1]

JSH erroneously equated the end of Schindler's clean-up of debris and splatter from the concrete spill as establishing the return to the pre-loss condition and found, based on Schindler Daily Reports, that the clean-up activities ended on February 26, 2016. Schindler's Change Order #7 and correspondence between Swinerton and Schindler dated March 29, 2016[2] surrounding that change order, establish that the clips on floors 1 through 19, which were damaged by the concrete spill, were not replaced until after March 29, 2016. Schindler's Daily Reports and employee timecards[3] establish that the passenger shaft GRIK tool destroyed by the concrete spill was rebuilt during the week of April 25, 2016 - April 29, 2016. In particular, the GRIK tool is a critical element of Schindler's

[1] "Exhibit 0059", email from Christopher Lape, 2/2/17, SB40084609

[2] "RE: 10K SM – Report on Elevator Damage", email from Christopher Lape, 3/29/16, SEC 001132

[3] "Employee Timecards", Timecards from Schindler, 4/29/16, SEC000765

installation system and consists of a custom fabricated device built specifically for each project and each elevator shaft. Fabrication of the new GRIK tool after the loss event required a long lead time. The rebuilding of the GRIK tool in the passenger elevator shaft, first mentioned as being back in place and being adjusted and ready to drop target lines after 4/25/16, would mark the ability to start Jump 2 following the loss event. Our understanding of the timing of the work was confirmed by interviews with the Swinerton and Schindler personnel who were involved.

We, therefore, disagree with the JSH interpretation of the end of clean-up activities that show up on the Schindler daily reports as substantiating the Period of Delay as ending on 2/26/16. JSH should have considered other documentation of work being performed in April and replacement of temporary equipment in the shaft, including the GRIK tool, in establishing the end of the end of repair work.

**JSH Opinion 2.** The Penthouse re-design changes (Bulletin #28) delayed the concrete pours on Level 40, Level 41 (elevator machine room floor), Level 42 the Helipad (elevator machine room roof), the elevator machine room work, the subsequent elevator work, and impacted the project.

**Response:** The JSH analysis is based on their understanding that the machine room had to be complete prior to proceeding with Jump 2. Although this is a logic constraint included in the Swinerton schedules, in the as built sequence the machine room work in fact did not hold up work on Jump 2. The Schindler Scaffold-less Installation Methodology (SLIM) removes the constraint by allowing work to progress in the shaft independent of the work in the machine room. Whether the installation was to be 3 jumps, or 2 jumps or 4 jumps was entirely dynamic and the determination off what levels to work from and the number of jumps that would best facilitate the work could be adjusted to best fit the conditions with respect to how elevator installation related to concrete shaft completion.

Figure 1 below demonstrates that Jump 2 did in fact proceed before the completion of the machine room. Even though the concrete pours on Level 40, Level 41 (elevator machine room floor) and Level 42 (elevator machine room roof) were delayed it did not delay completion because after the completion of these activities the work in the elevator shaft could not commence for a period of 47 days until April 26, 2016 when the replacement GRIK tool as discussed above could be utilized to set the target line (refer

to Figure 1). Even if the slab pours took place on the dates originally planned it would not have resulted in the project being completed earlier. The machine room was complete with permanent power on April 8th, the GRIK tool was rebuilt on April 25th, this shows that the shaft work was behind the machine room by over a month.



