United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SM 10000 PROPERTY, LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ALLIANZ GLOBAL RISKS US INSURANCE COMPANY,<br><br>Defendant. | Case No.  19-cv-03054-PJH<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 63, 68 |

Plaintiff SM 10000 Property LLC's ("SM") and Swinerton Builders, Inc.'s ("Swinerton") (collectively, "plaintiffs") motion for summary judgment came on for hearing before this court on January 28, 2021.  Defendant Allianz Global Risks US Insurance Company's ("defendant") motion for summary judgment came on for hearing before this court that same day.  Plaintiffs appeared through their counsel, Valentine Hoy and Linda Kornefeld.  Defendant appeared through its counsel Matthew Ponzi and Christopher Snow.  Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court **GRANTS IN PART** and **DENIES IN PART** plaintiffs' motion for summary judgment and **GRANTS IN PART** and **DENIES IN PART** defendant's motion for summary judgment.

## BACKGROUND

This case is an insurance coverage action arising out of an accident during the construction of a luxury residential building west of downtown Los Angeles.  On May 1, 2019, plaintiffs filed the action against defendant in the San Francisco County Superior Court.  Dkt. 1.  On June 3, 2019, defendant removed it to this court.  Id.  In their

complaint, plaintiffs allege the following three claims:

- Breach of contract.  Dkt. 1-1 at 31-42 (Compl.) ¶¶ 25-28.
- Breach of the implied covenant of good faith and fair dealing.  Id. ¶¶ 29-34 (the "bad faith claim").
- Declaratory relief.  Id. ¶¶ 35-37.

Plaintiffs seek punitive damages on their bad faith claim.  Id. ¶ 34.  In its answer, defendant alleges reformation as an affirmative defense.  Dkt. 1-1 at 2-28 ¶¶ 72-77 (the "reformation defense").

On December 2, 2020, the parties filed the instant cross-motions for summary judgment.  Dkt. 68 (plaintiffs' motion); Dkt 63 (defendant's motion); Dkt. 75 (defendant's opening brief errata).  During their briefing, the parties filed multiple erratas to their briefs and associated exhibits.  Unless otherwise specified, the court will cite the revised filings.

The sequence of events, insurance policy provisions, and the parties' prelitigation communications are key to understand their dispute.  The court will detail the relevant facts as necessary below.

## I.    The Parties

SM is a limited liability company formed by principals of a firm that develops, owns, and operates real property in major United States cities.  Dkt. 71 (Palermo Decl.) ¶ 2.  SM owns the real property ("Ten Thousand") at issue.  Id.  In 2013, SM hired Swinerton as a general contractor to build Ten Thousand.

Defendant is an insurer.  It issued to plaintiffs the policy underlying plaintiffs' claims.  Dkt. 68-2 ("Policy") at 47, § 1B (endorsement adding SM and Swinerton as additional insureds).

## II.    The Ten Thousand Building and Its Construction

Ten Thousand is a characteristically Los Angeles high-rise located at 10000 Santa Monica Boulevard.  Dkt. 71 ¶ 4.  It comprises 40 floors and 283 units.  Id. ¶ 4.  It includes an outdoor park, movie theaters, and an 80-person staff to "see to its residents' every wish."  Id.  Its monthly rent ranges from $10,000 to $65,000.  Id.  The building's projected

United States District Court
Northern District of California

construction cost was over $198 million.  Dkt. 71 ¶ 5.

### A.    The Construction Agreement Between Plaintiffs

On November 14, 2013, plaintiffs entered an "Agreement Between Owner and Contractor" (the "Construction Contract").  Dkt. 71 ¶ 6.  Under the Construction Contract, Swinerton would provide SM the complex's units in multiple phases.  Dkt. 71 ¶ 8.  As part of that plan, SM would gain early occupation of an on-site leasing office.  Id.  From there, Swinerton would deliver the subject units on a lower floor to upper floor basis.  Id.

Under the Construction Contract, Swinerton would begin working on the project on November 18, 2013.  Dkt. 71-2 (Construction Contract) at 12 ¶ 4.1.1.  The Construction Contract details four "completion deadlines/milestones."  Dkt. 71-2 at 13, ¶ 4.1.2.  The subject deadlines range from September 4, 2015 to May 10, 2016.  Id.  Each deadline calls for the construction of a certain number of units in the building.  Id.

The court will detail the milestones as necessary in its analysis below.

### B.    Pre-December 2, 2015 Delays

Aspirations aside, plaintiffs encountered a handful of delays during construction. First, because of SM's unspecified delays in obtaining loans, Swinerton did not break ground until April 2, 2014, Dkt. 71 ¶ 7, thereby adding around 4.5 months to the original break ground date.  Second, because of the discovery of methane gas on some unspecified date, Swinerton had to install a vapor barrier.  Dkt. 69 ¶ 3.  That installation delayed the project by approximately 30 days.  Id.

### C.    The Revised November 30, 2015 Construction Schedule

On November 30, 2015, just days before the accident giving rise to this action, Swinerton issued a revised construction schedule to SM.  Dkt. 69 ¶ 4 (attaching revised schedule, Dkt. 69-1).  Under that schedule, Swinerton's delivery on the four milestones referenced above was extended approximately five to six months, respectively.  Id. ¶ 5.

### D.    The December 2, 2015 Concrete Accident

On December 2, 2015, workers poured concrete into a wooden frame outlining the elevator core walls on Ten Thousand's 36th floor.  Dkt. 69 ¶ 6.  The wooden frame failed.

3

Id. Two tons of concrete cascaded into the elevator shaft, smashing numerous wooden crash decks along the way. Id. The wet concrete and wood fell to the pit of the elevator. Id. While money was lost, nobody was hurt.

### E.      The Dates of Actual Completion and Delivery of the Milestones

On July 1, 2016, Swinerton completed and delivered Ten Thousand's leasing office. Dkt. 71 ¶ 11. In January 2017, Swinerton completed and delivered the 1st through 21st units to SM. Id. ¶ 12. Between January 2017 and March 9, 2017, Swinerton completed and delivered the 22nd through 96th units. Id. ¶ 13. Between March 9, 2017 and April 20, 2017, Swinerton delivered the 97th through 225th units. Id. Between April 20, 2017 and April 27, 2017, Swinerton delivered the 226th through 275th units. Id. The delivery dates for the remaining eight units are not at issue.

A wait list of prospective tenants formed before Swinerton completed the above units. Dkt. 71 ¶ 12. SM leased the units as quickly as Swinerton delivered them. Id.

## III.    The Parties' Post-Accident Communications and Tendered Claims

On December 21, 2015, SM, through its broker of record the Aon company ("Aon"), emailed defendant a notice of loss concerning the damage caused by the December 2, 2015 accident. Dkt. 64 (Reyes Decl.) ¶ 9. Defendant opened a claim.

On December 22, 2015, defendant's adjuster, Lourdes Reyes ("Reyes"), spoke with Swinerton's project manager for Ten Thousand, Keith Dancey ("Dancey"), about the accident and resulting damage. Id. ¶ 10. That same day, Reyes inspected the scene of the accident. Id. ¶¶ 11-12. In 2016, Reyes sent Swinerton several requests for information "relevant to the evaluation" of its claim under the policy. Id. ¶¶ 14, 16-24.

On January 3, 2017, Reyes received a link with various documents concerning Swinerton's tendered claim (the "Property Damage Claim"). Id. ¶ 25. Swinerton initially sought $2,695,241.56 in property damage related costs. Id. Reyes, Aon, and Swinerton engaged in numerous follow-up conversations. Id. ¶¶ 26-31. Reyes later received an updated claim from Swinerton seeking an additional $10,014,930.92. Id. ¶ 31.

On April 10, 2017, Reyes received an email from Aon detailing SM's tendered

1   claim (the "Delay Claim").  Dkt. 64 ¶ 36.  SM sought $19,169,367 in loss purportedly

2   resulting from Ten Thousand's delayed opening.  Id.  Reyes sought and received

3   additional information from both plaintiffs through 2017.  Id. ¶¶ 38-44, ¶¶ 49-50.

4       On November 21, 2017, JS Held ("Held") (a consulting company "hired" by

5   defendant to help evaluate plaintiffs' tendered claims, id. ¶ 32) issued a 62-page report.

6   Id. ¶ 51. In it, Held concluded that the accident did not cause a delay in the completion of

7   any construction milestones or Ten Thousand's development.  Id. ¶ 51; Dkt. 71-3 (the

8   "Held Report").  In its report, Held further concluded that there were delays attributable to

9   other causes.  Dkt. 64 ¶ 51.  Defendant then provided plaintiffs a copy of the Held Report.

