VALENTINE S. HOY (BAR NO. 121766)
ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
One America Plaza
600 West Broadway, 27th Floor
San Diego, California 92101-0903
Phone: (619) 233-1155
Fax: (619) 233-1158
E-Mail: vhoy@allenmatkins.com

LINDA KORNFELD (BAR NO. 155765)
BLANK ROME LLP
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
Phone: (424) 239-3824
Fax: (424) 239-3434
E-Mail: lkornfeld@blankrome.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SM 10000 PROPERTY, LLC, a Delaware limited liability company and SWINERTON BUILDERS, a California Corporation,

Plaintiffs,

vs.

ALLIANZ GLOBAL RISKS US INSURANCE COMPANY and DOES 1 through 10,

Defendant.

Case No. 19-CV-03054-PJH

Judge Hon. Phyllis J. Hamilton

**PLAINTIFFS' NOTICE OF *DAUBERT* MOTION AND *DAUBERT* MOTION TO EXCLUDE EXPERT TESTIMONY OF J.S. HELD WITNESSES**

Date: September 16, 2021
Time: 2:00 p.m.
Ctrm: 3

Trial Date: October 18, 2021

# TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 4

II. BACKGROUND ..... 5

A. Ten Thousand and the Loss Event ..... 5

B. The Policy and Plaintiffs' Claim ..... 5

C. The Delayed Completion of the Project ..... 7

D. J.S. Held Opinions ..... 7

E. The Court's Summary Judgment Order ..... 10

III. LEGAL STANDARD ..... 10

IV. ARGUMENT ..... 12

A. J.S. Held's Methodology is Not Reliable ..... 12

1. J.S. Held's Methodology is Not Recognized Within the Relevant Community ..... 12

2. J.S. Held's Equation of TCO #4 with Completion is Unreliable ..... 16

3. J.S. Held Ignores Obvious Alternatives ..... 20

B. J.S. Held's Retrospective Analysis is Not Relevant Because it is Contrary to the Policy at Issue ..... 24

V. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bourjaily v. United States*,
483 U.S. 171 (1987) .... 12

*Claar v Burlington Northern R.R. Co.*,
29 F.3d 499 (9th Cir 1994) .... 12, 20

*Daubert v. Merrell Dow Pharm.*,
43 F.3d 1311 (9th Cir. 1995) .... 12, 24, 25

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .... 4, 10, 11, 24

*G.M. Shupe, Inc. v. United States*,
5 Cl. Ct. 662 (1984) .... 14

*General Electric Co. v. Joiner*,
522 U.S. 136 (1997) .... 11

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .... 11

*MacKinnon v. Truck Ins. Exch.*,
31 Cal. 4th 635 (2003) .... 12

*Mariscal v. Old Republic Life Ins. Co.*,
42 Cal. App. 4th 1617 (1996) .... 12

*Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*,
175 F.3d 1221 (10th Cir. 1999) .... 14

*Perry v. Brown*,
671 F.3d 1052 (9th Cir. 2012) .... 11

*Perry v. Schwarzenegger*,
704 F. Supp. 2d 921 (N.D. Cal. 2010) .... 11

*Wilner v. United States*,
24 F.3d 1397 (Fed. Cir. 1994) .... 14

## Rules

Fed. R. Evid. 702 .... 4, 10, 11, 12

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**NOTICE IS HEREBY GIVEN** that on September 16, 2021 at 2:00 p.m. in Courtroom 3 of the United States District Court, Northern District of California, located at 1301 Clay Street, 3rd Floor, Oakland, California 94612, Plaintiffs SM 10000 Property, LLC and Swinerton Builders (collectively "Plaintiffs"), will, and hereby do, move to exclude the expert testimony of Granger Stuck, Lisa Enloe, Jonathan Perry, and Jonathon C. Held.

This Motion is made on the grounds that the expert testimony of Granger Stuck, Lisa Enloe, Jonathan Perry, and Jonathon C. Held is not relevant or reliable and should be excluded under the governing legal standards for expert testimony. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-93 (1993). This Motion is based upon this Notice and Motion, the accompanying Memorandum of Points and Authorities, the Declarations of Valentine S. Hoy, Ray Haj, Seth Frohlich, Keith Dancey, Christopher Palermo, and Ted Bumgardner, all pleadings and papers on file in this action, any other matters of which the Court may take judicial notice, any evidence or argument presented at or before the hearing on this Motion, and any other matters the Court deems proper.

Procedural Requirements: If you oppose the Motion, you are required to file your written opposition with the Office of the Clerk, U.S. District Court, Northern District of California, 1301 Clay Street, 3rd Floor, Oakland, California 94612, and serve the same on the undersigned no later than August 26, 2021, as set by this Court's Order dated August 4, 2021, Dkt. 126.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This Court has already held that Defendant Global Risks US Insurance Company's ("Allianz") experts' method for measuring delay is not consistent with Plaintiffs' insurance policy. Dkt. 113 ("S.J. Order") at 25. The opinions of Allianz's experts that utilized this methodology therefore are not a reliable means of measuring the Period of Delay as defined in Plaintiffs' insurance policy, have no relevance to this dispute, and should be excluded at trial.

About half way through construction of a luxury residential tower in Beverly Hills ("Ten Thousand" or the "Project"), a concrete accident caused wet concrete to spill down 36 floors of the

main elevator shaft. The resulting damage and resequencing of work caused six months of delay to the completion of the Project. Plaintiffs turned to their insurance company for coverage of the resulting extra expenses and lost rent. Allianz, through its proffered experts at J.S. Held, applied a biased methodology for measuring the Period of Delay and concluded that wet concrete cascading down 36 floors did not delay the completion of Ten Thousand. This methodology is not recognized by any professional association and is based on several unreliable assumptions. The Court should not permit J.S. Held's unreliable and irrelevant opinions to reach the jury.

## II. BACKGROUND

The Court is familiar with the background of this litigation, *see* S.J. Order at 1-12, however Plaintiffs will provide a brief statement of the facts relevant to this motion.

