1
2
3
4
5
6

G. EDWARD RUDLOFF, JR. (SBN 56058)
DIANNE J. MECONIS (SBN 120895)
**FORAN GLENNON PALANDECH**
**PONZI & RUDLOFF PC**
200 Pringle Avenue, Suite 410
Walnut Creek, CA  94596
Telephone:      (925) 357-8640
Facsimile:      (510) 740-1501
E-mail:          erudloff@fgppr.com
                 dmeconis@fgppr.com

7
8
9
10
11

MATTHEW S. PONZI (*Pro Hac Vice*)
CHRISTOPHER M.H. SNOW (*Pro Hac Vice*)
**FORAN GLENNON PALANDECH**
**PONZI & RUDLOFF PC**
222 North LaSalle Street, Suite 1400
Chicago, IL  60601
Telephone:      (312) 863-5000
Facsimile:      (312) 863-5099
E-mail:          mponzi@fgppr.com
                 csnow@fgppr.com

12
13

Attorneys for Defendant ALLIANZ GLOBAL RISKS
US INSURANCE COMPANY

14

**UNITED STATES DISTRICT COURT**

15

**NORTHERN DISTRICT OF CALIFORNIA**

16

17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| SM 10000 PROPERTY, LLC, a Delaware limited liability company and SWINERTON BUILDERS, INC., a California Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, an Illinois corporation, and DOES 1 through 10,<br><br>Defendants. | Case No. 19-CV-03054-PJH<br><br>**DEFENDANT ALLIANZ GLOBAL RISKS US INSURANCE COMPANY'S MOTIONS *IN LIMINE***<br><br>**DATE:      September 16, 2021**<br>**TIME:      2:00 p.m.**<br>**CTRM.:      Zoom Webinar**<br><br>State Court Complaint Filed:  10/1/2019<br>Removal Date:          6/3/2019<br>Trial Date:          10/18/2021 |

DEFENDANT'S MOTIONS *IN LIMINE*; Case No. 19-CV-03054-PJH

1        **1.       Motion in *Limine* No. 1 to Preclude Testimony of Edward McKinnon.**

2            By this motion, Defendant Allianz Global Risks US Insurance Company ("Allianz") seeks

3    to prelude testimony by Plaintiffs' insurance expert, Edward McKinnon on the grounds that Mr.

4    McKinnon's expected testimony is not relevant.

5            On July 27, 2021, Plaintiffs served Amended Initial Disclosures ("Amended Disclosures")

6    indicating that they intend to offer trial testimony from an expert who was designated to testify on

7    insurance issues, such as the "handling of claims," "common practices" of claims adjusters and

8    managers and the "standard of care applicable related to claims handling."  Declaration of

9    Christopher M.H. Snow ("Snow Decl."), Ex. A, pp. 11-12, Ex. B, p. 1.

10           Claims handling issues are not relevant to Plaintiffs' breach of contract and declaratory

11    relief claims, which are Plaintiffs' only claims remaining in this case.  The only relevance of the

12    proffered testimony would be for an insurance "bad faith" claim, which would put at issue the

13    reasonableness of the insurer's conduct.  However, Plaintiffs' bad faith claim is no longer a part of

14    this case, as the Court summarily adjudicated that claim against Plaintiffs, i.e., no reasonable jury

15    could find for Plaintiffs on their bad faith claim.  (ECF 113, pp. 14, 30-33.)  Thus, Mr.

16    McKinnon's testimony on claims handling is wholly irrelevant and should be excluded.

17           To the extent that Plaintiffs wish to offer Mr. McKinnon's testimony to interpret the

18    insurance policy at issue, such testimony is prohibited as well.  Expert testimony is inadmissible to

19    establish the meaning of language in an insurance policy.  *McHugh v. United Service Auto. Ass'n*,,

20    164 F.3d 451, 454 (9th Cir. 1999) (expert "testimony cannot be used to provide legal meaning or

21    interpret the policies as written"); *Flintkote Co. v. General Acc. Assur. Co.*, 410 F.Supp.2d 875,

22    885 (N.D. Cal. 2006), citing *Cooper Cos v. Transcontinental Ins. Co.,* 31 Cal.App.4th 1094, 1100

23    (1995), ("the meaning of the policy is a question of law about which expert opinion testimony is

24    inappropriate") and *Chatton v. National Union Fire Ins. Co.,* 10 Cal.App.4th 846, 865 (1992) ("it

25    has been held that opinion evidence is completely irrelevant to interpret an insurance contract").

26           Plaintiffs have no purpose for offering Mr. McKinnon's testimony other than to taint the

27    case with irrelevant and improper expert opinion.  Accordingly, Mr. McKinnon's testimony

28

1

1    should be precluded in its entirety as irrelevant.

2        **2.        Motion in *Limine* No. 2 to Preclude Evidence First Disclosed After Discovery**

3            **Closed.**

4        Allianz respectfully moves this Court for an order precluding Plaintiffs from calling

5    witnesses at trial who were first identified in their Amended Disclosures, served on July 27, 2021

6    – well after the close of fact discovery on October 15, 2020.  This motion is made on the grounds

7    that, under Federal Rules of Civil Procedure ("FRCP"), Rule 37(c), a party is not permitted to use

8    as evidence at trial any witness or information not disclosed, as required by Rule 26.  Further, the

9    introduction of evidence during trial that was not provided to Allianz during discovery would be

10   unduly prejudicial under Federal Rules of Evidence ("FRE"), Rule 403.