| Name | Start | Finish |
|---|---|---|
| **Pre loss Schedule** | **Jul 13, 2015** | **May 11, 2016** |
| Jump 1 (1 - 15) | Jul 13, 2015 | Dec 18, 2015 |
| Jump 2 (16 -28) | Jul 20, 2015 | Feb 8, 2016 |
| Pour Machine Room Floor Slab (level 41) | Jan 11, 2016 | Jan 11, 2016 |
| Pour Machine Room Roof Slab (level 42) | Jan 15, 2016 | Jan 15, 2016 |
| Machine Room | Jan 19, 2016 | Feb 8, 2016 |
| Elevator Machine Room (Equipment) | Apr 5, 2016 | Apr 28, 2016 |
| Jump 3 (29 - 40) | Feb 9, 2016 | May 11, 2016 |
| **As Built Schedule** | **Jul 13, 2015** | **Nov 26, 2016** |
| Jump 1 (1- 19) | Jul 13, 2015 | Jul 22, 2016 |
| Pour Machine Room Floor Slab (level 41) | Feb 22, 2016 | Feb 22, 2016 |
| Pour Machine Room Roof Slab (level 42) | Mar 7, 2016 | Mar 7, 2016 |
| Machine Room | Mar 11, 2016 | Jul 22, 2016 |
| Elevator Machine Room (Equipment) | Mar 11, 2016 | Jun 29, 2016 |
| Jump 2 (20-40) | Apr 25, 2016 | Nov 26, 2016 |
| **Loss event Repairs** | **Dec 2, 2015** | **Apr 26, 2016** |
| Loss event | Dec 2, 2015 | Dec 2, 2015 |
| Clean-up, damage assessment, safety measures, equip procure & manufacture | Dec 2, 2015 | Apr 26, 2016 |
| Drop target lines with GRIK - elevator work can re-start | Apr 26, 2016 | Apr 26, 2016 |



***Figure 1 - Tower Concrete Loss Event Relationship***

**JSH Opinion 3:** The post-loss re-design of the crash decks and re-installation of the crash decks impacted the start of the elevator shaft repair work.

**Response:** JSH argues that, "…had the crash decks been rebuilt according to the original design, the crash decks could have been replaced earlier, allowing both repair work and new installation work to begin earlier." JSH attributes delay in the crash deck re-design and replacement to Schindler and seems to argue that Schindler could have simply put the crash decks back up after the loss event and kept going. Multiple crash decks were damaged or completely destroyed by the concrete falling down the shaft when the





formwork failed, and the delay in getting crash decks re-designed and back in place was a direct impact of the loss event. Had the form failure occurred an hour earlier when workers were in the shaft, the crash deck failure would have likely resulted in the death of workers in the shaft. The loss event and the failure of the crash deck system caused great concerns with worker safety going forward. Even with the re-designed crash decks, Schindler refused to be on site working in the shafts on pour days. The JSH assumption that after the loss event Swinerton could have simply put the same crash decks in place that had just failed and expected Schindler to return to work in the shaft is not reasonable.

Change Order CO5 as requested by Schindler and approved by Swinerton[4] outlined criteria that had to be met prior to Schindler crews mobilizing the host way, and included:

- All divider beam installations are halted while SEC employees are on site,
- No concrete pouring on shear walls or deck areas within 25 feet of hoist ways while SEC employees are on site,
- Two additional crash decks installed per SEC specifications at level 30 and 36,
- SEC will require 3 days' notice for the remaining shear wall pours to ensure enough time to schedule employees for offsite work.

According to Conco daily reports, the crash decks at levels 30 and 36 were installed on 1/25/16. As discussed in the response to JSH Opinion 1, Schindler's daily reports show the damage assessment took place on February 18, 2016 and the clean-up complete around 2/26/16, but the damaged clips were not replaced until the first week of April and the GRIK tool was not in place until 4/26/16 which marked the start of Jump 2.

Therefore, we conclude, contrary to JSH, that it would have been unreasonable to have used the original crash deck design going forward after the original design had failed so dramatically in containing falling debris, or to have expected Schindler to send its work crews back into the shaft under those circumstances, and we disagree with JSH that getting the crash decks back in place any sooner would have reduced the delay due

[4] "Change Order #5", Subcontractor Change Order from Schindler, 1/12/16, SEC001124

to the repairs since the elevator work could not have proceeded without new clips and the GRIK tool in place on 4/26/16.

**JSH Opinion 4.** The elevator work and durations were impacted and delayed by the elevator front (entrances) work and the elevator card reader/port system work. These issues impacted the completion of the elevator work and of the project. These items were base contract work and were not damaged as a result of the loss event.