10  Id. ¶ 54.  On December 6, 2017, the parties had a dramatic meeting, which apparently

11  ended with plaintiffs walking out of the room.  Id.

12      Following the failed meeting, throughout 2018, plaintiffs provided defendant

13  additional information.  Dkt. 64 ¶¶ 55-57.  JS held drafted two additional reports analyzing

14  that information.  Id. ¶¶ 56-58.  Both reports concluded that the new information did not

15  alter the original Held Report's conclusions.  Id.

16      In February 2019, defendant paid plaintiffs the undisputed amount on Swinerton's

17  Property Damage Claim ($285,854.46).  Id. ¶ 58.  The remaining portion of that claim

18  was not paid.  Id.  On April 25, 2019, Reyes sent SM a letter denying coverage for the

19  Delay Claim.  Id. ¶ 59.  This action followed.

20  **IV.     The Policy**

21      Plaintiffs' insurance policy includes coverage for numerous sorts of first-party risk

22  that they faced in course of Ten Thousand's development.  Only two sorts of risk are

23  relevant to this action: (1) coverage for loss resulting from a delayed start; and (2)

24  coverage for loss resulting from physical property damages.

25      The policy provides coverage for the first sort of loss under a supplemental

26  Delayed Opening Insurance Extension Coverage Form.  Policy at 23-29.  For simplicity,

27  the court will refer to this portion of the policy as the "Delayed Start Coverage Form."

28      The policy provides coverage for the second sort of loss under its primary

United States District Court
Northern District of California

1   Contractors Installation/Builders Risk Form.  Id. at 3-22. The court will refer to this portion

2   of the policy as the "Property Damage Coverage Form."  The court details the relevant

3   policy provisions below.

4        A.      **Delayed Start Coverage Form Provisions**

5        The Delayed Start Coverage Form is a seven-page addition to the parties'

6   underlying insurance policy.  Boiled down, this form protects against certain economic

7   loss resulting from a delay in the completion of Ten Thousand's development, provided

8   certain conditions.  Four of its provisions and one of its endorsements (Endorsement 10)

9   are relevant to the viability of the tendered Delay Claim.

10       First, the Delayed Start Insuring Agreement states the following in relevant part:

11              subject to the terms, conditions, and limitations of the Policy . .
                . and terms, conditions, and limitations of this extension, this
12              Policy is extended to indemnify the Insured, specified in the
                Delayed Opening Insurance Extension Schedule, for Delayed
13              Start-Up Expenses, Loss of Gross Earnings, and/or Loss of
                Rental Income . . . incurred during the Period of Delay, when
14              such delay is caused by direct physical loss or direct physical
                damage to Insured Property during the Period of Insurance,
15              provided such loss or damage is indemnifiable under the policy
                to which this extension is attached or would have been able
16              except for the application of the Deductible.  Policy at 25, § 9.

17       Second, "Period of Delay" means:

18              [T]he period of time between the Scheduled Date of Completion
                and the actual date on which commercial operations or tenant/
19              owner occupancy commenced or could have commenced;
                however, not exceeding such delay as would result if the loss
20              or damage were repaired or replaced with the exercise of due
                diligence and dispatch, but in no event exceeding the Period of
21              Indemnity stated in the Schedule for all indemnifiable
                Occurrences combined. The Period of Delay shall not be
22              terminated by the expiration or cancellation of the Policy with
                respect to indemnity payable hereunder in direct consequence
23              of insured loss or damage occurring prior to such expiration or
                cancellation.  Policy at 26, § 12(B).
24

25       Third, the "Scheduled Date of Completion" means the ***later*** of the following:

26              (i)     The date stated in the Schedule; or

27              (ii)    The date on which, but for the insured loss or damage,
                        commercial operations or tenant/owner occupancy
28                      would have commenced.  Policy at 25, § 12A(i)-(ii).

United States District Court
Northern District of California

Fourth, "Delayed Start-Up Expenses" include various expenses defined in the policy. Policy at 26-28, § 12(F). In relevant part, such expenses include "General Overhead," "Construction Loan Fees," "Additional Construction Financing Interest," "Real Estate and Property Taxes," and "Loss of Rents." Id. The court need not define those expenses to decide the instant motions.

Fifth, the Delayed Start Coverage Form includes a Basis for Indemnity section, which provides that "subject to the Limit of Liability specified in the Schedule, the Insured will be indemnified for:"

A. Delayed Start-Up Expenses, during the Period of Delay, to the extent that such expenses are actually and necessarily incurred, to enable the Insured to commence commercial operations in the manner originally planned.

B. Loss of Gross Earnings and/or Loss of Rental Income which, but for the delay, would have been derived from the Insured Project, during the Period of Delay. Loss of Gross Earnings and/or Loss of Rental Income shall be adjusted, as may be necessary, to provide for market trends or special circumstances. The amount thus adjusted shall represent as near as may be reasonably practicable the Loss of Gross Earnings and/ or Loss of Rental Income.

C. The Delayed Start-Up Expenses, Loss of Gross Earnings, and/or Loss of Rental Income Coverage indemnifiable under this extension shall be reduced by the following:

(i) Any income realized from commercial operations at the Location of the Insured Project during the Period of Delay, or any increase in the Insured's income from any other property due to the delay;

(ii) Any amount saved in respect of labor costs, charges and expenses payable out of the anticipated revenue that do not arise or are reduced during the Period of Delay;

(iii) Any liquidated damages and/or penalties the Insured is entitled to receive;

(iv) Any income realized from deferred sales or from increased production or profits during a period of 12 months immediately following the Period of Delay resulting as a direct consequence of the delay. Policy at 25, §10A-C.

/ / /

United States District Court
Northern District of California

United States District Court
Northern District of California

**B.      Endorsement 10**

At the heart of defendant's reformation defense is "Endorsement 10," a seemingly benign amendment to the policy.  Policy at 48-49.  Defendant issued Endorsement 10 effective January 1, 2016.  Id.  In relevant part, Endorsement 10 amends the "Expiration Date" detailed in the "Period of Insurance" boxes of the Property Coverage Form, id. at 8, and the Delayed Start Coverage Form, id. at 23, from January 1, 2016 to December 31, 2016, id. at 48.

This endorsement is important because of what it purportedly omits.  In support of its reformation defense, defendant sets forth the following course of events to show that the parties made a mutual mistake by omitting a commensurate December 31, 2016 amendment to the "Scheduled Date of Completion" under Section 12A(i).

First, on January 13, 2016, defendant sent Irene Chung ("Chung"), an Aon employee, an email stating the following:

> On January 01, 2016, the above captioned policy expired. Please be advised that we now consider that the project declared under this policy has been completed and formally accepted by the purchaser, tenant, or owner as of January 01, 2016.  The coverage provided by said policy is no longer in effect beyond 12:01 am or the above-mentioned expiration date or the actual completion date, whichever is earlier.  Dkt. 67-2 at 5.

In response, Chung had a phone call with an underwriter for defendant, Greg Mason ("Mason").  Id.  Chung then followed-up with an email, stating the following:

> I know the work is still ongoing.  Please provide us with a soft 30-day extension while we figure out what the remaining timeline for work is.  Id. at 4-5.

On January 20, 2016, Mason then responds to Chung.  Dkt. 67-2 at 4.  In relevant part, he asks that Chung provide him a description of the work remaining on the Ten Thousand, its completed percentage, and a "new estimated completion date."  Id.

On January 21, 2016, Chung responds.  Dkt. 67-2 at 3-4.  In relevant part, she states the following:

> As of 12/31/15, the cost to complete is $80,148,274.61.

1   Crescent Heights [SM's principal] will need insurance through
2   the end of 2016 to complete this project.  There is no change in
    scope, just pushed back due to delays."  Id.

3   That same day, after exchanging a round of emails with Mason concerning

4   potential changes in Ten Thousand's total value, Dkt. 67-2 at 2-3, Chung then follows-up

5   with him, stating:

6   Please confirm extension to 12/31/16 as I need to issue certs
7   to lenders.  Id. at 3.

8   Later that morning, Mason emails Chung, quoting a premium for the requested

9   extension and stating the following:

10   [W]e need to understand why a project that was supposed to
11   be completed already needs to be extended for an entire year.
     What are the reasons for the delay?  In addition, please provide
12   the revised Gantt chart (construction timeline).  This information
     is critical.  Id. at 2.

13   Later that afternoon, Chung emails Mason with an excerpted response from SM

14   (apparently sent to Chung as a conduit) stating the following:

15   There are no new delays on the books. Contract substantial
16   completion date was originally 9/22/16 and was formally
     changed to 10/27/16 back in 2014 due to the vapor barrier
17   being added to the project at the City's request. The contract
     substantial completion date has not changed since that time.