### A. Ten Thousand and the Loss Event

Plaintiffs are the owner and builder, respectively, of Ten Thousand, a 40-story luxury residential tower in Beverly Hills ("Ten Thousand" or the "Project"). Plaintiff SM 10000 Property, LLC ("Owner" or "SM 10000") hired Plaintiff Swinerton Builders ("Swinerton") as general contractor in 2013 to build Ten Thousand. Palermo Decl. ¶ 3.[1] Approximately half way through the construction of Ten Thousand, on December 2, 2015, a concrete accident in the elevator shaft shut down construction of the elevators for five months, which had a ripple effect on the construction schedule. Dancey Decl. ¶ 3. As the elevator core walls were being poured above the 36th floor, the wooden form containing the concrete failed, allowing wet concrete to escape into the elevator shaft and accumulate on crash decks suspended higher in the elevator shaft. *Id.* Two tons or more of wet concrete accumulated, overwhelming the protective crash decks and causing them to give way. *Id.* The wet concrete and wood cascaded down the shaft all the way to the elevator pit, damaging everything in its path. *Id.* The concrete accident is referred to as the "Loss Event."

---

[1] References to declarations and exhibits refer to the Declarations of Valentine S. Hoy, Ray Haj, Seth Frohlich, Keith Dancey, Christopher Palermo, and Ted Bumgardner and their accompanying exhibits filed concurrently with this motion.

**B. <u>The Policy and Plaintiffs' Claim</u>**

To insure against the unexpected during the construction of Ten Thousand, SM 10000 obtained a builders risk insurance policy with various endorsements from Allianz (the "Policy"). Frohlich Ex. A. The Policy included a seven-page Delayed Opening Insurance Coverage Extension Form ("DOI Form") to protect and indemnify SM 10000 against loss of rents and extra expense resulting from a delay to completion of the Project caused by covered damage. *Id.* at AGR US 00006322. Period of Delay is defined as the time between the Scheduled Date of Completion and the date on which commercial operations or owner / tenant occupancy commenced, or could have commenced, in the manner planned. *Id.* § 12.B.

Four sections of the Policy are critical to this coverage dispute. All can be found in Exhibit A to the Frohlich Declaration filed concurrently with this motion. *First*, Section 9 of the DOI Form describes the delayed start up coverage as follows:

> In consideration of the additional premium charged, . . . this policy is extended to indemnify the Insured . . . for Delayed Start Up Expenses, Loss of Gross Earnings, and / or Loss of Rental Income, as defined in this extension, incurred during the Period of Delay, when such delay is caused by the direct physical loss or direct physical damage to insured property during the Period of Insurance, provided such loss or damage is indemnifiable under the Policy to which this extension is attached . . . .

*Second*, Section 10(A) explains the scope of the Policy's "Delayed Start-Up" coverage as addressing expenses incurred "during the Period of Delay, . . . to enable the Insured to commence commercial operations in the manner originally planned." *Third*, Section 12(B) defines "Period of Delay" as:

> the period of time between the Scheduled Date of Completion and the actual date on which commercial operations or tenant / owner occupancy commenced or could have commenced; however, not exceeding such delay as would result if the loss or damage were repaired or replaced with the exercise of due diligence and dispatch, but in no event exceeding the Period of Indemnity stated in the Schedule for all indemnifiable Occurrences combined. The Period of Delay shall not be terminated by the expiration or cancellation of the Policy with respect to indemnity payable hereunder in direct consequence of insured loss or damage occurring prior to such expiration or cancellation.

*Fourth*, the Policy defines "Scheduled Date of Completion" in Section 12(A) as:

> the later of the following:
>
> (i) The date stated in the Schedule; or
> (ii) The date on which, but for the insured loss or damage, commercial operations or tenant/owner occupancy would have commenced.

On December 21, 2015, SM 10000 reported the Loss Event to Allianz. Dancey Decl. ¶ 4. Swinerton submitted documentation and provided updates to Allianz throughout 2016. *Id.* at ¶ 8. Swinerton provided full documentation in the Spring of 2017 as the Project neared completion. *Id.* SM 10000 and Swinerton met with Allianz and its consultants twice, replied to dozens of questions, and produced over 100,000 pages of documents relating to the Project, the claims, and the Loss Event. Palermo Decl. ¶ 5.

### C. <u>The Delayed Completion of the Project</u>

Swinerton's contract with SM 10000 included four Completion Deadlines/Milestones. Palermo Ex. A, Agreement Between Owner and Contractor § 4.1.2. The Milestones required "Substantial Completion" of specified phases of the Project. "Substantial Completion" included the issuance of a temporary certificate of occupancy ("TCO") from the City of Los Angeles, along with other criteria. *Id.* § 4.1.3. A TCO certifies that a building is in compliance with minimum safety and building codes. *See* Hoy Ex. A, Dancey Dep. 148:5-11; Hoy Ex. C, Haj Percipient Dep. 27:9-16.

The last schedule Swinerton prepared prior to the Loss Event (the "Pre-Loss Schedule") included a "Contractual Milestone" of "TCO #4 – Unit Interiors For levels 32-40" with a "Current Contract Date" of October 27, 2016. Dancey Ex. A, Nov. 2015 Monthly Narrative at 1. As a result of the Loss Event, many tasks throughout the Project were delayed and each Milestone was delayed by four to six months. The City of Los Angeles issued the Project's final temporary certificate of occupancy ("TCO #4") on December 10, 2016. Dancey Decl. ¶ 7 & Ex. D. Swinerton delivered units to Owner in move-in condition for tenants on a rolling basis, starting in January 2017 and continuing until about April 27, 2017. Palermo Decl. ¶ 4. The units were not delivered in the same order as originally planned. *Id.* By April 27, 2017, Swinerton had

completed delivery of 275 of 283 total units, as well as the common areas, amenities, and parking. *Id.* No claim is made based on the delayed completion of the last 8 units.