11       On July 27, 2021, long after the close of discovery, Plaintiffs served their Amended

12   Disclosures.  Snow Decl. ¶¶ 3-4. The Amended Disclosures list at least seven new witnesses who

13   were not previously disclosed and therefore have not been deposed.  Snow Decl. ¶ 4.

14       FRCP 37(c) provides that a party who fails to disclose information required by FRCP 26(a)

15   (initial disclosures) or FRCP 26(e)(1) (imposing a duty to update Initial Disclosures or responses

16   to requests for discovery upon court order or in a timely manner upon learning of a material

17   inaccuracy or deficit), is not, unless such failure is harmless or substantially justified, permitted to

18   use as evidence at trial any witness or information not so disclosed.  FRCP 37(c).

19       The burden of establishing harmlessness or substantial justification under FRCP 37(c) is

20   on the party who failed to make the required disclosure.  *Yeti by Molly, Ltd. v. Deckers Outdoor*

21   *Corp.* (9th Cir. 2001) 259 F.3d 1101, 1107.  Plaintiffs cannot meet their burden, as there is no

22   possible justification for disclosing seven new witnesses over nine months after discovery closed.

23   Moreover, the belated disclosure of new witnesses is obviously prejudicial as Allianz never had an

24   opportunity to depose them.

25       Any attempt to convey information to the jury not provided to Allianz during the discovery

26   process would be improper and prejudicial to Allianz under FRE 403.  Such surprise evidence

27   should be excluded.  *See Pfingston v. Ronan Engr. Co.*, 284 F.3d 999, 1005 (9th Cir. 2002).

28

1    This case was filed in May, 2019. Plaintiffs had ample opportunity to identify witnesses

2    prior to the close of the discovery. Indeed, the whole intent behind the FRCP 26 Initial

3    Disclosures is to have the parties identify early in the action the witnesses and documents relevant

4    to their claims. Plaintiffs should not be allowed to flaunt the discovery rules and introduce at trial

5    information through witnesses that they identify during discovery.

6    **3.     Motion in *Limine* No. 3 to Preclude Expert Testimony of Unretained Experts.**

7    Rule 26(a)(2) provides for disclosures by two types of expert: those retained or specifically

8    employed to give expert testimony in a case, Fed. R. Civ. P. 26(a)(2)(B), and those who are not

9    retained or specially employed, but who nonetheless may provide expert testimony, Fed. R. Civ.

10    P. 26(a)(2)(C). An expert who falls into the first category is required to provide an expert report.

11    Fed. R. Civ. P. 26(a)(2)(B). An expert who falls into the second category, however, need only

12    provide disclosures stating both "the subject matter on which the witness is expected to present

13    evidence under Federal Rule of Evidence 702, 703, or 705[ ] and ... a summary of the facts and

14    opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C)(i), (ii). These

15    disclosure requirements were added "to mandate summary disclosures of the opinions to be

16    offered by expert witnesses who are not required to provide reports under Rule 26(a)(2)(B) and of

17    the facts supporting those opinions." See Adv. Comm. Notes to 2010 Amendments. In their Rule

18    26(a)(2) expert disclosures, Plaintiffs disclosed that they "reserve the right to elicit opinion

19    testimony" and "may elicit expert testimony" from Ray Haj, Keith Dancey, Peter Ruiz, Ralph

20    Testa, Dennis Davis, Chris Palermo, Jonathan Meir and Roman Speron, "who are identified as

21    unretained experts unretained experts about the subjects described below" (collectively, Plaintiffs'

22    "Unretained Experts") (Pl. Expert Disclosures, ECF No. 98-2, pp.4-7). The subjects include, but

23    are not limited to: "schedule delays experienced on the Ten Thousand project and the reasons for

24    them", "whether Swinerton would have completed the Ten Thousand project earlier but for the

25    loss event", "when milestones would have been met but for the loss event", "the early completion

26    bonus Swinerton would have received but for the loss event", "the J.S. Held & Co. reports and the

27    analysis contained in them, delay analysis methodologies used in the construction industry", "the

28

costs and extra expenses incurred by Swinerton due to the loss event", "the reasonableness of the owner's pro forma financial models for lease up of Ten Thousand", and "the accuracy and reasonableness of the owner's claim for extra costs and expenses and loss of revenues caused by the loss event". (*Id.*). For each of these witnesses, Plaintiffs have disclosed the general subject matter of the testimony, but there are no summaries of "the facts and opinions to which" each witness "is expected to testify, as required by Rule 26(a)(2)(C)(ii). Plaintiffs' disclosures are insufficient as matter of law. *Merch. v. Corizon Health, Inc.*, 993 F.3d 733, 740 (9th Cir. 2021) (non-retained expert disclosures that do not summarize the facts and opinions to which an expert would testify do not comply with Rule 26(a)(2)); *Pineda v. City & Cty. of San Francisco*, 280 F.R.D. 517, 523 (N.D. Cal. 2012) (disclosures stating only that non-retained experts "will present factual and opinion testimony on causation, diagnosis, prognosis, [and] extent of [plaintiff's] disability" or "the reasonableness of healthcare costs generated for medical treatment and medical testing rendered to Plaintiff" do not comply with Rule 26(a)(2)(C) because there is no summary of the facts and opinions to which each witness will testify). Here, Plaintiffs did not disclose a summary of the facts and opinions to which each of their Unretained Experts will testify. Plaintiffs' boilerplate conclusory description of the subject matter of the anticipated testimony is woefully inadequate.