**Response:** In early March 2016, Schindler was informed by a representative from LA City's building department regarding ADA issues affecting the PORT card reader.[5] Specifically, the Owner had requested that Schindler customize its PORT elevator call console for the lobby. The original design was such that the panel that a user would interact with to call the elevator projected out from the wall. The ADA-required call button slopes away from the user. In the Owner's requested design, the panel would be flush-mounted. The response from Binh Phan at LA City on 3/10/16 was:

> "Flush mounting of the hall call console is not allowed. Its position shall be sloped away from the user at 15 to 25 degrees from the vertical plane per LABC 11B-411.2.1.3.4."

Later however, in June 2016, Binh Phan and Barry Friesen of LA City met with Schindler representatives who "determined the job should not be covered under new ADA rules and falls under 2011 rules so we are grand fathered in."[6] This was incorporated into RFI 634.1.

Then on 7/5/16, it was clarified that while the older ADA requirements did apply due to "grandfathering," the old code still required an ADA button.[7] By October 20, 2016, the ADA buttons were still 3 weeks from being delivered, so Schindler and Swinerton agreed to use a temporary station in order to meet the requirements for the Elevator A and B inspections.[8] An email dated 10/25/16 from Keith Dancy (Swinerton) to Ralph Testa

---

[5] "Fw: 10000 Santa Monica – Fixture Question", email from Christopher Lape, 3/10/16, SM0008390
[6] "FW: Elevator Lobby Port Panel – RFI 634.1", email from Nalani Wong, 6/3/16, SB2000971
[7] "Fw: Elevator Lobby PORT Panel", email from Christopher Lape, 7/5/16, SB048863
[8] "RE: 10000 Santa Monica – Elevator A and B inspection", email from Keith Dancey, 10/25/16, SB2003541

(Schindler) directed Schindler to install temporary push buttons to "allow us to final these cars".

We therefore conclude, contrary to JSH, that the card reader issue did not hold up the project and, since there was a fairly simple solution achieved by installing temporary call buttons, the issue would not have held up the project had the loss event not occurred.

The Held report does not follow the correct critical path analysis method and failed to take float into account when considering the work on the elevator fronts. All the elevator fronts activities in the schedules relied upon by JSH had significant float ranging from 26 to 84 working days, indicating these activities were not on the critical path. For example, if the float in the April 11, 2016 Schedule update is considered in relation to the as-built schedule completion dates the elevator fronts level 1 – 19 could even have been completed 42 working days later without impacting the project completion date. Only one elevator fronts activity, the machine room activity of the front walls to 41 seems to have exhausted its float with 25 working days. This activity does not have a successor in the as-built schedule. The logical successor for the front walls to 41 activity completion of the drywall. The final drywall activity included in the schedule is the drywall on level 40. The drywall on level 40 was completed on September 28, 2016, which is more than two months after the completion of the front walls to level 41, which were completed on July 22, 2016. The front walls to 41, therefore, did not delay the occupation of the units.

| ACTIVITY | PRE-LOSS NOV 30, 2015 | | ACTIVITY | RECOVERY FEB 16, 2016 | | UPDATE APR 11, 2016 | | AS-BUILT MAY 31, 2017 |
|---|---|---|---|---|---|---|---|---|
| | FINISH | FLOAT | | FINISH | FLOAT | FINISH | FLOAT | FINISH |
| **Jump 1 (1-15)**<br>Fronts complete to 12 | Dec 16, 2015 | 84 | **Jump 1 (1-19)**<br>Fronts complete to 19 | Feb 25, 2016 | 64 | Apr 8, 2016 | 42 | Apr 8, 2016 |
| **Jump 2 (16-28)**<br>Fronts complete to 27 | Feb 4, 2016 | 53 | | | | | | |
| **Jump 3 (29-40)**<br>No fronts activity | | | **Jump 2 (20-40)**<br>No fronts activity | | | | | |
| **Machine room**<br>Fronts complete to 41 | Feb 8, 2016 | 53 | **Machine room**<br>Fronts complete to 41 | Apr 22, 2016 | 26 | May 16, 2016 | 42 | Jul 22, 2016 |