18   . . .

19   We are requesting coverage through end of 2016 as a buffer
20   since there's always the possibility for delays, last minute
     changes, or lingering punch list items that would result in some
21   work taking place beyond 10/27.  Id. (italics removed).

22   In her own words, Chung added that the following:

23   Just as additional backup, the casualty [policy] was originally
24   bound to expire until Oct 2016.  I'm not sure why the term on
     BR [Builders Risk portion of the policy] was set so short but this
25   plus the setbacks due to loss is what is driving the date.  Let
     me know if this is sufficient and forward endorsement as soon
26   as possible.  Id.

27   In a declaration proffered in support of defendant's motion, Mason states that

28   "based on the information provided by Aon [through Chung]," Mason "authorized an

9

extension of the policy from January 1, 2016 to December 31, 2016, which was reflected in Endorsement No. 10 to the policy." Dkt. 63-1 ¶ 7. He adds the following:

> I intended and understood that amending the "Expiration Date" of the policy's Delayed Opening Insurance Extension Schedule also amends the "Scheduled Date of Completion" stated in the policy's Delayed Opening Insurance Extension Schedule.
>
> . . .
>
> I intended and understood that amending the "Expiration Date" of the policy's Delayed Opening Insurance Extension Schedule to December 31, 2016 in Endorsement No. 10 also amended the "Scheduled Date of Completion" stated in the policy's Delayed Opening Insurance Extension Schedule to December 31, 2016.
>
> . . .
>
> I understood that Aon, as the broker of record for SM 10000, also understood that amending the "Expiration Date" of the policy's Delayed Opening Insurance Extension Schedule to December 31, 2016 also amended the "Scheduled Date of Completion" stated in the policy's Delayed Opening Insurance Extension Schedule. Id. ¶¶ 8-10.

In her deposition, Chung testified in relevant part that:

> Q: To your knowledge, did the Allianz builders risk policy expire on January 1st, 2016?
>
> A: Yes. Dkt. 67-1 at 13 (Certified Tr. 47:16-18).
>
> . . .
>
> Q: Did you intend for Allianz to issue an endorsement to the policy that amended the expiration date shown in the schedule for the policy's delayed opening insurance extension coverage form from January 1st, 2016, to December 31st, 2016?
>
> A: No. They would issue an endorsement to the entire policy, and this delayed opening insurance extension coverage form is just a part of the policy in its entirety.
>
> Q: So what did you intend for the endorsement that extended the policy to provide for?
>
> A: It would restate the new expiration date.
>
> Q: And did you intend for the endorsement that contained the new expiration date of December 31st, 2016, to also contain a new scheduled date of completion that's shown in the schedule for the delayed opening insurance extension coverage form?

United States District Court
Northern District of California

A: I am not exactly sure if that is reiterated on Allianz's extension endorsement.

Q: Would you have intended for the extension endorsement to have amended the scheduled date of completion?

[Objection omitted]

A: I would expect that it be understood that the scheduled date of completion is no sooner than the expiration date of the policy.

Q: Okay. So if the expiration date of the policy was changed from January 1st, 2016, you would understand that the scheduled date of completion in the policy would also be changed from January 1st, 2016, to December 31st, 2016?

[Objection omitted]

A: As I understand it, yes. Dkt. 67-1 at 25-26 (Certified Tr. 79:13-80:25)

. . .

Q: When Endorsement 10 was issued to the builders risk policy, was it your understanding that the scheduled date of completion shown in the schedule for the policy's delayed opening insurance extension coverage form was inaccurate?

A: It's my understanding that this endorsement amends the completion date.

Q: And you're referring to the completion date for purposes of the insurance policy?

A: Yes, which includes the delayed opening insurance extension.

Q: Right. So that would include the scheduled date of completion, item number 5 on the – on page 22 of Exhibit 17 (Endorsement 10)?

[Objection omitted]

A: Correct.

[Objection omitted]

Q: If Endorsement No. 10 was reissued to specifically address the scheduled date of completion in the policy's delayed opening insurance extension coverage form to read December 31st, 2016, instead of January 1st, 2016, would that change make the policy more accurate in your opinion?

[Objection omitted]

A: I would -- I mean, I would understand that amending the

United States District Court
Northern District of California

expiration date amends the completion date.

Q: And again, when you say "the completion date," that's the scheduled date of completion that's shown in the delayed opening coverage form?

A: Yes.  Dkt. 67-1 at 27-29 (Certified Tr. 83:15-85:5).

### C.    Property Damage Coverage Form Provisions

The Property Damage Coverage Form serves as the primary portion of the policy. Boiled down, this form protects against various first-party losses resulting from physical damage to Ten Thousand.  The parties' motions primarily focus on the tendered Delay Claim.  Given that, the court will detail the relevant Property Damage Coverage provisions only as necessary in its analysis below.

## V.    The Instant Cross-Motions for Summary Judgment

In their motion, plaintiffs move for an order on its claim for declaratory relief that would "confirm" the following "interpretations" of the Delayed Start Coverage Form:

- The Delayed Start Insuring Agreement's "Period of Delay" started on the date of the completion that was reasonably expected immediately before the accident, without consideration of the accident.  Dkt. 68 at 4.

- Endorsement 10 did **not** alter the preexisting January 1, 2016 "Scheduled Date of Completion" to December 31, 2016.  Id. (emphasis added).

- The "Period of Delay" ended when all Ten Thousand's units "were ready for use by the owner in the manner originally planned," which, in plaintiffs' words, means "substantially complete as defined in the Construction Contract, with all units being deemed complete on or before April 27, 2017."  Id.

- The "Period of Delay" is measured by either (i) "beginning on the Scheduled Date of Completion of Milestone 1 and ending when all four Milestones were actually achieved" or (ii) "four separate periods of delay associated with each planned phase."  Id.

In its motion, defendant requests the following relief:

- Summary judgment granting its reformation defense, thereby amending

12

Endorsement 10 to detail December 31, 2016 as the Scheduled Date of Completion under Section 12A(i).  Dkt. 75 at 9.

- Summary judgment of the breach of contract claim based on both the Delay Claim and Property Damage Claim tendered to defendant.  Id.

- Summary judgment of the bad faith claim.  Id.

- Summary adjudication of the prayer for punitive damages.  Id.

Given the complexity of the requests presented in the parties' cross-motions, the court provides a brief executive summary of its analysis of each request.  First, the court analyzes the reformation issue simultaneously raised in plaintiffs' second and defendant's first requests.  The parties primarily focus on that issue in their briefing and, from what the court can tell, a determination on it would significantly affect the coverage available for the Delay Claim.  The court finds that both sides proffered evidence shows a triable factual issue on the elements necessary to show the reformation defense.  Thus, the court denies both sides' competing requests for summary judgment on that defense.

Second, the court turns to plaintiffs' first, third, and fourth requests.  Because of an ambiguity in Section 12A(ii)'s use of the phrase "but for," the court finds that the interpretation proffered by plaintiffs in their first request controls.  Accordingly, the court grants plaintiffs' request for summary adjudication on that aspect of their claim for declaratory relief.  However, plaintiffs attempt to lace disputed factual determinations into their third and fourth requests.  Given that, the court denies their remaining requests for summary adjudication on those aspects of their claim for declaratory relief.

Third, with the above interpretative determinations in mind, the court analyzes defendant's second request for summary judgment of the breach of contract claim.  The court will analyze the viability of that claim under two separate bases, namely the Delay Claim and Property Damage Claim.  The court finds that triable factual issues underlie both bases and, thus, denies summary judgment of the breach of contract claim.

Lastly, the court analyzes the viability of plaintiffs' bad faith claim and prayer for punitive damages.  The court finds that defendant maintained a good faith, reasonable

basis to deny coverage of the tendered Delayed Start and Property Damage Claim.  On that basis, the court concludes that defendant is entitled to summary judgment of the bad faith claim and summary adjudication of the prayer for punitive damages.

### DISCUSSION

## I.   Legal Standard

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id. "A 'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact."  United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989).