**D. <u>J.S. Held Opinions</u>**

The parties exchanged expert witness disclosures on October 26, 2020. Allianz designated Granger Stuck, Lisa Enloe, and Jonathan Perry as a retained experts to testify at trial. Hoy Ex. L, Allianz Disclosures at 2-4. Stuck is "expected to testify consistent with the opinions and bases set forth in his report" provided the same day. *Id.* at 2. In his report, Mr. Stuck concludes that the Loss Event did not delay the completion of the Project by a single day. Hoy Ex. M, Stuck Rep. at 2. His report and his analysis echo prior reports written by other J.S. Held employees during the pre-litigation claim review period, namely Ms. Enloe and Mr. Perry. *See* Palermo Ex. B, C & D. Mr. Stuck's assumptions, methods and conclusions are consistent with the prior work of Ms. Enloe and Mr. Perry.

On November 16, 2020, the parties exchanged rebuttal expert witness disclosures. Allianz again designated Mr. Stuck, Ms. Enloe, and Mr. Perry, and also added Jonathon C. Held, President and Chief Executive Officer of J.S. Held LLC. Hoy Ex. N, Allianz Rebuttal Disclosure at 2, 4. Allianz served written rebuttal reports by Mr. Stuck and Mr. Held. Mr. Stuck's Rebuttal Report stated that "all opinions, information, and statements in [his] October 26, 2020 expert report remain as stated in that report." Hoy Ex. O, Stuck Rebuttal Rep. at 1. Mr. Held opined that Plaintiffs' expert, Ted Bumgardner of Xpera Group, used an "inappropriate to measure the period of delay" and instead should have used the method applied by Mr. Stuck, Ms. Enloe, and Mr. Perry. Hoy Ex. P, J.C. Held Rebuttal Rep. at 1-4.

Mr. Stuck, Mr. Held, Ms. Enloe, and Mr. Perry all sat for depositions in this case. Hoy Ex. B, D, E, I & K. Their assumptions, methods, and conclusions were thoroughly discovered and documented. Mr. Stuck, Ms. Enloe, and Mr. Perry made the same assumptions, utilized the same method, and answered the same question, and Mr. Held criticized Plaintiffs' expert for not using that same method. For convenience, this motion refers to them collectively as J.S. Held and to refer to their analyses collectively as the J.S. Held analysis or J.S. Held method. There is no material distinction between the witnesses' assumptions, methods, or opinions.

What did J.S. Held do to reach its conclusion that the Loss Event caused zero delay? *First*, J.S. Held made the following assumptions per Allianz's instructions: that the date on which the City of Los Angeles issued the Project its final TCO (December 10, 2016) was the "date on which, but for the insured loss or damage, commercial operations or tenant/owner occupancy would have commenced," *see* Hoy Ex. M, Stuck Rep. at 29 & n.39; Frohlich Ex. A, DOI Form § 12.A(ii); and that the Loss Event could not delay any other activities, meaning it could have no domino effect on the rest of the project, *see* Hoy Ex. K, Stuck Dep. 292:10-293:15.

*Second*, J.S. Held relied on Allianz's instructions as to the meaning of the Policy and the analysis for which it called. *See* Hoy Ex. M, Stuck Rep. at 29 n.39; Hoy Ex. B, Enloe Dep. 74:17-24; Hoy Ex. D, J.C. Held Percipient Dep. 95:2-14; Hoy Ex. I, Perry Dep. 80:21-81:4. Per Allianz's instructions, J.S. Held applied a method it refers to as a "As-Built-But-For" method, which it describes as "a retrospective view of the project." Hoy Ex. I, Perry Dep. 73:17-21; Hoy Ex. P, J.C. Held Rebuttal Rep. at 3. This method was invented by Mr. Held, who has no training in or understanding of critical path methods. Hoy Ex. D, J.C. Held Percipient Dep. 101:9-102:4, 107:10-109:2. It inevitably eliminates or shortens the period of delay caused by any loss event. *See* Hoy Ex. K, Stuck Dep. 292:10-293:15 ("[W]e assume that non-loss-related activities can continue on as planned."); Hoy Ex. I, Perry 112:15-113:11 ("[I]f you do not specifically assign a delay as being associated with a loss event, then it will by definition be left unassigned and not associated with the loss event."). This Court previously acknowledged that J.S. Held's methodology "does appear to necessarily stack the deck against an insured." S.J. Order at 32.

What did J.S. Held *not* do in order to reach its conclusion that the Loss Event caused no delay? *First*, J.S. Held did not investigate whether the Pre-Loss Schedule was accurate, correct, or achievable immediately before the Loss Event. Hoy Ex. K, Stuck Dep. at 59:20-60:14. *Second*, J.S. Held did not investigate or verify the reasonableness of the assumptions given to it by Allianz. *Third*, J.S. Held did not determine when any of the contract Milestones were achieved or when units were turned over to the Owner and ready to be leased. *See id.* 87:18-88:15. *Fourth*, J.S. Held did not utilize any industry recognized method of critical path analysis to determine the impact of the Loss Event on the construction schedule. J.S. Held ignored Critical Path

Methodology ("CPM") altogether in favor of its own home brewed method that is not used by anyone else in the industry. Even experienced professionals in the forensic delay analysis field who have not encountered J.S. Held are unfamiliar with its method. Hoy Ex. I, Perry Dep. 205:21-206:4, 234:1-235:24. *Fifth*, J.S. Held made no effort to test the reasonableness of its assumption that the insured parties would have be unable or unwilling to make adjustments to maintain their schedule had the Loss Event not happened, instead evaluating the Loss Event in a vacuum and ignoring any impact, such as diversion of manpower, the Loss Event may have on other tasks. Hoy Ex. K, Stuck Dep. 292:10-293:15

### E. <u>The Court's Summary Judgment Order</u>

In its Summary Judgment Order, the Court held that J.S. Held's methodology was contrary to the Policy. S.J. Order at 25 (holding that "Plaintiffs' forward-looking analysis for interpreting the term 'but for' as used in the Scheduled Date of Completion" was required under Section 12A(ii) of the Policy). The Court criticized the retrospective method employed by J.S. Held, stating "Plaintiffs fairly argue that the Held Report's use of the retrospective method to determine the 'Scheduled Date of Completion' under Section 12A(ii) is confusing and amounts to a misnomer" and the "arguments and evidence support an inference that Held was not impartial when conducting its retrospective analysis." *Id.* at 32. The Summary Judgment Order further states that J.S. Held's "analysis does appear to necessarily stack the deck against an insured." *Id.*