Fed.R.Civ.P. 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." "Rule 37(c)(1) is a 'self-executing,' 'automatic' sanction designed to provide a strong inducement for disclosure. The only exceptions to Rule 37(c)(1)'s exclusion sanction apply if the failure to disclose is substantially justified or harmless." *Goodman v. Staples The Office Superstore*, LLC, 644 F.3d 817, 827 (9th Cir. 2011) (internal citations omitted). The burden of establishing harmlessness or substantial justification under FRCP 37(c) is on the party who failed to make the required disclosure. *Yeti*, 259 F.3d at 1107. Accordingly, because Plaintiffs failed to disclose a "summary of the facts and opinions" their Unretained Experts are

1    expected to testify to, Rule 37(c)(1) requires the exclusion of whatever undisclosed facts and

2    opinions they may have at trial.  *See Merch.*, 993 F.3d at 740 (affirming exclusion of non-retained

3    expert witnesses under Rule 37(c)(1) where plaintiff's Rule 26(a)(2)(C) disclosures lacked a

4    summary of the facts and opinions to which each expert was expected to testify).

5        In addition, or in the alternative, any attempt to convey information to the jury not

6    provided to Allianz during the discovery process would be improper and prejudicial to Allianz

7    under Fed.R.Evid. 403.  *See Pineda*, 280 F.R.D. at 523 ("Without information as to the opinions

8    Plaintiffs' non-retained expert witnesses are expected to testify to and the main facts on which

9    these opinions are based, Defendant's ability to meaningfully depose or cross-examine these

10   witnesses is undermined.").  Such surprise evidence should be excluded.  *See Pfingston v. Ronan*

11   *Engr. Co.*, 284 F.3d 999, 1005 (9th Cir. 2002); Accordingly, the Court should preclude any

12   "expert" testimony or opinions from Ray Haj, Keith Dancey, Peter Ruiz, Ralph Testa, Dennis

13   Davis, Chris Palermo, Jonathan Meir, or Roman Speron under FRE 403.

14       **4.    Motion in *Limine* No. 4 to Exclude Evidence That Swinerton's Damages Fall**

15           **Within the Scope of Coverage.**

16       Allianz propounded an Interrogatory on Swinerton to identify and state the basis for any

17   amounts claimed or allegedly owed under the supplemental Policy coverages for Expediting

18   Expense, Debris Removal, Escalation, Temporary Repairs, and Contractors Extra Expense.

19   (Swinerton Resp. to Interrogatory No 7, ECF No. 98-6, pp. 5-6). Swinerton responded that "it will

20   be necessary for Swinerton to engage the services of a qualified expert to determine the amount

21   that falls within each of [those] categories…. Swinerton expects to present this information

22   through expert testimony at the appropriate time."  (*Id.*)  In their Rule 26(a)(2) expert disclosures,

23   Swinerton disclosed Ted Bumgardner as its retained expert witness to determine "losses, costs and

24   expenses incurred by Swinerton as a result of the loss event" and rely on his expert damages report

25   dated October 26, 2020 ("Bumgardner's Damages Report"). (Pl. Expert Disclosures, ECF No. 98-

26   2, pp. 2-3).

27

28

As a retained expert, Fed.R.Civ.P. 26(a)(2)(B) requires the disclosure of a written report that must contain, among other things: "a complete statement of all opinions the witness will express and the basis and reasons for them". Fed.R.Civ.P. 26(a)(2)(B)(i). Bumgardner's Damages Report is the subject of Defendant's *Daubert* Motion[1]. ECF No. 133. The instant motion *in limine* seeks to preclude any other witness from testifying as to basis for any amounts claimed or allegedly owed under the supplemental Policy coverages for Expediting Expense, Debris Removal, Escalation, Temporary Repairs, and Contractors Extra Expense.

Fed.R.Civ.P. 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Goodman*, 644 F.3d at 827.

Because Swinerton admitted in interrogatory responses that it was "necessary for Swinerton to engage the services of a qualified expert to determine the amount that falls within" the Policy categories for Expediting Expense, Debris Removal, Escalation, Temporary Repairs, and Contractors Extra Expense, and no retained expert can explain how or why Swinerton incurred any losses, costs, or expenses that fall within these Policy categories, the Court should preclude all testimony and opinions that Swinerton sustained any losses, costs, or expenses that fall within the Policy categories for Expediting Expense, Debris Removal, Escalation, Temporary Repairs, and Contractors Extra Expense.