***Figure 2 - Elevator Front Float***

The JS Held report mistakenly concludes that the extended duration of elevator front work is not related to the loss event and subsequent repairs. The loss event directly impacted the planned installation timeline of the elevator fronts. To be able to adjust and set the elevator fronts an operational platform inside the elevator shaft was required. The occurrence of the loss event prevented access into the shaft for several months making impossible to set the elevator fronts during this period

**JSH Opinion 5:** Elevator E, located in a separate elevator shaft and not damaged by the loss event, was the first "temporary" elevator car available for construction use, and was a predecessor to the removal of the exterior building personnel lift (manhoist). Elevator E was completed within the 16-week Subcontract Agreement 'clock start' duration terms, even though work stoppages and non-work periods impacted its completion.

**Response:** JSH identifies 119 calendar days of "no work" in service elevator shaft E between 11/6/15 and 3/28/16 based on actualized schedule entries in Swinerton's schedule update between activities Install Main Rails to 19 and Build Entrances. JSH describes and treats this as a delay unrelated to the loss event. JSH concludes that (E) was not affected by the loss event and was delayed by inadequate workforce, that having E operational was the condition precedent to being able to remove the temporary hoist and therefore, the loss event was not responsible for any delay related to the temporary hoist, or the subsequently the zipper units.

It is clear from the project documentation that, although no concrete actually spilled down the E shaft, work inside the E shaft stopped due to the safety concerns caused by the loss event. That stoppage was caused directly by, and was not unrelated to, the loss event. On 12/11/15, Schindler notified the Swinerton that it would not have crew inside any hoist ways prior to the building being topped out and machine room walls erected.[9]

Work inside the E shaft resumed earlier than work inside the passenger elevator shaft. However, as reflected in an April 4, 2016 letter from Schindler to Swinerton[10], manpower was diverted from shaft E to handle clean up and restoration work in shaft A-D. Once

---

[9] "Reference: Concrete Damage to Elevator Hoistways – Cars A, B, C, & D", letter from Schindler, 12/11/15, SEC 001097
[10] "Exhibit 0053", letter from Schindler, 4/4/16, SEC001309

again, the diversion of manpower from shaft E was directly caused by the loss event and was not unrelated to the loss event. Therefore, the JSH assessment that the service elevator work was unaffected by the loss event is directly contradicted by clear project documentation and cannot be supported. The project documentation shows that work occurring in the service elevator shaft E was in fact directly affected by the safety concerns that arose after the loss event that affected work in all shafts, and was affected by the diversion of manpower to the passenger elevator shaft for clean-up and restoration work.

**JSH Opinion 6:** Delays to TCO #1 through TCO #4 were not related to the loss event.

**Response:** Our analysis as described in our primary report addresses our evaluation of the delay. One significant difference of opinion with the JSH analysis is the use of dates on which the City of Los Angeles building department issued temporary certificates of occupancy ("TCO dates") as completion dates. JSH, in their analysis, states that they were asked to measure the Period of Delay, if any, caused by the loss event. For the purposes of their analysis they were asked by their client or its attorneys to assume that "the actual date on which commercial operation or tenant/ owner occupancy commenced or could have commenced" is the actual date when all temporary certificates of occupancy ("TCO") for the project were achieved. For the purposes of their analysis, they define completion date and TCO date as one in the same.

We found that in the original project planning and, as evidenced in the pre-loss Swinerton schedules and schedule updates, all work necessary to achieve each project milestone described in the construction contract ("Milestone") was expected to be complete on the TCO date associated with that Milestone. The contract between Swinerton and Owner defined completion by Milestones with specific criteria well beyond TCO, however. The TCO was only one of 7 criteria in the Milestone definition of completion. Due to delays caused by the loss event, both the owner and Swinerton began to focus on work necessary to obtain the actual TCOs, by themselves, in order to satisfy the lender requirements to obtain a refinance of the project and minimize the financial impact of the delay. Achieving the TCOs was a requirement of the re-finance. SM10000 Property was setting up a refinance to occur immediately after the anticipated issuance of TCO

#2.[11] The delay resulted in an inability to refinance the construction loan and mezzanine loan.[12] By August 2016, the goal was to refinance by the end of the year. However, due to the schedule slippage at that point, it was not possible to achieve TCO and total completion before the end of the year. As of November 22, 2016, in an email from Crescent Heights to Swinerton, "the delay in lender had already resulted in a multi-million increase in the cost of buying a required cap under the loan"[13].