Courts recognize two ways for a moving defendant to show the absence of a genuine dispute of material fact: (1) proffer evidence affirmatively negating any element of the challenged claim or (2) identify the absence of evidence necessary for plaintiff to substantiate such claim.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000) ("In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.").  Rule 56(c)(1) expressly requires that, to show the existence or nonexistence of a disputed fact, a party must "cit[e] to particular parts of materials in the record."  Fed. R. Civ. Pro. 56(c)(1).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must

United States District Court
Northern District of California

affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  S. California Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003) ("As the party with the burden of persuasion at trial, [plaintiff] must establish beyond controversy every essential element of its [claim under the Constitution's Contract Clause]."); Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986) ("Thus, if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor.") (italics in the original).  That said, on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Cattrett, 477 U.S. at 325; In re Brazier Forest Prod., Inc., 921 F.2d 221, 223 (9th Cir. 1990) ("[I]if the nonmoving party bears the burden of proof on an issue at trial, the moving party need not produce affirmative evidence of an absence of fact to satisfy its burden. The moving party may simply point to the absence of evidence to support the nonmoving party's case. The nonmoving party must then make a sufficient showing to establish the existence of all elements essential to their case on which they will bear the burden of proof at trial.") (quoting Celotex Corp. at 322-23).

   "Where a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense."  Friedman v. Live Nation Merch., Inc., 833 F.3d 1180, 1188 (9th Cir. 2016) (internal citations omitted).  The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted."  Anderson, 477 U.S. at 248.  It is not the task of the court to scour the record in search of a genuine issue of triable fact. Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. Id.

   The court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the

1  nonmoving party, the judge must assume the truth of the evidence set forth by the

2  nonmoving party with respect to that fact.  <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1865 (2014);

3  <u>Leslie v. Grupo ICA</u>, 198 F.3d 1152, 1158 (9th Cir. 1999).  If the nonmoving party fails to

4  produce evidence rebutting the moving party's initial showing, "the moving party is

5  entitled to judgment as a matter of law."  <u>Celotex Corp.</u>, 477 U.S. at 323.

6      Lastly, without granting summary judgment of an entire claim, courts may rely

7  upon Rule 56 to determine certain facts or elements of a claim as established and

8  thereby dispose of the need to adjudicate them at trial.  <u>Lahoti v. VeriCheck, Inc.</u>, 586

9  F.3d 1190, 1202 n. 9 (9th Cir. 2009) (Citing with approval then-existing Rule 56(d)'s

10  advisory committee note that "[t]he partial summary judgment is merely a pretrial

11  adjudication that certain issues shall be deemed established for the trial of the case . . .

12  and likewise serves the purpose of speeding up litigation by eliminating before trial

13  matters wherein there is no genuine issue of fact.").

14  **II.   Analysis**

15     **A.    Preliminary Evidentiary Objections**

16      The parties raise five evidentiary objections in their briefing.  Three of the five

17  objections pertain to evidence that is immaterial or otherwise unnecessary to determine

18  the viability of the claims at issue.  Given that, the court overrules the following objections

19  as moot:

20  - Plaintiffs' objection to Reyes declaration (Dkt. 64) at 2:1 to 3:8.  Dkt. 99-1 at 7.

21  - Plaintiffs' objection to Granger Stuck's ("Stuck") declaration (Dkt. 65) at 3:9 to

22    5:2.  <u>Id.</u>

23  - Defendant's objection to various unauthenticated or uncertified deposition

24    transcripts attached.  Dkt. 98 at 6-9.  Plaintiffs initially attached those exhibits to

25    the Kornefeld declaration Exhibits 54-58 (Dkt. 95-12 through Dkt. 95-16) and

26    Exhibits 60-66 (Dkt. 95-18 through Dkt. 95-24).

27      With respect to the third objection, the court notes that plaintiffs refiled various

28  deposition transcripts following defendants' objection.  Dkt. 99-101.  To the extent the

16

1  court cites the revised exhibits in its analysis, the court finds that plaintiffs cured the

2  authentication and certification issues identified by defendant.

3       That said, the remaining two objections are material to the court's decision.  The

4  court analyzes each remaining objection in turn below.

5                    **1.     The Mason Declaration**

6       Plaintiffs object to Mason's declaration at paragraphs 8 through 10.  Dkt. 99-1 at 7.

7  Plaintiffs assert that the all three paragraphs are inadmissible under Federal Rules of

8  Evidence 401 and 402.  Id.  Plaintiffs further assert that the third paragraph is separately

9  inadmissible under Rule 602.  Id.

10      Federal Rules of Evidence 401 and 402 set forth the basic rules on relevance.

11  Fed. R. Evid. 401; Fed. R. Evid. 402.  Rule 602 permits a witness to "testify to a matter

12  only if evidence is introduced sufficient to support a finding that the witness has personal

13  knowledge of the matter."  Fed. R. Evid. 602.

14      The court finds that Mason's testimony about his intention and understanding of

15  Endorsement 10's effect on the Scheduled Date of Completion is relevant to defendant's

16  reformation defense.  As detailed below, to prove that defense, defendant must show that

17  the parties' mutually intended an agreement to give rise to a certain effect.  While

18  perhaps not dispositive, Mason's testimony about his understanding is, at minimum,

19  probative of defendant's purported intent for Endorsement 10 to revise the preexisting

20  January 1, 2016 Scheduled Date of Completion with December 31, 2016.  Given that, the

21  court overrules plaintiffs' Rule 401 and 402 objections.

22      The court also finds that Mason satisfies the personal knowledge requirement to

23  testify to his belief about Chung's understanding about the effect of Endorsement 10 at

24  the time it was negotiated.  Mason communicated with Chung numerous times over the

25  course of January 2016 concerning the requested policy extension.  Such

26  communications occurred by both email and phone.  They provide a sufficient ground to

27  permit Mason to form a conclusion about Aon's (i.e., Chung's) understanding of

28  Endorsement 10's effect.  Given that, the court overrules plaintiffs' Rule 602 objection.

United States District Court
Northern District of California

2.     **The Chung Declaration**

Defendant objects to the Chung declaration as inadmissible under the sham affidavit rule.  Dkt. 98 at 8-11.  Chung provided her declaration in support of plaintiffs' opposition to defendant's motion.  In it, she states the following in relevant part:

> When a policy extension is requested I would ordinarily expect the new policy expiration date to be congruent with the scheduled date of completion in the contractor's updated schedule.  That is because, as noted above, the insured would not typically want to pay for "extra" coverage beyond the anticipated completion date.  That is what I meant when I answered Mr. Snow's questions on page 80 at line 10-17 and 19 - 25 and on page 81 at lines 6-9 of my deposition. That does not mean, however, that when the policy expiration date is changed by endorsement it automatically adjusts the Scheduled Date of Completion in the policy schedule. Such a change could have implications far beyond a change to the term of the policy.  If a change to the date for the Scheduled Date of Completion in the policy schedule is intended I would expect the parties to agree upon that change separately, to consider the implications of such a change, and to include language in the endorsement to memorialize any agreement. That did not happen in the case of SM 10000.
>
> . . .
>
> Here, the insured requested a policy extension of December 31, 2016 in order to provide a buffer, in case of further delays. In other words, the insured was willing to incur the premium expense for a term that went beyond the expected completion date in order to be conservative and potentially avoid having to document another policy extension.  I clearly communicated that intent to Mr. Mason.
>
> . . .
>
> When I was discussing Endorsement No. 10 with Allianz and Mr. Mason, I did not ever intend or understand the Scheduled Date of Completion in the policy schedule was, or had to be, December 31, 2016.   I also did not intend or expect Endorsement No. 10 to change the Scheduled Date of Completion or to narrow coverage for the pending claim based on the December 2, 2015 loss event. To the extent Allianz is arguing in its motion for summary judgment that I intended or understood Endorsement No. 10 to modify the Scheduled Date of Completion in the policy schedule, that is not correct. If my deposition testimony indicates that I had such an understanding or intent when discussing Endorsement No. 10 with Mr. Mason, then I was confused. My only understanding is as set forth above.  Dkt. 92-2 ¶¶ 7-9.

Defendant contends that Chung's declaration statements concerning her intent

18

1   about Endorsement 10 are inconsistent with those previously testified to under oath in

2   her deposition.  Dkt. 98 at 8-11.

3       "The general rule in the Ninth Circuit is that a party cannot create an issue of fact

4   by an affidavit contradicting his prior deposition testimony."  Yeager v. Bowlin, 693 F.3d

5   1076, 1080 (9th Cir. 2012) (citations omitted).  This rule "prevents a party who has been

6   examined at length on deposition from raising an issue of fact simply by submitting an

7   affidavit contradicting his own prior testimony, which would greatly diminish the utility of

8   summary judgment as a procedure for screening out sham issues of fact."  Id.

9       However, the sham affidavit rule "should be applied with caution because it is in

10  tension with the principle that the court is not to make credibility determinations when

11  granting or denying summary judgment."  Id.  To trigger the sham affidavit rule, "the

12  district court must make a factual determination that the contradiction is a sham" and "the

13  inconsistency between a party's deposition testimony and subsequent affidavit must be

14  clear and unambiguous to justify striking the affidavit."  Id.