## III. <u>LEGAL STANDARD</u>

To qualify as an expert under Federal Rule of Evidence 702, the court looks at "whether the in expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. The court's gatekeeping duty is codified in Federal Rule of Evidence 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The court must determine whether the expert's testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589; *see* Fed. R. Evid. 702, Advisory Committee Notes ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded."). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal quotations omitted).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). "Several factors are relevant to an expert's reliability: (1) whether a method can be (and has been) tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the method's operation; (5) a degree of acceptance of the method within a relevant community; (6) whether the expert is proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation; (7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (8) whether the expert has adequately accounted for obvious alternative explanations; (9) whether the expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field; and (10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 946-47 (N.D. Cal. 2010) (citations, quotations, and alterations omitted), *aff'd sub nom. Perry v. Brown*, 671 F.3d

1052 (9th Cir. 2012). These requirements are not limited to scientific testimony; any expert testimony is subject to the court's gatekeeping duty under Rule 702. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *General Electric*, 522 U.S. at 142.

A district court must be "certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. The party proffering the expert testimony "must show that the expert's findings are based on sound science" by, for example, providing "objective, independent validation of the expert's methodology." *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*"); *see* Fed. R. Evid. 702, Advisory Committee Notes ("The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field ….""). In other words, the court must analyze whether the "analysis undergirding the experts' testimony falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions." *Daubert II*, 43 F.3d at 1317. Failure to consider obvious alternative explanations is reason to question the reliability of a proffered expert's analysis. *See Claar v Burlington Northern R.R. Co.*, 29 F.3d 499, 502 (9th Cir 1994). The proponent of expert testimony bears the burden of proving by a preponderance of the evidence that the admissibility requirements for expert testimony are met. *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987).

Under California law, grants of insurance coverage are to be interpreted and applied broadly, and limitations narrowly. *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003) (holding that courts must construe coverage grants broadly "to afford the greatest possible protection" while interpreting exclusions "narrowly against the insurer"). Insurers have a duty to consider all of the facts and coverages afforded by the policy and look for ways to find coverage for the insured. *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 1623 (1996) ("An insurer must liberally construe claim forms and the policy in favor of coverage").

## IV. ARGUMENT

### A. J.S. Held's Methodology is Not Reliable

#### 1. J.S. Held's Methodology is Not Recognized Within the Relevant Community

The methodology J.S. Held employed in this case has not been recognized by any professional association or court. J.S. Held instead ignored Critical Path Methodology ("CPM"), widely considered the standard method for quantifying construction delays. The Association for the Advancement of Cost Engineering ("AACE") is an industry organization that publishes recommended practices and guidelines. The AACE International Recommended Practice 29R-03 Forensic Schedule Analysis explains that the concept of the critical path is an "underlying fundamental" of schedule analysis:

> At any given point in time on projects, certain work must be completed at that point in time so the completion of the project does not slip later in time. The industry calls this work, "critical work." Project circumstances that delay critical work will extend the project duration. Critical delays are discrete, happen chronologically, and accumulate to the overall project delay at project completion.

Bumgardner Ex. A, AACE 29R-03 at 16-17. A general principle is that "delay must affect the critical path. This is because before a party is entitled to time-related compensation for damages it must show that it was actually damaged." *Id.* at 18.

The Delay and Disruption Protocol by the UK-based Society of Construction Law ("SCL"), another influential industry organization, further explains that the protocol focuses on "critical delay," meaning "delay to the completion of the works." Bumgardner Ex. B, Delay and Disruption Protocol at 9. Disruption of activities on the "critical path" can lead to "critical delay." *Id.* at 10. The "critical path" underlying the SCL's guidance is:

> The longest sequence of activities through a project network from start to finish, the sum of whose durations determines the overall project duration. There may be more than one critical path depending on workflow logic. A delay to progress of any activity on the critical path will, without acceleration or re-sequencing, cause the overall project duration to be extended, and is therefore referred to as a "critical delay."

*Id.* at 62.

Literature on quantifying construction delays in the context of delayed start up insurance is limited, but no independent sources advocate for the methodology J.S. Held applied in this case. A publication from Swiss Reinsurance Company Ltd. ("Swiss Re") entitled Delay in Start-up Insurance discusses overlap of insured and non-insured events. Bumgardner Ex. C at 29; *see* J. Held Expert Dep. 40:4-9 (authenticating document). The article explains that the analysis of delay claims involves ascertaining the impact of the insured and uninsured events on the critical path. Bumgardner Ex. C, at 25, 29-30.[2] A 2017 article by Iftikhar Ali, a U.K.-based attorney, on the Lexology website entitled Delay in Start Up Insurance and Delay Analysis Techniques discusses the applicability of different CPMs to delayed start up claims; the article does not advocate for the use of other methods. Bumgardner Ex. D, at 3-4. A two-page practice note from the International Association of Engineering Insurers and the London Engineering Group entitled Delay in Start Up Insurance does not discuss what methods should be used to determine the delay in delayed start up insurance claims. Bumgardner Ex. E.

Courts have recognized the application of CPM to construction delay disputes. *See generally Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1232 (10th Cir. 1999) ("CPM enables contractors performing complex projects to identify a critical path of tasks that must each be completed before work on other tasks can proceed. A delay on the critical path will thus delay the entire project …."); *G.M. Shupe, Inc. v. United States*, 5 Cl. Ct. 662, 728 (1984) ("If work on the critical path was delayed, then the eventual completion date of the project was delayed. Delay involving work not on the critical path generally had no impact on the eventual completion date of the project."), *cited with approval by Wilner v. United States*, 24 F.3d 1397, 1399 n.5 (Fed. Cir. 1994).

In his deposition, Stuck confirmed that J.S. Held's retrospective delay analysis is not a critical path analysis and does not illuminate whether a given loss event changed the critical path.

[2] To explain J.S. Held's failure to use an approach consistent with this SwissRe publication, Jonathon Held asserts that the article "may have been presented either in error, or may apply to certain builders risk policies in the international market." Hoy Ex. P, J.C. Held Rep. at 3. His only basis for this opinion is a conversation with a SwissRe employee who was not involved in drafting the document, was not familiar with it, and did not know the author, as well as a discussion with Enloe. Hoy Ex. E, J.C. Held Expert Dep. 46:1-47:10, 65:4-16.