**5.    Motion in *Limine* No. 5 to Exclude Evidence of Swinerton's Damages in Excess of the Applicable Sublimit.**

In its summary judgment order, the Court ruled that "various sub-limits control the amount available to Swinerton" and provide an "upward bound for the amount that plaintiffs may recover under such provisions at trial". (S.J. Order, p.27:24—29:5) (citations omitted). The Court found

---

[1] The basis and reasons for Bumgardner's opinions regarding Swinerton's losses for Expediting Expense, Debris Removal, Escalation, Temporary Repairs, and Contractors Extra Expense were not disclosed in his written report. When asked at deposition "where in your report can I find the basis and reasons supporting your opinions that are set forth in Exhibit D", Bumgardner confessed to the obvious: "Those are not -- those are not separately established in the report." (ECF No. 98-3, Bumgardner Depo. Tr.: 24:5-13).

that "the apparent purpose of the Property Damage Coverage form provisions" for Expediting Expenses, Debris Removal, Temporary Repairs, and Contractor's Extra Expense is "to provide supplemental coverage for loss suffered separate and apart from that covered under the General Property Insuring Agreement." (*Id.* p. 30:19-22). Allianz agrees and has never argued otherwise. The total Limit of Liability under the Policy's Builder's Risk Form is "$198,018,341 per Occurrence except as sublimited below:"

- With respect to Expediting Expenses: "25% of the adjusted loss subject to a maximum of $5,000,000 per occurrence" (Policy, ECF No. 1-1, p. 85)
- With respect to Debris Removal: "10% of the adjusted loss subject to a maximum of $50,000,000 per occurrence" (Policy, ECF No. 1-1, p. 84)
- With respect to Temporary Repairs: "20% of the adjusted loss subject to a maximum of $2,500,000 per occurrence" (Policy, ECF No. 1-1, p. 84)
- With respect to Contractor's Extra Expense "10%o [*sic*] of the adjusted loss subject to a maximum of $5,000,000 per Occurrence" (Policy, ECF No. 1-1, p. 84)

The Court determined that for purposes of pretrial rulings, it "will adopt plaintiffs' proffered construction that 'adjusted loss' includes 'the total amount of loss' generally 'arising from' a covered accident and measured ***before*** the application of any applicable deductible or limit of liability." (*Id.*, p. 30:15-18) (emphasis in original). Here, before the application of any applicable deductible or limit of liability, Swinerton claims a total amount of $609,545 for alleged direct physical loss or damage to insured property[2]. (*See* Bumgardner's Damages Report, ECF No. 98-4, pp. 6-7) (showing Policy category for "Direct" with a grand total of $609,545). Per Allianz's understanding of the Court's Order, the additional, sub-limited amount of supplemental coverage potentially *available* under the Policy is to be computed as follows:

///

///

---

[2] Allianz contends that this amount is overstated but, for purposes of this motion, it represents the maximum amount or ceiling that Swinerton can recover.

DEFENDANT'S MOTIONS *IN LIMINE*; Case No. 19-CV-03054-PJH

| | Potential coverage before application of deductible or any limit of liability: |
|---|---|
| Total amount of loss generally arising from damage covered under the General Property Insuring Agreement: | $609,545 |
| Expediting Expense—coverage that supplements (up to 25% but no more than $5 million) the $609,545 of the total loss under the General Property Insuring Agreement before application of any deductibles or limits of liability.  Here, 25% of the $609,545 total loss as claimed by Swinerton is: | $152,386 |
| Debris Removal—coverage that supplements (up to 10% but no more than $50 million) the $609,545 of the total loss under the General Property Insuring Agreement before application of any deductibles or limits of liability.  Here, 10% of $609,545 total loss as claimed by Swinerton is: | $60,954 |
| Temporary Repairs—coverage that supplements (up to 20% but no more than $2.5 million) the $609,545 of the total loss under the General Property Insuring Agreement before application of any deductibles of limits of liability. Here, 20% of $609,545 as claimed by Swinerton is: | $121,909 |
| Contractor's Extra Expense—coverage that supplements (up to 10% but no more than $5 million) the $609,545 of the total loss under the General Property Insuring Agreement before application of any deductibles of limits of liability.  Here, 10% of total loss of $609,545 as claimed by Swinerton is: | $60,954 |
| **Total potential coverage available under the General Property Insuring Agreement plus the supplemental coverages:** | **$1,005,749** |

Any evidence or testimony relating to alleged damages in excess of the Policy sublimits is irrelevant, prejudicial, and should be excluded from trial.

**6.    Motion in *Limine* No. 6 to Exclude Evidence the Period of Delay Extends Beyond October 28, 2016.**

The Insuring Agreement of the Policy's Delayed Opening Form states that "[i]n consideration of the additional premium charged, and subject to the terms, conditions, and limitations of the Policy to which this extension is attached *and to the Limit of Liability, terms,*

8

*conditions*, and limitations *of this extension*, this Policy is extended to indemnify the Insured, specified in the Delayed Opening Insurance Extension Schedule, for Delayed Start-Up Expenses, Loss of Gross Earnings, and / or Loss of Rental Income, as defined in this extension, incurred during the Period of Delay, when such delay is caused by direct physical loss or direct physical damage to Insured Property during the Period of Insurance …" (Policy, ECF No. 1-1, p. 67).

Under California law, conditions precedent in an insurance policy "neither confer nor exclude coverage for a particular risk but, rather, impose certain duties on the insured in order to obtain the coverage provided by the policy." *N. Am. Capacity Ins. Co. v. Claremont Liab. Ins. Co.*, 177 Cal. App. 4th 272, 289–90, 99 Cal. Rptr. 3d 225, 240 (Cal. App. 4th 2009) (citation omitted).  Here, two conditions precedent imposed on SM 10000 to obtain coverage under the Delayed Opening Form are: (1) that it *immediately* notify Allianz of any change between the planned and the actual project progress schedule and, (2) in the event of *any* incident or Occurrence that *might* give rise to a claim for coverage under the Delayed Opening Form, SM 10000 is required to *immediately* notify Allianz and *immediately* submit to Allianz *any revisions to the original progress schedule* where such revisions could delay the Scheduled Date of Completion:

***

<strong>CONDITIONS</strong>

***

**15. NOTICE OF CHANGE IN PROGRESS SCHEDULE:**

The Insured shall immediately advise the Company of any change between the planned and the actual project progress schedule.