In order to get the refinance accomplished and mitigate potential further financial damages, effort was focused in the Fall of 2016 on satisfying the City of Los Angeles Department of Building and Safety (LADBS) in order to obtain TCOs even though substantial other contract work remained to be performed that would be necessary to achieve completion necessary for the commencement of commercial operations or tenant occupancy as defined by the policy.

As of 12/10/16, there was still contract work not yet completed, which included work on exterior systems at Levels 1 and 3, curtain wall, storefront & doors, panels & louvers, east garage entry canopy, interior glazing and glass doors at Studio Area, window coverings, gate at transformers, and casework, stone, doors, wood floors, etc., throughout the building.[14] None of the units was ready for occupancy at that time and it would be months before all units were ready for occupancy.

We, therefore, disagree with the JSH assumption that the issuance of TCO's signified the completion date of the work as used in their analysis. That assumption is contrary to the facts as shown by the project documentation and should have been challenged by JSH. We also disagree with JSH conclusion, based on the erroneous assumption noted above, that delays to TCO #1 through #4 are not related to the loss event.

---

[11] "RE: 10000SMB: Sheedy", email from Ray Haj, 7/13/16, SM0007829
[12] "SM 10000 Project: Project & Overview", presentation from Swinerton, 7/12/17, MMD 00020463
[13] "update", email from Bruce Menin, 11/22/16, SM0007019
[14] "10000 Santa Monica 5/31/17 As Built", schedule from Swinerton, 9/13/17, SB30081294

## 3. REVIEW OF METHODOLOGY IN CONTEXT OF INDUSTRY BEST PACTICE

### 3.1 INDUSTRY BEST PRACTICE

Delay analysis methods utilized in the construction industry are formalized in best practice guides such as the American Association of Cost Engineers (AACE) Forensic Schedule Analysis Practice Note. The best practice publications provide guidance on how to execute the 5 core methods commonly utilized to analyze CPM schedules and also provides direction on how to consider other complex matters in schedule analysis like concurrent delays and float ownership.

Very limited industry guidance specifically relating to delay start up (DSU) insurance claims is in existence. A limited number of published articles provide commentary on the application of the 5 core delay analysis methods utilized in the construction industry in the context of DSU claims. Literature on concurrent delays relating to DSU claims is exceptionally limited. To address this knowledge gap, the world's second largest reinsurer, Swiss Reinsurance Company Ltd., produced a guideline to assist underwriters and the parties involved in large construction projects with fundamentals for start-up insurance. A method to deal with concurrent insured and uninsured delays, that is similar to construction industry best practice for concurrent delays, is explained in the guideline.

No industry recognized delay analysis method uniquely suited for the analysis of construction delay for DSU Insurance claims exists. Established delay analysis methods utilized in the construction industry are potentially relevant in the context of DSU insurance claims. Absent a clear agreement to use a particular method, the selection of the most appropriate method or methods in a particular case should be made by the schedule analyst exercising sound professional judgment based on the availability of project documentation, the complexity of the project, and the language of the policy. That did not happen in this case because JSH was instructed or directed by lawyers to use a particular method that is not an industry recognized method.

### 3.2 J.S. HELD ANALYSIS IN CONTEXT OF INDUSTRY BEST PRACTICE

The requirements contained in the industry best practice guides were utilized to assess the J.S. Held reports.