15      The court concludes that the sham affidavit rule does not apply to Chung's

16  declaration.  Critically, the subject statements fall short of clear inconsistency with her

17  prior testimony.  Instead, when read in context, it appears that her declaration expands

18  on and explains her prior testimony.  Given that, the court overrules defendant's sham

19  affidavit objection.

20      In light of its above rulings, the court considers both Mason's and Chung's

21  declaration in deciding the instant motion.

22      **B.    The Court Denies Summary Judgment of the Reformation Defense**

23      In Hess v. Ford Motor Co., 27 Cal. 4th 516 (2002), the California Supreme Court

24  collected a litany of rules relating to a reformation defense under California law.  Id. at

25  524-25.  In relevant part, the Hess court recognized that "[w]hen, through . . . mistake a

26  written contract fails to express the real intention of the parties, such intention is to be

27  regarded, and the erroneous parts of the writing disregarded. . . . If there is 'a mutual

28  mistake of the parties,' a written contract may be revised, on the application of a party

19

1   aggrieved, so as to express that intention, so far as it can be done without prejudice to

2   rights acquired by third persons, in good faith and for value." <u>Id.</u> at 524.

3       When reforming a written agreement, a court may "transpose, reject, or supply

4   words," but has "no power to make new contracts for parties." <u>Id.</u> Instead, the court may

5   "only reform the writing to conform with the mutual understanding of the parties at the

6   time they entered into it, if such an understanding exists." <u>Id.</u>

7       To raise mutual mistake as a defense, an aggrieved party "need only allege and

8   prove mutual mistake in order to avoid enforcement of the erroneous terms." <u>Id.</u> at 525.

9   To determine whether a mutual mistake occurred, a court may consider parol evidence.

10  <u>Id.</u> Such evidence is admissible to show mutual mistake even if the contracting parties

11  intended the writing to be a complete statement of their agreement. <u>Id.</u>

12      Lastly, California state courts recognize that "to reform a written instrument, the

13  party seeking relief must prove the true intent by clear and convincing evidence." <u>Shupe</u>

14  <u>v. Nelson</u>, 254 Cal. App. 2d 693, 700 (1967).

15      The court denies defendant's request to reform Endorsement 10 to include

16  December 31, 2016 as the Scheduled Date of Completion. First, defendant cannot show

17  the absence of a genuine dispute concerning SM's intent to include the requested

18  information in Endorsement 10. Critically, in her January 21, 2016 email, Chung copies

19  SM's own representation (via Frohlich) that:

20          ***Contract substantial completion date*** was originally planned
            09/22/16 and was formally changed to ***10/27/16*** back in 2014 .
21          . . The ***contract substantial completion date has not
            changed since that time*** . . . We are requesting coverage
22          through end of 2016 as a ***buffer*** since there's always the
            possibility for delays . . . that would result in some work taking
23          place beyond 10/27." Dkt. 67-2 at 2 (emphasis added).

24      The above bolded language supports a triable issue that, as of January 21, 2016,

25  SM understood the Ten Thousand's Scheduled Date of Completion was October 27,

26  2016. SM's statement that it sought the December 31, 2016 policy extension as a

27  "buffer" further supports the existence of such an issue.

28      Second, even putting aside the above contemporaneous email, defendant failed to

United States District Court
Northern District of California

1  proffer "clear and convincing" evidence that *it,* in fact, understood that the Scheduled

2  Date of Completion would likewise be extended when issuing Endorsement 10.  Mason's

3  declaration shows only an unexpressed belief about such effect.  Dkt. 63-1 ¶¶ 8-9.  At

4  best, his self-serving statement is probative of defendant's intent.  It does not clearly

5  establish that intent.

6       Third, while not helpful to plaintiffs' position, Chung's deposition testimony does

7  not eliminate a triable factual issue concerning SM's intent for Endorsement 10.  Chung's

8  deposition testimony stands for the proposition that she "***would expect*** that it be

9  understood that the scheduled date of completion is no sooner than the expiration date of

10  the policy."  Dkt. 67-1 at 25-26 (Certified Tr. 79:30-80:25) (emphasis added).

11      At best, this testimony shows Chung's understanding about standard industry

12  practices when renegotiating an extension on a policy.  It says ***nothing*** about the intent

13  of the specific insured (SM) at hand.  In any event, Chung's testimony cannot ameliorate

14  the inference that the court must draw about SM's intent when viewed in light of

15  Frohlich's contemporaneous statement included in the January 21, 2016 email.

16      Relatedly, in her declaration, Chung states that "[w]hen a policy extension is

17  requested I would ordinarily expect the new policy expiration date to be congruent with

18  the scheduled date of completion in the contractor's updated scheduled.  ***That is***

19  ***because***, as noted above, ***the insured would not typically want to pay for 'extra'***

20  ***coverage beyond the anticipated completion date***."  Dkt. 92-2 ¶ 7 (emphasis added).

21      The bolded statement plausibly explains how Chung could simultaneously

22  maintain (1) the general understanding that an expiration date and Scheduled Date of

23  Completion move together and (2) a belief that SM did not intend to correspondingly

24  extend the Scheduled Date of Completion to December 31, 2016.  Put simply, SM did not

25  mind paying more money for ***non***-coextensive dates if it could get the coverage desired.

26      Fourth, plaintiffs persuasively argue that reforming the Scheduled Date of

27  Completion would have an inequitable effect on benefits already accrued under the

28  policy.  As they point out, the Period of Delay states that, for purpose of coverage under

the Delayed Start Insuring Agreement, it "***shall not be terminated by the expiration*** . . . of the Policy with respect to indemnity payable hereunder in direct consequence of insured loss or damage ***occurring prior to such expiration*** or cancellation.  Policy at 26, § 12B (emphasis added).

The December 2, 2015 accident fell within that form's October 1, 2013 to January 1, 2016 period of insurance.  Policy at 23, § 3.  The court finds it fair to infer that, had plaintiffs known that the requested extension would compel an amendment to the Scheduled Date of Completion that would result in a loss of future potential benefits, they might have found an alternative carrier for the post-January 1, 2016 period.

In short, the evidence shows triable factual issues concerning the parties' intent about the scope of Endorsement 10.  Given that, the court denies defendant's request for summary judgment of its reformation defense and plaintiffs' competing request for an order confirming that the Scheduled Date of Completion under Section 12A(i) remains January 1, 2016.  The parties may still pursue and prove their positions at trial.  Until then, however, the court will treat the Scheduled Date of Completion under Section 12A(i) as presently stated in Endorsement 10—January 1, 2016.

One final point.  Plaintiffs repeatedly cite Getty v. Getty, 187 Cal. App. 3d 1159 (1986) for the proposition that defendant ***must*** have expressed its intent that Endorsement 10 would revise the preexisting Scheduled Date of Completion.  Dkt. 99-1 at 9-10.  The court is not yet convinced that an outward expression is a necessary condition to obtain reformation.  In Getty, the court ruled (without cited authority) that "[a] reformation action lies ***when*** a written instrument does not accurately reflect the oral understanding which gave rise to it."  187 Cal. App. 3d at 1178 (emphasis added).  The placement of the "when" condition in that statement of the rule makes it ambiguous as to whether an oral understanding is a sufficient or necessary element to substantiate a reformation defense.  In any event, given the reasoning above, the court need not now resolve that legal question.  The parties should, however, be prepared to address it in their pretrial filings.

22

**C.     The Court Grants Summary Adjudication of Plaintiffs' First Proffered Policy Interpretation**

Plaintiffs' first request raises a complicated interpretative question.   As detailed above, the Delayed Start Coverage Form defines Scheduled Date of Completion to mean the later of (1) the date stated in the Schedule (Section 12A(i)) *or* (2) the date on which, ***but for*** the insured loss or damage, commercial operations or tenant/owner occupancy would have commenced (Section 12A(ii)).  Policy at 28 (emphasis added).  Naturally, because the Scheduled Date of Completion affects the length of the Period of Delay, the parties dispute how to determine the Scheduled Date of Completion under the Section 12A(ii) prong.

Plaintiffs ask that the court interpret Section 12A(ii) to require a sort of prospective analysis to determine the Section 12A(ii) date.  Dkt. 68 at 17-18.  Under that analysis, a factfinder would look to plaintiffs' planned dates for completing Ten Thousand's development milestones immediately prior to the December 2, 2015 accident.  Id.

Defendant, on the other hand, asks that the court interpret Section 12A(ii) to require a sort of retrospective analysis to determine its date.  Dkt. 76 at 22-23.  Under that analysis, a factfinder would consider all pre- and post-December 2, 2015 events to determine how much delay (if any) the accident added to the building's development.  Id. Whether plaintiffs' or defendant's preferred analysis controls depends on the meaning of Section 12A(ii)'s use of the phrase "but for."