Hoy Ex. K, Stuck Dep. 134:19-23 ("[D]id you do enough analysis to determine whether or not the loss event caused the critical path of this job to change? A. Well, we didn't because we didn't have to in our analysis."); *see id.* 134:9-13 (stating that our "analysis isn't really a critical path analysis"). In various depositions, the J.S. Held experts, including Mr. Held himself who invented the method, acknowledged that their method is not one of the AACE's approved methods:

- *Mr. Held*: "Ms. Enloe told me that the JS Held methodology, the but-for methodology as practiced by JS Held, is not one of those [AACE] methods. Is that correct? A. That is correct, yes." Hoy Ex. D, J.C. Held Percipient Dep. 99:3-17.
- *Mr. Stuck*: "Did you use any of the processes described as MIP 3.1 through 3.9, utilizing the steps – all the steps that are identified in the AACE document marked as Exhibit 14? A. Not as they have them outlined here, no." Hoy Ex. K, Stuck Dep. 121:10-14.
- *Ms. Enloe*: "Q. Are you aware of any publications, published articles or industry guidelines that discuss the method of but-for analysis that you've described to me here? A. With respect to insurance claims, I'm not." Hoy Ex. B, Enloe Dep. 161:5-8.
- *Mr. Perry*: "Q Is the as-built but-for schedule analysis technique that was used by Held in this case described anywhere in the AACE Recommended Practice marked as Exhibit 9? A Well, I don't have this document memorized. I do not believe that any of the method implementation protocols, MIPs, that they have in here describe that as-built but-for methodology." Hoy Ex. I, Perry Dep. 233:13-21.

Rather than follow any recognized industry guidelines, J.S. Held, in close concert with insurance companies themselves, has developed its own method for analyzing delay claims. J.S. Held is the only known practitioner of this method. Its existence comes as a surprise even to experienced professionals at the top of the field who have not encountered J.S. Held. For example, Perry himself had not heard of J.S. Held's retrospective method prior to starting at the firm, despite ten years of experience in the industry. Hoy Ex. I, Perry Dep. 205:21-206:4 ("Q And you'd not heard of this method of analysis, even though your job was to do schedule analysis before you went to J.S. Held; is that right? A Yes."). Perry has since left J.S. Held for another consulting firm. Dr. Anamaria Popescu, Perry's new boss, is a contributor to the AACE International Recommended Practice 29R-03 on Forensic Schedule Analysis and has more than 20 years of experience. *Id.* 235:21-24; *see* Bumgardner Ex. A, AACE 29R-03 at title page & 131-32

(acknowledging contributions from Dr. Popescu). Yet, Perry found that Dr. Popescu was unfamiliar with the methodology employed by J.S. Held:

Q Have you discussed the Held as-built but-for analysis with Dr. Popescu?

A I have.

….

Q Did she express any views about that as-built but-for analysis?

A Only that was something that was unfamiliar to her.

Hoy Ex. I, Perry Dep. 234:1-235:4.

In defense of its decision not to use any industry-recognized method, J.S. Held posits that it has been instructed by Allianz's attorneys that the Policy language dictates the method of analysis J.S. Held employed. This Court has already rejected Allianz's interpretation on this point. S.J. Order at 23-25.

This Court has also already recognized the one-sided nature of J.S. Held's analysis. S.J. Order at 32 ("[S]uch analysis does appear to necessarily stack the deck against an insured."). Mr. Perry's testimony explains how, if the insurer concludes that a delay was not caused by the insured event, that conclusion necessarily works against the insured. Hoy Ex. I, Perry 113:7-11 ("[I]f you do not specifically assign a delay as being associated with a loss event, then it will by definition be left unassigned and not associated with the loss event."). Approximately 85% of J.S. Held's work comes from insurance company clients. Hoy Ex. D, J.C. Held Percipient Dep. 16:16-22. J.S. Held has never represented a policyholder in a delay claim. *Id.* 47:20-48:10. Generally, J.S. Held's insurance company clients, or their attorneys, instruct the firm on how conduct its analysis such that it conforms with the insurance company's view of the relevant policy language. Hoy Ex. B, Enloe Dep. 168:8-18 (Q. "So, in essence, the insurance companies are the ones that tell you to use this particular analysis for their policies?" A. "[I]t may be the attorneys."). The only published sources advocating for the method J.S. Held used were written by J.S. Held employees themselves. Ms. Enloe and Mr. Held published "Builders Risk, Measuring Delay" in conjunction

with an American Bar Association conference in or around 2009. Hoy Ex. Q; Hoy Ex. B, Enloe Dep Tr. 163:4-164:5. And Mr. Perry, along with another J.S. Held employee, published a paper in 2020, after this litigation was well under way, with the AACE entitled "Comparison of Delay Analysis Methodologies in a Builder's Risk Context." Hoy Ex. R.

2. <u>J.S. Held's Equation of TCO #4 with Completion is Unreliable</u>

J.S. Held's analysis erroneously assumes the issuance of the project's final Temporary Certificate of Occupancy ("TCO") on December 10, 2016, is the date on which "commercial operations or tenant/owner occupancy commenced or could have commenced"—the ending point of the Period of Delay—even though work continued for months beyond December 10. Stuck explained:

> For purposes of this analysis, we were asked to assume that "the actual date on which commercial operations or tenant/owner occupancy commenced or could have commenced" is the actual date when all temporary certificates of occupancy ("TCO") for the project were achieved …. We were further asked to determine the date on which, but for the insured loss or damage, TCO #4 would have occurred, and use that date as the Scheduled Date of Completion in order to measure the Period of Delay.

Hoy Ex. M, Stuck Rep. at 29. Enloe testified that she did not review the Policy herself, Hoy Ex. B, Enloe Dep. 74:17-24, and was "generally told [that] when you can move in is when you receive TCO," *id.* 89:24-90:4. In her words, "we equate substantial completion with TCO and substantial completion is … what we use to measure against." *Id.* 90:2-4. Perry too confirmed that J.S. Held was "instructed by Allianz's lawyers to treat the issuance of the City's temporary certificate of occupancy as a certificate of completion for purposes of [J.S. Held's] analysis." Hoy Ex. I, Perry Dep. 189:25-190:16 (noting "[i]t certainly wasn't my call ….").