**16. REQUIREMENTS IN CASE OF LOSS:**

In the event of any incident or Occurrence which might give rise to a claim under this extension:

A.  The Insured shall immediately notify the Company and immediately submit to the Company any revisions to the original progress schedule where such revisions could delay the Scheduled Date of Completion.

***

1  (Policy, ECF No. 1-1, p.67, 70)

2         Plaintiffs are asserting "that the Scheduled Date of Completion is October 27, 2016 per the

3  most current [construction] schedule prior to the Loss Event." (Pl. Mot. to Bifurcate, ECF No.

4  128, p. 3:12-16).  Plaintiffs are also asserting that "[c]lean-up, repairs, and replacement of

5  destroyed parts continued through April 2016".  (Decl. of Keith Dancey, ECF No. 69, ₱ 9).

6  However, "[t]he last schedule update was done on June 3, 2016."  (Bumgardner Delay Report,

7  ECF No. 94-2, p. 65).  And according to that June 3, 2016 schedule update, the completion of the

8  project was anticipated to be October 28, 2016.  (Declaration of Granger Stuck, ECF No. 76-1).

9  Thus, the last progress schedule revision provided to Allianz by SM 10000 pursuant to Paragraphs

10  15-16 of the Policy Conditions, several months after the loss and after all repairs were completed,

11  specified a 1 day delay—from October 27, 2016 to October 28, 2016.  No other schedule revisions

12  could have been provided to Allianz after the June 3, 2016 update because no updates were

13  created after June 3, 2016.  (Bumgardner Delay Report, ECF No. 94-2, p. 65).

14         SM 10000 now seeks to introduce evidence at trial of a *210-day* delay—a Period of Delay

15  from October 27, 2016 and April 27, 2017.  Yet it is undisputed that as the construction

16  progressed beyond June 3, 2016—the date when the "most current" construction schedule

17  predicted completion on October 28, 2016, SM 10000 failed to *immediately* notify Allianz of *any*

18  change or delay to the new October 28, 2016 completion date of the schedule because no schedule

19  updates were created after June 3, 2016 to show such changes.  It is also undisputed that, because

20  no schedule updates were created after June 3, 2016 SM 10000 did not comply with the Policy

21  Conditions in Paragraphs 15 and 16  to *immediately* notify Allianz and *immediately submit to*

22  *Allianz* any revisions to the June 3, 2016 schedule.

23         The necessity these schedules, and prejudicial effect of SM 10000's failure to supply them

24  to Allianz, is self-evident from the report of its own proffered delay expert Ted Bumgardner. (*See*

25  Bumgardner Delay Report, ECF No. 94-2, p.62, 69 (admitting "[i]t was not possible to consider

26  net losses over the entire period because of the limited number of schedules available" and "[t]he

27  June 3, 2016 schedule shows that several … activities … might be delayed on level 40. … Based

28

1   on the available schedule updates, it was not possible to track these activities for the final months

2   of the project to determine whether the delay did materialize.")).

3        And despite failing to comply with the Policy Conditions requiring that SM 10000 provide

4   construction schedule updates to Allianz, SM 10000 now seeks to *preclude* Allianz from offering

5   any opinions about delay causation for the duplicitous reason that Allianz did not use a "method of

6   critical path analysis to determine the impact of the Loss Event on the construction schedule." (Pl.

7   *Daubert* Mot. re: Granger Stuck, ECF No. 130, p. 9:27-28). SM 10000's 30(b)(6) witness on the

8   issue of critical path delays admitted that SM 10000 was not aware of any critical path delays after

9   June 2016. (Snow Decl, Ex. C, Chris Palermo Depo. Tr.: 135:19—25) ("Q. Is SM 10000 aware of

10  any delays to the critical path for TCO No. 4 that began after June 14th, 2016? A. I don't think so.

11  I'm not aware of any. …"). And ***SM 10000's own delay expert admitted that there are neither***

12  ***construction schedules nor a critical path to analyze after June 3, 2016.*** (Snow Decl. Ex. D,

13  Bumgardner Depo. Tr.: 211:18—212:9) ("Q. And does your delay analysis consider whether there

14  were any delays to the critical path after June of 2016? A. … since we did not have the critical

15  path updates -- schedule updates after that period, there wasn't any critical path to analyze beyond

16  the critical path, as stated in the June updates. … we didn't have subsequent schedules to have

17  done further critical-path analysis, too, as you get further past June.").