### A. FAILURE TO CONSIDER INFORMATION ESSENTIAL FOR ACCURATE ANALYSIS

Industry guidance organizations place great emphasis on the importance of reviewing contractual documentation and contemporaneous project documents as a fundamental principle of the delay analysis process. In following the principle, the consideration of the construction agreement's definition of project completion and the definition of the period of delay in the insurance policy, are critical to ensure accurate results in the analysis process. J.S. Held mistakenly assumes that the issuance of a Temporary Certificates of Occupancy (TCO) constitutes project completion. In addition to a TCO, the construction agreement requires that units should be in a move-in condition for project completion to be achieved. The insurance policy also relies on the date when tenant occupancy could commence or in other words when the units were in move-in condition in calculating the period of delay. When it performed its original analysis JSH did not review the insurance policy according to the deposition of Lisa Enloe. It is not known whether JSH read the policy after the date of her deposition.

It is clear from the project documents that the date when the units were complete and tenant occupancy could commence trails the issuance of the TCO by several months. J.S. Held was requested to determine the period of delay. The flawed assumption on project completion prevented J.S. Held to accurately determine the period of delay. The error that resulted in the flawed conclusions could have been avoided by following the guidance of the AACE to review and consider the requirements set out in the construction agreement and insurance policy.

⇒ Not considering contractual requirements – AACE 29R-03, p 10, 13, 18, 22, 32, 50, 103 & 104

### B. UNPROVEN METHOD NOT KNOWN BY INDUSTRY UTILIZED

None of the 5 proven industry recognized CPM delay analysis methods was utilized in the J.S. Held analysis. These methods were developed to ensure consistency and accuracy of results. The J.S. Held report does not identify the analysis method that was utilized. The subsequent deposition of the authors of the report revealed that a specific method developed by J.S. Held for insurance related claims was utilized. A very recent article, titled: "*A comparison of delay analysis methodologies in a builder's risk context*", written by a present and a former employee of J.S. Held argues for a different approach that is used by J.S. Held. The authors acknowledge this approach is not used in the construction





industry, is largely unknown to professional schedule delay analysts and contractors and can lead to misunderstanding, controversy and litigation.

The industry recognized delay analysis methods were developed over many years, tested by industry, peer reviewed by means of countless research papers, tested in legal proceedings and evaluated by industry specialist bodies before these methods received industry recognition and were incorporated in industry guidance documents. The Held method has not been tested in any of the ways explained above and remains, to the best of our knowledge, an approach only applied by J.S. Held. By not utilizing any of the proven industry recognized CPM delay analysis methods the credibility of the results is compromised. The results are also compromised in that only one method is utilized to reach conclusions. Industry guidance documents are in favor of using more than one method.

- ⇒ Not utilizing industry recognized delay analysis method – AACE 29R-03, p 38 - 97
- ⇒ Not following recommendation to use more than one method - AACE 29R-03, p 126

### C. METHODOLOGY FOLLOWED FAILED TO DETERMINE WHAT WAS REQUIRED

The policy provides coverage for the period of delay caused by the loss event. To calculate the period of delay the analysis should establish whether the project would have completed earlier but for the loss event. The method utilized by J.S. Held does not answer this question, because it does not take into account how construction would have progressed, or what probably would have happened, had the loss event not occurred. The method utilized makes the flawed assumption that the contractor and owner would have made the same decisions whether or not the loss event occurred. This assumption fails to consider the rational actions that would be taken by a contractor to avoid or minimize delay by re-sequencing and re-prioritizing activities. All that this method can determine is what would have happened in a hypothetical situation where the loss event did not occur, but the contractor and owner behaved as though the loss event did happen. In other words, they are charged with the decisions they made and the actions they took when the loss event happened, even if those decisions and actions would, in all likelihood, have been different if the loss event did not occur. That is not a plausible hypothetical and as a result the method failed to establish when the project would have completed but for the loss event.

The recent article by a present and a former employee J.S. Held employees (referred to in section 3.2 B) acknowledges the following important points about the method used by JSH:

- The JSH method requires contractors and owners "to complete. . . activities that are well off of the critical path of the project . . . as quickly as possible . . . [to] immunize this contract work from being considered to be concurrently delayed."