The court finds plaintiffs' prospective interpretation more persuasive.  Critically, the Delayed Start Coverage Form does not define the phrase "but for."  Neither side cites any binding authority interpreting that phrase.  The court searched for such authorities.   It did not identify any authority interpreting that phrase under California law in the insurance context.[1]

---

[1] The court identified authority interpreting that phrase in the tort context.  In that context, the California Supreme Court recently described that phrase as asking "if the injury would have happened anyway, whether the defendant was negligent or not, then his or her negligence was not a cause in fact." South Coast Framing, Inc. v. Workers' Comp.

United States District Court
Northern District of California

In the absence of a definition or binding legal authority identified by the parties, the court looks to the policy in its entirety to determine whether the parties' competing analyses are reasonable.  The court agrees with plaintiffs that there is at least one provision in the Delayed Start Coverage Form that cuts against defendant's retrospective analysis.  That form excludes coverage for expenses resulting from delays "***beyond the Scheduled Date of Completion*** of the Insured Project directly or indirectly due to" various specific events including, for example, "enforcement of any ordinance" and "strikes, protests, [or] lockouts." Policy at 28, § 14 (emphasis added).

If defendant's interpretation of the meaning of the "but for" phrase did, indeed, call for a retrospective analysis, then the bolded portion's use of the word "beyond" would be unnecessary.  Critically, the retrospective analysis would already correct for delay resulting from non-covered events such as strikes or lockouts.  Absent any necessity for that provision, the court finds that defendant's proffered retrospective analysis would render it improper surplusage.

To be sure, the court understands that there are other provisions in the Delayed Start Coverage Form that undermine plaintiffs' prospective analysis—namely, Sections 15 and 16.  Section 15 requires an insured to "immediately advise the Company of any change between the planned and the actual project progress schedule."  Policy at 28, § 15.  In the event of an incident giving rise to a potential claim, Section 16 requires an insured to "immediately submit to the Company any revisions to the original progress schedule where such revisions could delay the Scheduled Date of Completion."  Id., § 16.

---

Appeals Bd., 61 Cal. 4th 291, 298 (2015).  The California Supreme Court then confusingly added that the "but for" test has been "subsumed" by the "substantial factor" test, which "require[es] only that the contribution of the individual cause be more than negligible or theoretical." South Coast Framing, Inc., 61 Cal. 4th at 298.

This recent construction of the "but for" phrase does not appear to resolve the instant interpretative question.  On the one hand, the South Coast Framing court's description of the "but for" test as asking whether an "injury would have happened anyway" supports defendant's retrospective analysis.  However, it appears that inquiry has effectively been abrogated by the substantial factor test, which, cuts in plaintiffs' favor.  In any event, neither side proffered this authority.  Thus, the court need not consider it when reaching its decision on plaintiffs' first request.

1      If plaintiffs are correct that the Scheduled Date of Completion contemplates a

2   prospective planned date of completion, then Section 15 would have simply used the

3   term "Scheduled Date of Completion" when requiring plaintiffs to provide information

4   about the "planned project progress schedule."  Similarly, Section 16 would have omitted

5   its reference to an "original progress schedule" and its associated "revisions."

6      Regardless, under the circumstances at hand, the court finds that Section 12A(ii)'s

7   "but for" phrase is ambiguous and, thus, open to multiple reasonable constructions.

8   California law requires courts to construe ambiguous insurance policy provisions in

9   accordance with an insured's objectively reasonable expectations and in favor of

10  coverage.  St. Mary & St. John Coptic Orthodox Church v. SBC Ins. Servs., Inc., 57 Cal.

11  App. 5th 817, 825 (2020), review denied (Mar. 10, 2021) ("If the terms are ambiguous,

12  they must be interpreted in accordance with the insured's 'objectively reasonable

13  expectations,' and, if this does not eliminate the ambiguity, ambiguous language is

14  construed against the party who caused the uncertainty to exist.").  Plaintiffs' forward-

15  looking analysis for interpreting the term "but for" as used in the Scheduled Date of

16  Completion is objectively reasonable.  Given that, the court adopts plaintiffs' proffered

17  interpretation of Section 12A(ii).  Accordingly, the court declares that Section 12A(ii)'s

18  requires a prospective analysis to determine Ten Thousand's Scheduled of Completion.

19      **D.      The Court Denies Summary Adjudication of Plaintiffs' Third and**

20              **Fourth Proffered Policy Interpretations**

21      The court denies plaintiffs' requests for their third and fourth policy interpretations.

22  Both purported interpretations rest on an application of the relevant policy language to

23  facts at hand.  In particular, the third request would require the court to determine that

24  "actual date" triggering the Period of Delay's endpoint takes on a ***specific*** meaning—

25  namely, when all units "were ready for use by the owner in the manner originally

26  planned."  Dkt. 68 at 4.  Similarly, the fourth request would require the court to determine

27  that the completion of Milestone 1 and Milestone 4 mark the beginning and end of the

28  Period of Delay, respectively.  The determination of such beginning and end dates are

1  factual issues properly resolved at trial.  Given that, the court denies plaintiffs' requests

2  for summary adjudication of their third and fourth proffered policy interpretations.

3        **E.**      **The Court Denies Summary Judgment of the Breach of Contract Claim**

4        In its motion, defendant alternatively argues that, in the event the court denies its

5  request for summary judgment of its reformation defense, plaintiffs' breach of contract

6  claim still fails.  According to defendant, plaintiffs fail to proffer evidence showing that

7  they suffered covered loss for their tendered Delay Claim and Property Damage Claim.

8  Dkt. 75-1 at 21-23.  The court disagrees.

9        **1.**      **The Delay Claim**

10        As a preliminary matter, the court has determined that defendant's reformation

11  defense raises triable factual issues.  Absent a determination on that defense, the court

12  observes that there is an open question on the relevant Scheduled Date of Completion

13  and, incidentally, the relevant Period of Delay.

14        First, plaintiffs presented evidence to support their position on various potential

15  Periods of Delay.  Dkt. 71 ¶¶ 11-13 (Palermo declaration listing differences between

16  anticipated and actual milestone completion dates).  In light of the court's prior

17  determinations, as well as the above evidence presented by plaintiff, defendant cannot

18  maintain that the Period of Delay is necessarily limited to 44 days.  Dkt. 98 at 13.

19        Separately, the court considered defendant's request to strike the October 2020

20  initial delay report (Dkt. 94-2) of plaintiffs' expert, Ted Bumgardner ("Bumgardner"), as

21  inadmissible under Rule 37(c)(1).  Dkt. 98 at 12-15.  The court denies that request.  As

22  just indicated, neither the court (nor a jury) need rely on an expert's testimony to

23  determine the relevant Period of Delay.  Second, even if Bumgardner omits an

24  explanation about how certain delays following the accident could have been avoided

25  "but for" such accident, Dkt. 98 at 14-15, that omission does not necessarily amount to a

26  failure to disclose under Rule 26(a)(2).

27        Second, plaintiffs claim that they suffered numerous sorts of Delayed Startup

28  Expenses between February 9, 2016 and December 31, 2017.  Dkt. 68-4 at 5-7.  Such

United States District Court
Northern District of California

1   expenses include millions of dollars in Additional Construction Financing Interest, Loss of

2   Rents, Real Estate and Property Taxes, Insurance Premiums, and other General

3   Overhead Costs.  Id.  The court understands defendant's general contention that plaintiffs

4   failed to explain how or why such expenses qualify as indemnifiable or were not subject

5   to an offset under Section 10.  Dkt. 75-1 at 22-23.  Those questions, however, are factual

6   issues better suited for a jury.

7       The same holds true with respect to defendant's argument that the Period of Delay

8   may not exceed the sort of delay that would result if the damage from the accident were

9   repaired "with the exercise of due diligence and dispatch."  Id. at 21-22.  Any dispute that

10  defendant has with plaintiffs' exercise of "due diligence" (or lack thereof) in repairing the

11  elevator shaft is a fact-intensive determination that depends in part on the relevant Period

12  of Delay.  Given that such period is itself an open question, the court cannot now

13  determine whether plaintiffs acted reasonably in their repairs.

14      That said, the court agrees with defendant that the evidentiary basis underlying

15  plaintiffs' claimed Additional Construction Financing Interest expenses appears vague

16  and relatively insubstantial.  In his deposition, however, plaintiffs' other expert, Brian

17  Bergmark ("Bergmark"), explains that he relied on certain "accounting information and

18  invoices," as well as his communications with his client, to form a conclusion about such

19  amounts.  Dkt. 101-3 at 12-15 (Certified Tr. 199:16-202:8).  Given that testimony, as well

20  as the primary information cited by Bergmark, the court finds a triable factual issue on

21  this set of claimed Delayed Startup Expenses.