This assumption is flawed. The term TCO does not appear in the Policy and is not a relevant measure for the Period of Delay. A TCO is a certificate from the government, in this case the City of Los Angeles, that a building is in compliance with the bare minimum of safety and building codes required for legal occupancy. Hoy Ex. A, Dancey Dep. 148:10-11; Hoy Ex. C, Haj Percipient Dep. 27:12-13. Compliance with minimum safety standards does not mean that occupancy would or could have commenced "in the manner originally planned" for a luxury high rise such as Ten Thousand. *See* Frohlich Ex. A, DOI Form § 10(B) (indemnifying insured for

expenses incurred to "enable the Insured to commence commercial operations in the manner originally planned"); Hoy Ex. A, Dancey Dep. 150:20-22 ("The City does not care about paint on walls and wallpaper and stuff like that. They just care that the building is safe for somebody to be in."); Hoy Ex. H, Palermo Dep. 94:14-18 ("The TCO gave us permission – the City would allow us to bring people in the building, but it doesn't necessarily mean it was habitable.").

In his deposition, Mr. Held testified that a TCO date may or may not be the date a construction project is considered complete, and that, with large projects, it "can be relatively normal" for the two dates to differ:

> Q. Your article says, and I assume you'd still agree, that the date of substantial completion and the date of a TCO may or may not be the same date; correct?
>
> A. It may or may not. I mean, it's not unusual to see a project with TCO dates that are -- with numerous TCO dates but only one completion date. In fact, that can be relatively normal, particularly with large projects.
>
> Q. And *is it also true that a TCO could come before a project is substantially complete*?
>
> A. *Absolutely*.

Hoy Ex. D, J.C. Held Percipient Dep. 115:20-116:6 (emphasis added).

J.S. Held's flawed assumption that the issuance of the final TCO signified that the Project was substantially complete apparently stems from Swinerton's occasional use of "TCO" as shorthand for the planned milestones per its contract with the Owner. The contract set four "Completion Deadlines/Milestones." Palermo Ex. A, Agreement Between Owner and Contractor § 4.1.2. The contract also defined "substantial completion" to include the issuance of a TCO, along with other criteria. *Id.* § 4.1.3 (listing "all final finishes … are in place," "all common areas … are in move-in condition," and "units are in move-in condition," among other requirements, as separate, necessary conditions for substantial completion). The Pre-Loss Schedule included a list of "Project Milestones," including a "Contractual Milestone" of "TCO #4 – Unit Interiors For levels 32-40."

**Project Milestones:**

| Contractual Milestone | Current Contract Dates | S50K Update | S51K Update | Contract TF (CD) | EF Variance (CD) |
|---|---|---|---|---|---|
| TCO #4 – Unit Interiors For levels 32-40 | 10/27/16 | 10/28/16 | 10/27/16 | 0 | +1 |
| **Bonus Milestones** | | | | | |
| TCO#1 – Sales Office (Exact Date TBD) | 02/09/16 | 02/16/16 | 02/12/16 | -3 | +4 |
| TCO#2 – Life Safe Core & Shell; Interior thru 15 | 08/01/16 | 008/9/16 | 08/08/16 | -7 | +1 |
| TCO#3 – Unit Interior for Levels 16-31 | 08/29/16 | 09/08/16 | 09/07/16 | -9 | +1 |

Dancey Ex. A, Nov. 2015 Monthly Narrative at 1. When reviewing this document at his deposition, Mr. Stuck testified that he agreed that the reference to "TCO #4" could be a shorthand for the contract's Milestone #4.

> Q. …. Would it be reasonable to conclude that the reference in Exhibit 48, the monthly narrative for November, to TCO Number 4-Unit interiors for the Levels 32 to 40, is a shorthand truncated description of all the words that are in Milestone Number 4?
>
> A. Yes. I -- I think the -- the TCO Number 4 milestone in the schedule was intended to show Milestone Number 4 in completion of the project.

Hoy Ex. K, Stuck Dep. 74:5-13. Mr. Perry too understood that securing a TCO and completing the contract Milestones were "different concepts." Hoy Ex. I, Perry Dep. 185:8-13. Nevertheless, it Allianz instructed J.S. Held to operate under the assumption that the issuance of the final TCO was the ending date of the Period of Delay. This was despite the clear language of the contract that the issuance of a TCO, standing alone, was not sufficient to achieve substantial completion, as well as J.S. Held's apparent independent understanding that the two dates can differ. *See, e.g.*, Hoy Ex. D, J.C. Held Percipient Dep. 115:20-116:6; Hoy Ex. K, Stuck Dep. 65:13-66:23; Hoy Ex. I, Perry Dep. 185:8-13. Stuck was also unaware of and did not consider the fact the Owner and Swinerton sought TCO #4 as soon as possible to secure refinancing. Hoy Ex. K, Stuck Dep. 67:18-22.

Mr. Stuck and Ms. Enloe's reports recognized that work did in fact continue beyond securing TCO #4. Hoy Ex. M, Stuck Rep. at 100 ("Work on the project continued after the 4 TCO milestones were achieved."); Palermo Ex. B, Enloe 11/20/17 Report at 54 (same). Mr. Stuck also testified at his deposition that the Santa Monica 10000 project at issue in fact was not substantially

complete when the final TCO was issued. He explained that, while the dates might have been planned to align at the beginning of construction, "at the end of the project, it seemed like they did not align" and that there was in fact "more work to do" after the project received its final TCO. Hoy Ex. K, Stuck Dep. 65:13-66:23. Despite there being "more work to do" after securing TCO #4 on December 10, 2016, Mr. Stuck abided by Allianz's instruction to use TCO #4 as the ending date for any potential Period of Delay and did no analysis to determine whether units were actually move-in ready on that date:

> Q. Do you believe that Swinerton turned over all the units when TCO 4 was issued on – on December 10th, 2016?
>
> A. I don't believe they did, because they continued to do work in them.
>
> Q. Right. So do you know when they did turn over the units to the owner for leasing?
>
> A. I don't know.
>
> ….
>
> Q. *Do you have any opinion as to when this project was substantially completed, meaning the entire project?*
>
> A. *No. I -- I just have a basis of the TCO date of December 10th, 2016.*

*Id.* 93:6-14, 95:17-21 (emphasis added). Thus, by J.S. Held's own admission, work continued for several months beyond December 10, 2016.