18       In short, SM 10000 alleges the Scheduled Date of Completion is October 27, 2016 based

19  entirely on a construction schedule update created before the Loss Event, and seeks coverage for a

20  210 day delay to the completion date shown in that construction schedule. But as a condition

21  precedent to obtaining coverage under the Delayed Opening Form, SM 10000 was required to

22  notify and provide Allianz with the revisions to the construction schedule that would show any

23  delay to the Scheduled Date of Completion. Here, the last schedule update SM 10000 provided to

24  Allianz  created in June 2016—after all repairs from the Loss Event were completed— shows a

25  predicted completion date of October 28, 2016, a 1 day delay. In effect the Policy Conditions

26  preclude SM10000 from doing exactly what it is attempting to do here: submitting evidence of a

27  lengthy project delay without ever supplying the updated progress schedules that would verify if

28

1   such a delay ever took place.  At best, the scheduling evidence that SM 10000  provided per the

2   Policy Conditions Allianz shows only that  the Loss Event delayed the project completion date  by

3   1 day.   SM 10000 is precluded by the Policy Conditions from introducing evidence or eliciting

4   testimony of any delay beyond the October 28, 2016 date predicted in the June 2016 schedule.

5          **7.        In the alternative to Motion in *Limine* No. 6, Motion in *Limine* No. 7 to**

6                      **Exclude Evidence of any Period of Delay Beyond January 1, 2017.**

7          The Policy coverage only applies to indemnify SM 10000 for covered damages "incurred

8   during the Period of Delay, when such delay is caused by direct physical is caused by direct

9   physical loss or direct physical damage to Insured Property…." (Policy, ECF No. 1-1, p.67).  The

10  phrase "Period of Delay" is defined by the Policy, in part, as "the period of time between the

11  Scheduled Date of Completion and the actual date on which commercial operations or tenant /

12  owner occupancy commenced or could have commenced".  (ECF No. 113, p.17-23). In its summary

13  judgment order, this Court explained that Allianz's "position that the term 'commence,' as used in

14  that [Period of Delay] definition, means what it says (i.e., to begin) is not just reasonable—it's

15  likely correct. From the court's perspective, the only real question on the Period of Delay's endpoint

16  is whether the 'commercial operations' or 'tenant/owner occupancy' served as the triggering event.

17  Defendant could more-than-reasonably argue that the delivery of Ten Thousand's leasing office,

18  which is intended to sign-up prospective tenant (seemingly a commercial operation), triggered that

19  endpoint." (ECF No. 113, p.32:17-21).

20         SM 10000 admitted in Interrogatory responses that but for the Loss Event, "commencement

21  of commercial operations would have occurred upon Swinnerton's delivery of the on-site leasing

22  office and one mock up unit for occupancy by SM 10000's leasing team.  The completion of the

23  leasing office and mock up unit were part of Milestone #1 in Swinerton's contract."  (SM 10000

24  Response to Interrogatory No. 4, ECF No. 67-7, p. 4).  There is no dispute that July 1, 2016 was the

25  *actual* date Milestone #1 in Swinerton's contract was completed. (Bumgardner's Delay Report,

26  ECF No. 94-2, p.56) ("The [July 1, 2016] issue date of the first temporary certificate of occupancy

27  was taken as the milestone 1 (TCO#1) completion date in the analysis").  Accordingly, there is no

28

dispute that July 1, 2016 is the actual date SM 10000 commenced or could have commenced its

commercial operations.  Separately, with respect to tenant occupancy, it is undisputed that the actual

date tenant occupancy commenced was January 1, 2017. (See Bumgardner Damages Report, ECF

No. 94-2, p. 36 ("The first occupancy was January 1, 2017").  Thus, per the Court's summary

judgment Order, the Period of Delay cannot end any later than January 1, 2017.  However, as noted

in Motion *in Limine* No. 6, SM 10000 intends to introduce evidence that the Period of Delay does

not end on January 1, 2017 and, instead, runs until April 27, 2017, nearly 5 months later. This

evidence violates the Policy terms and the Court's Order applying those terms.  Accordingly, any

evidence or testimony that the end of the Period of Delay is any later than January 1, 2017 is

irrelevant and should be excluded from trial.

**8.    Motion in *Limine* No. 8 to Preclude Evidence of SM 10000's Damages That Were Not "Incurred During the Period of Delay as modified by the 30 Day Waiting Period".**

The Policy coverage only indemnifies SM 10000 for covered damages "incurred during

the Period of Delay, when such delay is caused by direct physical is caused by direct physical loss

or direct physical damage to Insured Property…."  (Policy, ECF No. 1-1, p.67).  The categories of

covered damages claimed by SM 10000 here are Delayed Start Up Expenses and Loss of Rental

Income. These categories of damages cannot be recovered if they fall outside the Period of Delay.

As noted in the Court's summary judgment Order, the Delayed Opening Form includes a Basis for

Indemnity section, which states that "[S]ubject to the Limit of Liability specified in the Schedule,

the Insured will be indemnified for":

***

A. Delayed Start-Up Expenses, **during the Period of Delay, to the extent that such expenses are actually and necessarily incurred**, to enable the Insured to commence commercial operations in the manner originally planned.

B. Loss of Gross Earnings and/or Loss of Rental Income which, but for the delay, would have been derived from the Insured Project, **during the Period of Delay**. Loss of Gross Earnings and/or Loss of Rental Income shall be adjusted, as may be necessary, to provide for market trends or special circumstances. The amount thus adjusted shall represent as near as may be reasonably practicable the Loss of Gross Earnings and/ or Loss of Rental Income.