  The main purpose of utilizing the critical path method in construction projects is to ensure the planned completion date is met by identifying activities that are on the critical path to allocate resources that these activities are not delayed, as a delay to an activity on the critical path will translate into a delay to project completion. To expect a contractor to complete activities that are not on the critical path as quickly as possible is illogical because any acceleration of these activities would not result in an earlier completion date. For this reason, the JSH expected execution approach is contrary to the approach that is followed in all major construction projects. When an analysis method is utilized that expects a contractor to act in an illogical way, contrary to industry practice that defies CPM principles it is highly unlikely that this method will deliver accurate results.

- "In circumstances where it is desired to pace the completion of non-loss-related work because of loss-related delays," the JSH approach counts "any self-imposed (pacing) delays" against the insureds. This is contrary to industry best practice. The AACE 29R-03 (page 112) provides the following guidance on pacing:

  "*Provided that pacing is not precluded by contract or local law, the contractor's right to pace its work in reaction to a critical path delay is a generally accepted concept. Thus, the contractor will not be penalized for pacing its work.*"

  Neither the insurance policy nor the construction agreement precludes the contractor to pace the work. Pacing is a valuable tool for a contractor to avoid unnecessary costs by reallocating resources in response to a delay. Pacing would not have been required but for the loss. Therefore, in contradiction to industry best

practice and the insurance policy, the JSH method penalizes the contractor for taking proactive action to minimize cost in response to the loss event.

## D. CRITICAL REQUIREMENTS FOR ACCURATE DELAY ANALYSIS NOT CONSIDERED

The Critical Path Method (CPM) is utilized in the scheduling of almost all construction projects. In delay analysis one of the most fundamental requirements for an event to be considered as a delay to project completion is that the event should affect the critical path of the project. The AACE 29R-03 considers this requirement as one of the seven general principles of delay analysis. The J.S. Held report repeatedly refers to specific activities that were not related to the loss event and continued longer than planned, as delays without considering whether this activity affected the critical path. This flawed approach creates an inaccurate perception that numerous activities not related to the loss event delayed completion.

A review of delay concurrency is critical in producing accurate results when determining whether a delay impacted the completion of a project. Concurrency is recognized as one of the most complex but important matters that needs to be addressed in delay analysis. Over the years an extensive body of knowledge relating to concurrency in delay analysis was developed. Industry practice notes provide guidance on how to approach concurrency to allow for accurate results. The approach followed by J.S Held in considering concurrency is not consistent with any industry recognized best practice.

⇒ AACE 29R-03, p 17 -18, B General Principles

The JSH Expert Report dated October 26, 2020 and signed by Granger A. Stuck appears to be consistent with methodologies and overall approach expressed in the testimony of JSH former employee Lisa Enloe, who oversaw the prior JSH work and preparation of reports related to the subject claim. Enloe testified that although she is familiar with critical path methodologies and the concepts of concurrency in delay analysis, she did not perform a Critical Path Analysis. She also testified that she relied upon policy interpretation as it relates to defining completion date as TCO date, and instruction to use a single TCO date to represent the project completion date provided to her by an attorney or the insurer. She never determined the impact of any delays on the completion of the project, only on TCO dates.

## 4. CONCLUSION

As explained above, we found the analysis and approach used by J.S. Held was not consistent with industry standard practices and methods, relied to an unusual degree on subjective judgment of the analysist, failed to properly identify the correct relationships between activities, failed to identify and address project documentation supporting the insured's claims, overemphasized the significance of certain activity delays that did not appear to be critical path delays, did not account for float created by the loss event, failed to determine the critical path of the work throughout the period of construction and therefore failed to identify the impact on completion of the loss event or of any other identified schedule delay.

---

The opinions in the report are based on our review and analysis to date. We reserve the right to update these opinions upon receipt of new information, or in rebuttal to future expert testimony.

Sincerely,

Xpera Group
Ted Bumgardner