22      In sum, the court denies summary judgment of plaintiffs' breach of contract claim

23  to the extent it is based on the tendered Delay Claim.

24          **2.      The Property Damage Claim**

25      In its motion, defendant principally asserts that the policy's sub-limits control the

26  amount of coverage available for the tendered Property Damage Claim.  Dkt. 75-1 at 23.

27  Defendant explains that Swinerton fails to apply those sub-limits to its over $12 million in

28  purportedly covered losses.  Id. at 23-24.  While not forthrightly stated, defendant

United States District Court
Northern District of California

1  challenges this basis of the breach of contract claim on grounds that coverage under the

2  Property Damage Coverage form may not exceed the sub-limit amounts.  Id.

3    The court agrees that various sub-limits control the amount available to Swinerton

4  for the tendered Property Damage Claim.  Based on summary spreadsheets attached to

5  Bumgardner's declaration, Swinerton seeks coverage under various Property Damage

6  Coverage Form provisions.  Dkt. 94-6 (December 9, 2020 spreadsheet categorizing

7  claimed loss per insuring agreement under the Property Damage Coverage Form); Dkt.

8  94-5 (November 18, 2020 spreadsheeting doing the same).

9    In particular, Swinerton seeks coverage under the following provisions of that form:

10  -  General Property Insuring Agreement.  Policy at 11, § 8.

11  -  Expediting Expenses.  Id. at 16, § 26.

12  -  Debris Removal.  Id. at 17, § 27.

13  -  Temporary Repairs.  Id. at 21, § 44.

14  -  Contractor's Extra Expenses.  Id. at 21, § 46.

15    The policy includes a sub-limit of liability for coverage under the last four

16  provisions.  Policy at 8-9, § 4.  In particular, the policy limits coverage under those

17  provisions as follows:[2]

18  -  The Expediting Expenses provision limits per occurrence coverage to the

19    lesser of 25 percent of the "adjusted loss" or $5 million. Id. at 9, § 4N.

20  -  The Debris Removal provision limits per occurrence coverage to the lesser of

21    10 percent of the adjusted loss or $50 million. Id. at 8, § 4A.

22  -  The Temporary Repairs provision limits per occurrence coverage to the lesser

23    of 20 percent of the adjusted loss or $2.5 million. Id., § 4C.

24  -  The Contractor's Extra Expense provision limits per occurrence coverage to

25

26               

27  [2] Technically, the Policy includes an endorsement that controls the first three sub-limits. Policy at 42, § 4. However, the endorsement does not affect the prior schedule's stated limits and the parties do not bother to mention the endorsement. Thus, the court need not

28  and will not consider it.

1            the lesser of 10 percent of the adjusted loss or $ 5 million.  <u>Id.</u>, § 4D.

2            Plaintiffs fail to explain how or why the above-referenced sub-limits do not restrict

3 the scope of their recoverable loss under the Property Damage Coverage Form.  Thus,

4 these amounts provide an upward bound for the amount that plaintiffs may recover under

5 such provisions at trial.

6            With the above limitation in mind, the court finds defendant's two remaining main

7 arguments for summary judgment of this claim unpersuasive.  First, defendant contends

8 that Bumgardner fails to outline the basis and reasons for his covered loss conclusions.

9 Dkt. 75-1 at 25.  Perhaps.  But that disagreement is better suited for a pre-trial motion in

10 limine, ***not*** the instant motion for summary judgment.

11            Critically, in his declaration, Bumgardner states that:

12                        [He] identif[ied] and categoriz[ed] Swinerton's damages
13                        resulting from the Loss Event" and "[w]orking with Swinerton's
                       counsel . . . created categories for those expenses[] that were
14                        intended to align with categories identified in the Policy.  Then
                       we assigned the expenses to the categories and presented the
15                        information in a spreadsheet. Dkt. 94 ¶ 12.

16            Bumgardner attaches two versions of that spreadsheet to his declaration. Dkt. 94-

17 5 (November 18, 2020 spreadsheet); Dkt. 94-6 (December 9, 2020 spreadsheet).  Both

18 versions of those spreadsheets identify numerous invoices for charges that Swinerton

19 incurred and separates each charge into the "Direct," "Expediting Expenses," "Debris

20 Removal," "Temporary Repairs," or "GC's Extra Expense" provision categories.  <u>Id.</u>  For

21 each version, Bumgardner characterizes most of the claimed loss (approximately $ 12.5

22 million) as either a Contractor's Extra Expense or Expediting Expense.  <u>Id.</u>[3]  While not

23 identical, these spreadsheets are similar to that attached to a summary of Bumgardner's

24 October 26, 2020 damages report.  <u>Compare</u> Dkt. 98-4 at 6-7.

25

26 ──────────────────

27 [3] There appears to be a discrepancy between the Property Damage Claim amount stated
by plaintiffs in their opening brief ($12,210,172), Dkt. 68 at 10, and the amount listed by
Bumgardner in his spreadsheets (appx. $ 13.4 million).  The court need not now untangle
28 that discrepancy.  Plaintiffs should, however, be prepared to reconcile this apparent
discrepancy or clearly state the total amount at issue in their pretrial filings.

Separately, in his declaration, Dancey (Swinerton's project manager) attaches two documents describing the various repair costs incurred in apparent connection with the accident. Dkt. 70-1; Dkt. 70-2. Given the sheer volume of invoices testified to by Bumgardner and expenses identified by Dancey, the court finds a triable factual issue about the scope of costs incurred under the Property Coverage Form.

Second, defendant contends that the claimed property damage losses come within the consequential loss exclusion. Policy at 13, § 10C. Again, perhaps. But, in light of Bumgardner's declarations and spreadsheets, the court finds that plaintiffs identified sufficient evidence showing a triable factual issue on whether, in fact, such loss qualifies as consequential.

One final point. The court disagrees with defendant's construction of the undefined term "adjusted loss." Dkt. 75-1 at 23-24. In its opposition, defendant asserts that that term means "the adjusted amount of the direct physical loss covered by the insuring agreement of the Property Damage Form." Id. at 23. That construction is circular and, thus, by definition, unreasonable. Accordingly, for purposes of pretrial rulings, the court will adopt plaintiffs' proffered construction that "adjusted loss" includes "the total amount of loss" generally "arising from" a covered accident and measured **before** the application of any applicable deductible or limit of liability. Dkt. 99-1 at 22.

That construction is supported by the apparent purpose of the Property Damage Coverage form provisions to provide supplemental coverage for loss suffered separate and apart from that covered under the General Property Insuring Agreement. Compare Policy at 11, § 8.

In sum, the court denies summary judgment of plaintiff's breach of contract claim to the extent it is based on the tendered Property Damage Claim.

### F.    The Court Grants Summary Judgment of the Bad Faith Claim

Under California law, "there is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." Kransco v. Am. Empire Surplus Lines Ins. Co.,

30

23 Cal. 4th 390, 400 (2000), as modified (July 26, 2000).  "This principle applies equally to insurance policies, which are a category of contracts."  Id.  In most cases, because the covenant is a contract term, compensation for its breach is limited to contract rather than tort remedies.  Id.  However, "[a]n exception to this general rule has developed in the context of insurance contracts where, for a variety of policy reasons, courts have held that an insurer's breach of the implied covenant will provide the basis for an action in tort."  Id.  "The availability of tort remedies in the limited context of an *insurer's* breach of the covenant advances the social policy of safeguarding an insured in an inferior bargaining position who contracts for calamity protection, not commercial advantage."  Id. (emphasis in the original).

Tort liability for breach of the implied covenant of good faith and fair dealing has been "variously measured."  Love v. Fire Ins. Exch., 221 Cal. App. 3d 1136, 1151 (1990).  "The primary test is whether the insurer withheld payment of an insured's claim unreasonably and in bad faith."  Id.  "Where benefits are withheld for proper cause, there is no breach of the implied covenant."  Id.  Thus, California courts have explained that "there are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause."  Id.

With respect to the second element, California courts have ruled that:

> Where there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute. Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co., 90 Cal. App. 4th 335, 347 (2001), as modified on denial of reh'g (July 30, 2001) (emphasis in the original).

Thus, a court may "conclude as a matter of law that an insurer's denial of a claim is not unreasonable," provided that "there existed a genuine issue as to the insurer's liability."  Id.  The court may find a "genuine issue" if an insurer denies a claim "based on the opinions of experts."  Id.  That said, "an expert's testimony will not *automatically* insulate an insurer from a bad faith claim based on a biased investigation."  Id. at 348

31

1  (emphasis in the original).