Because J.S. Held admits that a TCO date does not mean a given project is complete and that Ten Thousand was in fact not complete when it received TCO #4, J.S. Held's use of TCO #4 as the end of the Period of Delay is unreliable. J.S. Held should not be permitted to present Allianz's unfounded assumptions to the jury under the guise of expert testimony.

3. J.S. Held Ignores Obvious Alternatives

J.S. Held concluded that other events besides the Loss Event caused the ultimate delay of the Project. J.S. Held based this conclusion on the assumption that those other events were not themselves delayed by the Loss Event. Because J.S. Held ignored the possibility that Loss Event had a domino effect on other aspects of the Project, its methodology yields unreliable results. *See*

*Claar*, 29 F.3d at 502 (holding experts' methods unreliable where they failed to consider other causes of plaintiff's injuries).

At his deposition, Mr. Stuck testified that his analysis "assume[s] that non-loss-related activities can continue on as planned," and ignores, for example, changes in available resources caused by a loss event:

> Q. …. Even if you had an unrelated activity on the job – it's not related to the damage caused by the loss event -- the resequencing of work and the reallocation of resources on the job that followed the loss event can impact the timing of completion of that unrelated work. You do not make any assumption about what probably would have happened with that unrelated work if the loss event hadn't occurred. In other words, you accept what actually happened in the real world, even though in the real world the loss event occurred.
>
> ….
>
> THE WITNESS: So we -- *we assume that non-loss-related activities can continue on as planned.* Now, if that requires more manpower, less manpower, diversion of manpower, we don't know. But we assume they can continue on as planned.
>
> Q. (BY MR. HOY) And even if the contractor in response to a loss event changes the allocation of resources so that they don't continue on as planned, you still don't make any assumption about what would have happened if there had been no loss event?
>
> A. Well, to some extent. We still analyze it as -- you know, for unrelated loss event activities that had no loss occurred they could still continue on as planned. ….

Hoy Ex. K, Stuck Dep. 292:10-293:15 (emphasis added). Thus J.S. Held made the assumption that the Loss Event could not and did not delay any other activities within the Project. J.S. Held's analysis makes this assumption regardless of its reasonableness and in so doing "necessarily stack[s] the deck against an insured." *See* S.J. Order at 32. Perry's testimony explains how this assumption results in findings biased against the insured:

> Q If a decision on the job made in the wake of a loss event causes delay, and you don't know whether the decision was related to the loss event or independent of the loss event, and you don't assign that loss to -- that loss of time, that delay that results, to the loss event, then essentially you're assigning it to other causes that are not covered by the insurance policy. …. Would you agree with the statement?
>
> ….

THE WITNESS: I would agree. I will say that *if you do not specifically assign a delay as being associated with a loss event, then it will by definition be left unassigned and not associated with the loss event.*

Hoy Ex. I, Perry 112:15-113:11 (emphasis added). J.S. Held's failure to see other possibilities was consistent with its culture where new ideas and "divergence from the road map in any context was not welcomed." *Id.* 30:19-21; *see id.* 29:24-32:5.

Several examples illustrate how this flawed assumption taints J.S. Held's conclusions.

(a) Penthouse re-design

Stuck opines that changes to the penthouse design, rather than the Loss Event, delayed concrete pours on Levels 40 through 42, elevator machine room work, and subsequent elevator work (called "Jump 2"). Hoy Ex. M, Stuck Rep. at 1, 9, 40, 47, 99.[3] Although the concrete pours on Levels 40 through 42 were delayed, this delay did not affect overall completion of the project. The work on that J.S. Held blames on the penthouse re-design was in fact delayed by the need to obtain a replacement for the Guide Rail Installation Kit, or "GRIK," tool that was destroyed in the Loss Event. The replacement GRIK tool was not operational until after the concrete pours on Levels 40 through 42 were already complete. Hoy Ex. J, Ruiz 30(b)(6) Dep. 113:23-116:7 ("I didn't end up getting the GRIK tool … until towards maybe the end of April. Which means … I was still doing hoistway work, so the machine room was not critical anymore…." Thus, "even though the machine room slab was poured … it didn't do me any good…."); *see* Hoy Ex. G at SEC 000765 to -767, -858 (time cards showing work performed during week ending April 29, 2016 included "build GRIK tool"); Hoy Ex. F, Lape 5/5/21 Dep. 190:13-21 (authenticating time cards). It was therefore the absence of a functional GRIK tool which was destroyed in the Loss Event, that delayed this elevator work, not the changes to the penthouse design that Stuck says delayed concrete pours on Levels 40 through 42.

[3] The penthouse is on Level 40 and the elevator machine room is on Level 42. *See, e.g.*, Hoy Ex. M, Stuck Rep. at 1, 9.

(b) Re-design of crash decks

Stuck states that the post-loss re-design and re-installation of crash decks delayed the Project's completion, not the Loss Event. Hoy Ex. M, Stuck Rep. at 1, 53-57. Stuck's position is that, absent the re-design of the crash decks, the elevator contractor, Schindler, "could have entered the shaft to start the repair work on approximately December 18, 2015"—16 days after the Loss Event—however, "the re-design of the crash decks and Schindler's lack of re-entering the shafts caused a minimum 48 calendar day delay to the start of the repair work." *Id.* at 57.