1    Plaintiffs now concede they are only asserting "that the Scheduled Date of Completion is

2    October 27, 2016 per the most current [construction] schedule prior to the Loss Event." (Pl. Mot. to

3    Bifurcate, ECF No. 128, p. 3:12-16). Thus, the Scheduled Date of Completion cannot be any *earlier*

4    than October 27, 2016. And for the reasons discussed in Motions in *Limine* No. 7, included by

5    reference herein, the end of the Period of Delay cannot be any *later* than the actual date tenant

6    occupancy commenced, which was January 1, 2017. Therefore, any evidence or testimony relating

7    to SM 10000's alleged damages incurred *before* October 27, 2016 or *after* January 1, 2017 are

8    irrelevant and should be excluded from trial.

9    But the analysis does not end there. This period is subject to the Policy's 30 day "waiting

10   period". Policy coverage under the Delayed Opening Form is subject to a 30-day waiting period

11   deductible. (Complaint ₱13, ECF 1-1, p. 35:4). Specifically, the Deductible Clause of the Delayed

12   Opening Form states: "It is agreed that the amount designated in the Schedule as the Deductible is a

13   waiting period. The number of days in the waiting period stated in the Schedule shall be deducted

14   from the Period of Delay for each and every Occurrence giving rise to a claim under this

15   extension." (Policy, ECF No. 1-1, p.70). As noted above, Plaintiffs are asserting "that the

16   Scheduled Date of Completion is October 27, 2016 per the most current [construction] schedule

17   prior to the Loss Event." (Pl. Mot. to Bifurcate, ECF No. 128, p. 3:12-16). Thus, the Period of

18   Delay, as claimed by SM 10000, starts on October 27, 2016. Therefore, the waiting period begins

19   on October 27, 2016, and ends 30-days later on November 26, 2016. And as previously stated in

20   MIL No. 7, the Period of Delay can be no *later* than January 1, 2017[3]. Accordingly, any evidence

21   or testimony relating to SM 10000's alleged damages incurred between *before* November 26, 2016

22   and *after* January 1, 2017 is irrelevant and should be excluded from trial because such damages

23   would not be "incurred during the Period of Delay" as required by the Policy. At best, only

24   damages "incurred between November 26, 2016 and January 1, 2017 are even potentially relevant

25   and admissible.

26

27   _____
     [3] And as argued in MIL No. 6, the more appropriate end date for the Period of Delay is 1 day—
28   October 28, 2016.

However, as more fully discussed in Allianz's *Daubert* Motion to Preclude the Expert Testimony of Brian Bergmark (ECF No. 134), SM 10000 intends on introducing evidence of purported damages for Delayed Startup Expenses that are not aligned with any conceivably possible Period of Delay. Bergmark calculates damages between August 8, 2016 and April 27, 2017. In other words, Bergmark used August 8, 2016 as the Scheduled Date of Completion (i.e., the beginning of the Period of Delay), and April 27, 2017 as the actual date on which commercial operations or tenant / owner occupancy commenced or could have commenced (i.e., the end of the Period of Delay). But these damages calculations are not aligned with the Period of Delay. Not even Plaintiffs are asserting that the Scheduled Date of Completion was August 8, 2016. They contend it was October 27, 2016. (Pl. Mot. to Bifurcate, ECF No. 128, p. 3:12-16). And Plaintiff's do not contest the application of the 30-day waiting period either. (Complaint, ECF No. 1-1, p. 35:4). That means November 26, 2016, is the *earliest* possible start date for the introduction of any evidence of any damages "incurred during the Period of Delay." Any evidence of damages incurred before November 26, 2016 is irrelevant, inadmissible and likely to confuse the jury. Likewise, SM 10000 cannot introduce evidence of damages incurred after January 1, 2017 either, as such damages would also not be "incurred during the Period of Delay".

Therefore, in the alternative to MIL No. 6[4], Allianz seeks an order from the Court limiting the introduction of any evidence of Delayed Start Up Expenses or Loss of Rental Income damages to the period of time between November 26, 2016 and January 1, 2017.

**9.      Motion in *Limine* No. 9 to Exclude Evidence of SM 10000's Damages That Do Not Account for SM 10000's Entitlement to Receive $7,840,000 Million in Liquidated Damages from Swinerton.**

Under California law, it is SM 10000's burden to establish that its claimed loss falls within the scope of coverage provided by the Policy. *See Garvey v. State Farm Fire & Cas. Co.*, 48 Cal.3d 395, 406 (1989); *MRI Healthcare v. State Farm General Insurance Co.,* 187 Cal.App.4th 766, 777-778 (2010). In addition, "California case law states that an insurer may offset its

---

[4] If the Court agrees with Allianz in MIL No. 6 that the Period of Delay cannot exceed one day, then there are no delay damages in excess of the 30 day waiting period.

DEFENDANT'S MOTIONS *IN LIMINE*; Case No. 19-CV-03054-PJH

contractual obligation to pay the insured against any previous payments made by other parties that have already compensated the insured for its loss." *Pan Pac. Retail Properties, Inc. v. Gulf Ins. Co.*, 471 F.3d 961, 973–74 (9th Cir. 2006) (*citing Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 65 Cal.App.4th 1279, 1295, 77 Cal.Rptr.2d 296 (1998) ("[W]here multiple insurers or indemnitors share equal contractual liability for the primary indemnification of a loss or the discharge of an obligation, the selection of which indemnitor is to bear the loss should not be left to the often arbitrary choice of the loss claimant, and no indemnitor should have any incentive to avoid paying a just claim in the hope the claimant will obtain full payment from another coindemnitor.")