2      The court grants defendant's motion for summary judgment of the bad-faith claim.

3  The court finds that the events surrounding this action undisputedly show a genuine issue

4  on defendant's obligation to cover the Delay Claim and Property Damage Claim.

5      First, the coverage determination for the Delay Claim rests in large part on the

6  meaning of the "but for" phrase used to define the Scheduled Date of Completion.

7  Plaintiffs fairly argue that the Held Report's use of the retrospective method to determine

8  the "Scheduled Date of Completion" under Section 12A(ii) is confusing and amounts to a

9  misnomer.  However, the Scheduled Date of Completion's "but for" phrase is clearly

10  indicated in that term and observably undefined in the Delayed Start Coverage Form.

11  Given that, plaintiffs cannot complain of any unfair surprise because of its use.

12      More importantly, though, the "but for" phrase has a rich (and often confusing)

13  meaning in the law.  While a retrospective analysis of prior actual events does not control

14  that phrase's interpretation in the policy at hand, such analysis nonetheless bears a

15  rational basis for determining a counterfactual event.

16      Second, defendant reasonably disputes the meaning and application of the

17  endpoint for the Period of Delay.  Defendant's position that the term "commence," as

18  used in that definition, means what it says (i.e., to begin) is not just reasonable—it's likely

19  correct.  From the court's perspective, the only real question on the Period of Delay's

20  endpoint is whether the "commercial operations" or "tenant/owner occupancy" served as

21  the triggering event.  Defendant could more-than-reasonably argue that the delivery of

22  Ten Thousand's leasing office, which is intended to sign-up prospective tenant

23  (seemingly a commercial operation), triggered that endpoint.

24      The court notes that plaintiffs' remaining critiques of the Held Report are valid.

25  The arguments and evidence support an inference that Held was not impartial when

26  conducting its retrospective analysis.  Moreover, such analysis does appear to

27  necessarily stack the deck against an insured.  Thus, the existence of the Held report

28  itself does ***not*** automatically insulate defendant from bad-faith liability. Chateau

United States District Court
Northern District of California

32

1   <u>Chamberay Homeowners Ass'n</u>, 90 Cal. App. 4th at 348.  However, because defendant

2   does not need an insulating expert report to preclude a finding of bad faith liability,

3   plaintiffs' remaining critiques are legally irrelevant.

4       Third, in its opposition, plaintiffs dedicate eight pages to discuss how and why

5   defendant's treatment of their Delay Claim was unreasonable.  Dkt. 99-1 at 22-29.

6   Plaintiffs omit any corresponding explanation for defendant's treatment of the Property

7   Damage Claim.  Given that failure, plaintiffs may not rely on defendant's treatment of the

8   Property Damage Claim to salvage a triable factual issue on their bad faith claim.  In any

9   event, based on the arguments presented in their briefing, it appears that plaintiffs have

10  ignored that sub-limits control their claimed losses under the Property Damage Coverage

11  Form.  Defendant pointed out that exact shortcoming in its opening brief.  Dkt. 75-1 at 23-

12  24.  Despite the opportunity in their opposition, plaintiffs again fail to even acknowledge

13  the existence of such sub-limits.  Under these circumstances, the court finds that

14  defendant genuinely disputed its liability for the Property Damage Claim.

15      For the above reasons, the court grants defendant's motion for summary judgment

16  of the bad faith claim.

17      **G.      The Court Grants Summary Adjudication of Punitive Damages**

18      California Civil Code § 3294 permits an award for punitive damages when a

19  plaintiff "prove[s] by clear and convincing that the defendant has been guilty of

20  oppression, fraud, or malice . . ." Cal. Civ. Code § 3294(a).  As used in § 3294(a), the

21  following definitions apply:

22          (1) "Malice" means conduct which is intended by the defendant
            to cause injury to the plaintiff or despicable conduct which is
23          carried on by the defendant with a willful and conscious
            disregard of the rights or safety of others.
24
            (2) "Oppression" means despicable conduct that subjects a
25          person to cruel and unjust hardship in conscious disregard of
            that person's rights.
26
            (3) "Fraud" means an intentional misrepresentation, deceit, or
27          concealment of a material fact known to the defendant with the
            intention on the part of the defendant of thereby depriving a
28          person of property or legal rights or otherwise causing injury.

1

Cal. Civ. Code § 3294(c)(1)-(3).

2

"Evidence that an insurer has violated its duty of good faith and fair dealing does

3

not thereby establish that it has acted with the requisite malice, oppression or fraud to

4

justify an award of punitive damages." Mock v. Michigan Millers Mut. Ins. Co., 4 Cal.

5

App. 4th 306, 328 (1992).  However, in the absence of a viable claim for breach of the

6

implied covenant of good faith and fair dealing, punitive damages are unavailable.

7

Chateau Chamberay Homeowners Ass'n, 90 Cal. App. 4th at 351 n.10 ("In view of this

8

result [the dismissal of a breach of the implied covenant claim], we need not reach or

9

discuss AIIC's attack on HOA's punitive damage claim. It was an integral part of, and falls

10

with our rejection of, HOA's bad faith cause of action.").

11

The court grants defendant's motion for summary adjudication of plaintiffs' prayer

12

for punitive damages.  First, plaintiffs failed to substantiate a bad faith claim.  Thus, the

13

court lacks any basis on which to award punitive damages.

14

Second, plaintiffs fail to show a triable factual issue that defendant acted with the

15

requisite mental state when handling the Delay Claim and Property Damage Claim.  To

16

be sure, plaintiffs identify a January 2020 article published by defendant's consultant

17

generally acknowledging that insurers know but do not inform their insureds that they

18

would likely reach a different result when calculating a period of delay *because* of the

19

retrospective versus prospective analysis each applies to determine a covered period.

20

Dkt. 74-1.  Based on that, plaintiffs extrapolate that defendant knowingly withheld critical

21

information concerning the coverage available on the Delayed Claim.  Dkt. 99-1 at 30.

22

Plaintiffs' theory, however, has a major problem: it assumes that defendant has a

23

legal obligation to affirmatively disclose its understanding of a policy term prior to the

24

agreement's execution.  Plaintiffs fail to proffer any authority to support that assumption.

25

Still, even if defendant were required to disclose such understanding, the court

26

finds that its mere failure to do so would not provide a sufficient basis to find a triable

27

factual question under the "clear and convincing" evidence standard that defendant acted

28

with malice, oppression, or fraud when issuing the policy.  Accordingly, the court grants

United States District Court
Northern District of California

1    defendant's motion for summary adjudication of the prayer for punitive damages.

2    **III.    Remaining Pretrial Matters**

3         Given this order's substantive rulings, the court will address a couple outstanding

4    pretrial matters.  First, on January 22, 2021, defendant filed a letter requesting that the

5    court strike third-party Christopher Lape's ("Lape") revised deposition testimony or

6    continue the January 28, 2021 hearing and permit defendant leave to further depose

7    Lape about his changes in testimony.  Dkt. 104.  The following Sunday, on January 24,

8    2021, the court denied the request to continue the hearing.  Dkt. 105.  The court noted,

9    however, that it would take defendant's substantive requests under submission.  Id.

10        The court now permits defendant the opportunity to further depose Lape about the

11   changes made to his deposition testimony (and only those changes or any other part of

12   his deposition that such changes might effect).  The court limits his follow-up deposition

13   to two hours.  The parties should work together with Lape to identify a mutually agreeable

14   time to conduct this deposition sometime by **Wednesday, May 5, 2021**.

15        Second, the court orders the parties to appear for a conference via Zoom on

16   **Thursday, May 13, 2021 at 2:00 pm**.  The parties should be prepared to discuss how to

17   proceed on what remains of this action and potential availability to shorten the existing

18   pretrial and trial dates and deadlines.

19        Third, the court will refer this action to a magistrate judge for a settlement

20   conference to occur by **Wednesday, June 9, 2021**, if possible, or, if not, at the earliest

21   convenience of the assigned judge.  The court will issue that referral as a separate order.

22                                    **CONCLUSION**

23        In light of the above, the court **GRANTS IN PART** and **DENIES IN PART** plaintiffs'

24   motion for partial summary judgment.  Dkt. 68.  The court also **GRANTS IN PART** and

25   **DENIES IN PART** defendant's motion for summary judgment, or in the alternative, partial

26   summary judgment.  Dkt. 63.

27        **IT IS SO ORDERED.**

28

United States District Court
Northern District of California

35

Dated: April 7, 2021

/s/ Phyllis J. Hamilton
_____
PHYLLIS J. HAMILTON
United States District Judge