Stuck's analysis seems to argue that Schindler could have reused the damaged crash decks (whose failure contributed to the Loss Event in the first place), or that Schindler's decision to re-design them for higher safety standards (a union requirement based on worker safety) was not a result of the Loss Event. Multiple crash decks were destroyed or damaged by the Loss Event and thus could not be reused. Dancey Decl. ¶ 5. The Loss Event understandably caused great concern for worker safety in the elevator shaft. After the Loss Event, Schindler demanded that the crash decks be redesigned and refused to have workers on site on concrete pour days going forward. *Id.*; Dancey Ex. B, Change Order #5. At his deposition, Stuck admitted that Schindler's demand for re-designed crash decks was probably a reasonable response to the Loss Event. Hoy Ex. K, Stuck Dep. 216:20-25 ("Q. You believe that the – that Schindler's demand for a redesign of the crash deck before it went back into the elevator shaft to work under concrete work was a reasonable response to the loss event? A. It – it probably was. ….."). Stuck's assumptions that same crash decks that had failed in the Loss Event could be used going forward, or that the required re-design was somehow unrelated to the Loss Event and thus not covered under the policy, are not reasonable and ignore the obvious explanation for this delay: safety concerns.

(c) Elevator fronts and card reader system

Stuck also points to issues with the fronts of the elevators and the elevators' card reader system as the causes of delay. Hoy Ex. M, Stuck Rep. at 1, 57-65. Again, this opinion ignores key facts. First, while it was discovered that the elevators' card reader call system did not comply with the Americans with Disabilities Act, Schindler and Swinerton were able to add a compliant temporary call button station to meet accessibility requirements. Dancey Decl. ¶ 6; Dancey Ex. C,

10/25/16 email. The elevator fronts likewise did not cause delay independent of the Loss Event. Rather, the Loss Event caused the installation of the elevator fronts to be delayed. Hoy Ex. J, Ruiz 30(b)(6) 151:19-152:18 ("[T]hey needed the elevator hoistway operational in order to install the front."). Even Mr. Stuck agreed that completion of the elevator fronts for each floor required access to the elevator shaft. Hoy Ex. K, Stuck Dep. 284:4-7. The Loss Event prevented this access and directly impacted the installation timeline for the elevator fronts. Stuck ignores this obvious explanation and instead insists that Schindler personnel should have reentered the elevator shaft earlier, regardless of safety concerns. *Id.* 284:8-285:3.

(d) Freight Elevator E

Stuck further opines that, because Elevator E, the service or freight elevator, was not damaged in the Loss Event, Elevator E should have been available for construction use as an alternative to the more limited exterior personnel hoist (also referred to as the person lift or manhoist), thus mitigating delays caused by the main elevators being unavailable. Hoy Ex. M, Stuck Rep. at 1, 65-69. However, work on Elevator E was directly impacted by the Loss Event in at least two ways: work on Elevator E paused immediately following the Loss Event due to overall project safety concerns, and workers that were planned to be assigned to Elevator E were diverted to the clean-up and restoration work needed in Elevator A-D's shafts following the Loss Event. Haj Ex. A, 4/4/16 Schindler Letter at 2 ("[R]edistribution of manpower resulted in a halt on progress on the Service Car E."). Stuck does not consider this possibility because his methodology necessarily "assume[s] that non-loss-related activities can continue on as planned." Hoy Ex. K, Stuck Dep. 292:10-293:15. No analysis is conducted to evaluate the reasonableness of that assumption or its impact on the overall result. Rather the assumption, even if unreasonable, is an essential part of the method.

**B. <u>J.S. Held's Retrospective Analysis is Not Relevant Because it is Contrary to the Policy at Issue.</u>**

J.S. Held's analysis is not helpful to the jury because it does not "fit" the case. *Daubert*, 509 U.S. at 591; *see Daubert II,* 43 F.3d at 1322 (holding expert opinion on causation would not be helpful to the jury where the opinion did not establish causation under the correct legal standard).

Here, the operative calculation to determine the "Period of Delay" under the Policy is the difference between the "Scheduled Date of Completion" and the actual date of completion. Frohlich Ex. A, DOI Form § 12(B). The Court has already ruled that the Policy requires a prospective analysis to answer this question. S.J. Order at 25. The Scheduled Date of Completion is the date on which completion was reasonably expected to be completed immediately before the occurrence of the loss event. In accordance with the Policy, at trial, the jury will be asked to evaluate delay under that framework. J.S. Held did not perform a prospective analysis, opting instead to use its retrospective method—which this Court called "confusing and amount[ing] to a misnomer." *Id.* at 32.

As explained above, Stuck deferred to Allianz for instruction on the interpretation of policy wording. *Supra* Section IV.A.1 & 2; Hoy Ex. M, Stuck Rep. at 29 n.39 ("J.S. Held defers to the insurer as to the interpretation of policy wording."). Because Stuck did not support his opinions with any other method besides the rejected retrospective method, Allianz must be precluded from presenting Stuck's opinions at trial. All J.S. Held personnel use the same method and have never used any other method. In his rebuttal to Plaintiffs' expert Ted Bumgardner, Mr. Held too relies on the retrospective method. His criticisms of Bumgardner for failing to apply a now-rejected analysis similarly will not be helpful to the jury. *See* Hoy Ex. P, J.C. Held Rep. at 2-3 (opining that it is "necessary to take a retrospective view of a project to determine all reasons for a delay").

J.S. Held's failure to use the correct methodology is a defect that is not curable at this stage. In *Daubert II*, the plaintiffs' experts failed to provide an opinion that met the relevant legal standard for causation. 43 F.3d at 1322. The Ninth Circuit held that their methodology therefore would not be helpful to the jury and that allowing the experts "to augment the substantive testimony as to causation … would, at this stage of the proceedings, fatally undermine any attempt to show that these findings were 'derived by the scientific method.'" *Id.*

## V. <u>CONCLUSION</u>

Because J.S. Held's opinions are not reliable or relevant, Plaintiffs respectfully request that the opinions of Granger Stuck, Jonathon C. Held, Lisa Enloe, and Jonathan Perry be excluded at trial.

Dated: August 17, 2021

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP

By: *<u>/s/</u>* <u>Valentine S. Hoy</u>
VALENTINE S. HOY
Attorneys for Plaintiffs

Dated: August 17, 2021

BLANK ROME LLP

By: *<u>/s/</u>* <u>Linda Kornfeld</u>
LINDA KORNFELD
Attorneys for Plaintiffs