Here, the construction contract between SM 10000 and Swinerton provides that SM 10000 is entitled to receive liquidated damages from Swinerton associated with the late completion of Milestone 2 and Milestone 4 of the construction contract, and provides the formula for calculating the amounts owed for late completion. (ECF No. 71-2, pp. 13-15). Per Swinerton's "schedule impact narrative" sent to Allianz in September 2017, Milestone 2 was delayed from August 1, 2016 to November 22, 2016 (a total of 113 days), and Milestone 4 was delayed from October 27, to December 10, 2016 (a total of 44 days). (*see* Declaration of Mark Newcomb, ECF No. 93, p.3:13-17; ECF No. 93-7). Using these same delay periods, SM 10000's senior project manager, Jon Meir, calculated SM 10000's liquidated damages under the construction contract to be $7,840,000—an amount which "can be extended based the signoff date per contract since SM 10000 Property LLC was unable to receive beneficial use due to lack of completion in amenity space and with unit turnover." (Snow Decl., Ex. E. (Meir Depo Ex. 172), p. 1).

As noted in the Court's summary judgment Order, the Delayed Opening Form includes a Basis for Indemnity section, which states that "[S]ubject to the Limit of Liability specified in the Schedule, the Insured will be indemnified for":

***

A. Delayed Start-Up Expenses, during the Period of Delay, to the extent that such expenses are actually and necessarily incurred, to enable the Insured to commence commercial operations in the manner originally planned.

B. Loss of Gross Earnings and/or Loss of Rental Income which, but for the delay, would have been derived from the Insured Project, during the Period of Delay. Loss of Gross Earnings and/or Loss of Rental Income shall be adjusted, as may be necessary, to provide for market trends or special circumstances. The amount thus adjusted shall represent as near as may be reasonably practicable the Loss of Gross Earnings and/ or Loss of Rental Income.

C. The Delayed Start-Up Expenses, Loss of Gross Earnings, and/or Loss of Rental Income Coverage indemnifiable under this extension shall be reduced by the following:

(i) Any income realized from commercial operations at the Location of the Insured Project during the Period of Delay, or any increase in the Insured's income from any other property due to the delay;

(ii) Any amount saved in respect of labor costs, charges and expenses payable out of the anticipated revenue that do not arise or are reduced during the Period of Delay;

**(iii) <u>Any liquidated damages and/or penalties the Insured is entitled to receive;</u>**

(iv) Any income realized from deferred sales or from increased production or profits during a period of 12 months immediately following the Period of Delay resulting as a direct consequence of the delay.

\*\*\*

(*see* ECF No. 113, p.7:9-14) (quoting Policy, §10A-C) (*see* ECF No. 1-1 at 67, emphasis ours). Thus, the formula for measuring the amount of indemnifiable Policy benefits owed under the basic scope of coverage requires, from the outset, a reduction for any liquidated damages SM 10000 is entitled to receive.

In this litigation, SM 10000 relies on a retained expert, Brian Bergmark "to establish the policy benefits owed to Plaintiffs as a result of the loss event". (Plaintiffs Rule 26(a)(2) disclosures, ECF No. 98-2, p. 3:10-19). Bergmark's expert report on damages ("Bergmark Report") (previously filed as ECF No. 134-02) is based on an alleged 213-day delay in the completion of Milestone 2, and a an alleged 185-day delay in the completion of Milestone 4. (Bergmark Report, ECF No. 134-02, p. 7:12-25). The delay periods Bergmark used are significantly longer than the delay periods SM 10000 used for its $7.8 million calculation of liquidated damages, implying that amount of liquidated damages SM 10000 is entitled to receive

17

from Swinerton under the contract is significantly greater than $7.8 million. At deposition, Bergmark admitted that his damages opinion considered the reductions required by section C(i) of the Basis of Indemnity clause. (ECF No. 98-11, Bergmark Depo. Tr.: 221:2—222:7). And section C(ii). (*Id.*) And section C(iv). (*Id.*) The *only* amount he skipped over and failed to consider for his opinion was section C(iii), the amount of any liquidated damages and/or penalties SM 10000 is entitled to receive from Swinerton for the delay being claimed to Allianz. (*Id.*). The true reason, of course, for Bergmark's selective ignorance on this one item obvious: Swinerton and SM 10000 are jointly represented in this lawsuit.

But biases aside, as a matter of California law, it is SM 10000's burden to establish that its claimed loss falls within the scope of coverage provided by the Policy. The contractual formula for establishing the amount of indemnity payable under the Policy's Delayed Opening Form requires SM 10000 to disclose and account for any liquidated damages they are entitled to receive. Bergmark did not follow the formula. Any evidence or testimony relating to alleged "policy benefits owed to" SM 10000 that fails to consider any liquidated damages SM 10000 is entitled to receive, is irrelevant and should be excluded from trial.

DATED: August 19, 2021

**FORAN GLENNON PALANDECH PONZI & RUDLOFF PC**

By:    /s/ Christopher M.H. Snow
        G. Edward Rudloff, Jr.
        Dianne J. Meconis
        Matthew S. Ponzi (*Pro Hac Vice*)
        Christopher M.H. Snow (*Pro Hac Vice*)

Attorneys for Defendant ALLIANZ GLOBAL RISKS US INSURANCE COMPANY