G. EDWARD RUDLOFF, JR. (SBN 56058)
DIANNE J. MECONIS (SBN 120895)
**FORAN GLENNON PALANDECH**
**PONZI & RUDLOFF PC**
200 Pringle Avenue, Suite 410
Walnut Creek, CA 94596
Telephone: (925) 357-8640
Facsimile: (510) 740-1501
E-mail: erudloff@fgppr.com
dmeconis@fgppr.com

MATTHEW S. PONZI (*Pro Hac Vice*)
CHRISTOPHER M.H. SNOW (*Pro Hac Vice*)
**FORAN GLENNON PALANDECH**
**PONZI & RUDLOFF PC**
222 North LaSalle Street, Suite 1400
Chicago, IL 60601
Telephone: (312) 863-5000
Facsimile: (312) 863-5099
E-mail: mponzi@fgppr.com
csnow@fgppr.com

Attorneys for Defendant ALLIANZ GLOBAL RISKS US INSURANCE COMPANY

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

SM 10000 PROPERTY, LLC, a Delaware limited liability company and SWINERTON BUILDERS, INC., a California Corporation,

Plaintiff,

vs.

ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, an Illinois corporation, and DOES 1 through 10,

Defendants.

Case No. 19-CV-03054-PJH

**DEFENDANT ALLIANZ GLOBAL RISKS US INSURANCE COMPANY'S OPPOSITION TO PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE EXPERT TESTIMONY OF J.S. HELD WITNESSES**

**DATE:** **September 16, 2021**
**TIME:** **2:00 p.m.**
**CTRM.:** **Zoom Webinar**

State Court Complaint Filed: 10/1/2019
Removal Date: 6/3/2019
Trial Date: 10/18/2021

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. ARGUMENT ..... 3

A. The Method Used by the JS Held Delay Experts is Relevant ..... 3

1. This Court rejected Plaintiffs' argument that the Period of Delay terminates with the actual completion of the project ..... 3

2. If "retrospective" delay analyses are irrelevant, then the retrospective analysis of Plaintiffs' expert is irrelevant ..... 5

B. The Method Used by the JS Held Delay Experts is Reliable ..... 6

1. Courts reject CPM-methods of delay analysis where CPM construction schedules do not exist for the duration of the project ..... 7

2. The used by JS Held Delay Experts is recognized and was published in AACE technical paper CDR-3356 ..... 9

3. Observational methods of delay analysis are recognized and described in the AACE 29R-03 document Plaintiffs rely on ..... 10

4. Under Plaintiffs' own insurance industry materials, a "retrospective" delay analysis incorporating a "but for" test that removes "concurrent uninsured delays" is standard ..... 13

5. Plaintiffs' disagreement with Stuck's conclusions about causation goes to weight, not admissibility ..... 15

6. Plaintiffs' remaining reliability arguments contradict the Court's summary judgment order or go to weight, not admissibility ..... 16

7. Plaintiffs' argument that obvious alternative causes were ignored is illogical and goes to weight, not admissibility ..... 18

III. CONCLUSION ..... 20

# TABLE OF AUTHORITIES

## Cases

*Blinderman Const. Co. v. United States*, 39 Fed. Cl. 529, 585 (1997), *aff'd*, 178 F.3d 1307 (Fed. Cir. 1998) ........ 7, 8, 9

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ........ 16

*Fortec Constructors v. U.S.*, 8 Cl. Ct. 490, 505 (Ct. Cl. 1986) ........ 7, 8, 9

*Garvey v. State Farm Fire & Cas. Co.*, 48 Cal.3d 395, 406 (Cal. 1989) ........ 15

*George Sollitt Const. Co. v. United States*, 64 Fed. Cl. 229, 240–41 (Ct. Fed. Cl. 2005) ........ 7

*Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir.2002) ........ 18

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 978 F. Supp. 2d 1053, 1069 (C.D. Cal. 2013) ........ 18, 19

*MRI Healthcare v. State Farm Gen. Ins. Co.*, 187 Cal.App.4th 766, 777-778 (Cal. App. 2010) ........ 15

*Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ........ 10

*Rustler*, 211 A.3d at 193 ........ 8, 9

## Statutes

Fed.R.Evid. 702 ........ 1

## I. INTRODUCTION

Plaintiffs seek to preclude Defendant Allianz from offering expert testimony from Granger Stuck, Lisa Enloe, Jon Perry, or Jon Held ("JS Held Experts"). Plaintiffs do not contest that Mr. Stuck, Ms. Enloe, or Mr. Perry (collectively, "the JS Held Delay Experts") are sufficiently qualified as experts under Fed.R.Evid. 702 to perform a delay analysis in order quantify and determine the cause of delays during a construction project.[1] Instead, Plaintiffs contend that their method of delay analysis is unreliable because it is allegedly not a "critical path method" or "CPM" method of delay analysis, which Plaintiffs allege are the only methods that can reliably quantify construction delays.

The fatal and fundamental flaw with Plaintiffs' argument is that numerous courts have rejected, as unreliable, the use of CPM methods of delay analysis where the underlying data that forms the basis of the analysis—the CPM schedule updates from the contractor—do not exist for the duration of the project. In this case, Plaintiff Swinerton Builders, Inc. ("Swinerton") did *not* update its CPM construction schedule for the duration of this project. There simply are no CPM schedule updates for anybody to analyze between June 2016 and the alleged completion of construction in July 2017. In this situation, numerous courts have rejected, as unreliable, the attempted use of CPM methods of delay analysis. As such, Plaintiffs' *Daubert* Motion effectively seeks to preclude concededly qualified forensic delay experts from offering opinions at trial because they allegedly failed to use a method of analysis that courts deem unreliable in the absence of CPM schedule updates for the duration of the construction project.

As further discussed below, JS Held Delay Experts *did* consider Swinerton's CPM schedules, and formed their conclusions based on a review of contemporaneous project documentation. Such a method is recognized by the professional associations and publications that Plaintiffs filed in support of their motion. Indeed, in a different case, Plaintiffs' own delay expert, Ted Bumgardner, has filed sworn statements in federal court explaining that he formed opinions about the cause of delays to a construction project "based simply on review of

[1] For the Court's reference, Mr. Stuck's resume was previously filed as ECF No. 65-1.

contemporaneous project documentation." (Snow Decl., Ex. A, Bumgardner Decl., ¶¶ 1-2, 6, 9). Plaintiffs' contention that JS Held Delay Experts, who did the same thing, used a "home brewed method that is not used by anyone else in the industry" is not only unsupported, it is contradicted by the sworn testimony of their own expert.

Plaintiffs also raise two relevancy arguments, one rejected and the other moot. First, Plaintiffs argue that the relevant measurement of the Period of Delay, as defined by the Policy, refers to a delay to the "actual completion" of the project. But the Court has already rejected this argument in its summary judgment order.

Plaintiffs' second relevancy argument is that the JS Held Delay Experts used a "retrospective" analysis method instead of a "prospective analysis" to determine the Scheduled Date of Completion under the Policy. This argument is a red herring. In its summary judgment order, the Court explained that under Plaintiffs' "prospective analysis", "a factfinder would look to Plaintiffs' planned dates for completing Ten Thousand's development milestones immediately prior to the December 2, 2015 accident." (ECF No. 113, p.23:12-14). Mr. Stuck and the JS Held Delay Experts *did* exactly that. Mr. Stuck's Delay Report expressly states that "[t]he longest (critical) path in each of the project schedule updates concludes with the TCO #4 milestone, which is the last item in the project schedule" and that "J.S. Held reviewed the critical path to each TCO on the November 30, 2015 pre-loss schedule", together with other schedule updates and project documentation, "to assess what activities were driving the completion of each schedule milestone and determine whether the loss event and subsequent repairs had an impact on the completion of these milestones." (Stuck Delay Report, ECF No. 65-2, p. 78; *see also* November 3, 2017 Report by Lisa Enloe and Jon Perry, ECF No. 64-4, p. 31 (same)). The analysis is directly relevant and responsive to the claims Plaintiffs are making and facts they seek to establish at trial.

///

///

///

///

## II. ARGUMENT

### A. The Method Used by the JS Held Delay Experts is Relevant

#### 1. This Court rejected Plaintiffs' argument that the Period of Delay terminates with the actual completion of the project.

Plaintiffs assert that the JS Held Delay Experts' testimony is irrelevant because "the operative calculation to determine the 'Period of Delay' under the Policy is the difference between the 'Scheduled Date of Completion' and the actual date of completion." (Pl. *Daubert* Mot., ECF No. 130, p.25:1-12) (citing Policy's Delayed Opening Form, § 12(B), ECF No. 130-15 at p. 26; Summ. J. Order, ECF No. 113 at p. 25). The Court has already rejected this argument. In its summary judgment Order, the Court ruled that Allianz's "position that the term 'commence,' as used in that [Period of Delay] definition, means what it says (i.e., to begin) is not just reasonable—it's likely correct. From the court's perspective, the only real question on the Period of Delay's endpoint is whether the 'commercial operations' or 'tenant/owner occupancy' served as the triggering event." (ECF No. 113, p. 32:17-21). As such, the "operative calculation" of the Period of Delay does not look to the "actual date of completion" but rather when "commercial operations' or 'tenant/owner occupancy" commenced.

Plaintiffs also assert that Mr. Stuck "did not support his opinions with any method other than the rejected retrospective method." But this a meaningless argument over semantics. For starters, in moving for summary judgment, Plaintiffs sought a declaration that the forecasted milestone completion dates found in Swinerton's Pre-Loss Schedule establish the date on which, but for the insured loss or damage, commercial operations or tenant/owner occupancy would have commenced (i.e., the Scheduled Date of Completion under subsection (ii) of the Policy definition), "provided it is proved at trial that those dates were current and correct." (Pl. Mot. Summ. J., ECF No. 68, p. 17, lines 7-9) (emphasis added). In its summary judgment order ("Order"), the Court adopted Plaintiffs' proffered interpretation and declared that the Policy definition "requires a prospective analysis" to determine the date on which, but for the insured loss or damage, commercial operations or tenant occupancy would have commenced. (Order, ECF No. 113, p. 25,

lines 14-18). Now, however, Plaintiffs seek to establish at trial that the November 30, 2015 pre-loss schedule ("Pre-Loss Schedule") "is the only reliable evidence" of the Scheduled Date of Completion "under a prospective method" and was "prepared by experts in the field". (Pl. Mot. *In Limine*, ECF No. 148, p. 9). As is argued in Allianz's *Daubert* motion, Plaintiffs' argument is moot because they failed to disclose any expert who can testify that the Pre-Loss Schedule is complete, accurate, reasonable, or an achievable projection of when future construction work would be performed and completed. (*See* Def. *Daubert* Mot. re: Bumgardner, ECF No. 133, pp. 13-15).

But, even assuming Plaintiffs are able to establish the Scheduled Date of Completion by reliance on the Pre-Loss Schedule without ever having disclosed the "experts in the field" who created it and what their assumptions about the project and the future were, the JS Held Delay Experts expressly analyzed the Pre-Loss Schedule and the delays to the planned dates therein. As noted above, Mr. Stuck's Delay Report expressly states that "[t]he longest (critical) path in each of the project schedule updates concludes with the TCO #4 milestone, which is the last item in the project schedule" and that "J.S. Held reviewed the critical path to each TCO on the November 30, 2015 pre-loss schedule", together with other schedule updates and project documentation, "to assess what activities were driving the completion of each schedule milestone and determine whether the loss event and subsequent repairs had an impact on the completion of these milestones." (Stuck Delay Report, ECF No. 65-2, pp. 78-109; *see also* November 3, 2017 Report by Lisa Enloe and Jon Perry, ECF No. 64-4, p. 31 (same)). These analyses are not examples of "the rejected retrospective method" that Plaintiffs' allege. Rather, these analyses fit neatly with the Court's order because the JS Held Delay Experts are analyzing the duration and causes of delays to "Plaintiffs' planned dates for completing Ten Thousand's development milestones immediately prior to the December 2, 2015 accident." (Order, ECF No. 113, p.23:12-14).

Notably, Plaintiffs' expert, Ted Bumgardner, also attempted to measure delays by "due to the Loss Event" beginning with "As-Planned" dates from the Pre-Loss Schedule. (*See* Bumgardner Delay Report, ECF 94-2, p.29) ("The objective of the analysis is to determine Period

of Delay … due to the loss event."); (ECF No. 133-2, Bumgardner Depo Tr.: 150:2-24) ("So I'd say from a calculation standpoint, the as-planned versus as-built is probably the driver of those dates."). But Bumgardner, unlike the JS Held Delay Experts, did not perform an analysis of all available project documentation to identify and answer the question as to whether delays to the Pre-Loss Schedule were caused by the Loss Event or something else. Instead, Bumgardner purported to use the "Windows Analysis" method to identify and quantify all delays unrelated to the Loss Event—but due to the lack of CPM schedules to apply this method, it "was not utilized to determine the number of days project completion was delayed." (Bumgardner Delay Report, ECF No. 94-2, pp. 11, 62). Bumgardner's analysis simply assumes that all delays to the Pre-Loss Schedule were caused by the Loss Event and used no method to verify otherwise. The JS Held Delay Experts do not make that assumption, and actually performed a causation analysis using the CPM schedules where possible and the available project documentation. Plaintiffs' argument that the JS Held Delay Expert's analysis and testimony is irrelevant is meritless. It is directly relevant to the issue of delay causation.

**2. If "retrospective" delay analyses are irrelevant, then the retrospective analysis of Plaintiffs' expert is irrelevant.**

According to Plaintiffs' own delay expert Ted Bumgardner, the American Association of Cost Engineers (the AACE) "is the recognized authority for schedule analysis guidance throughout the United States and around the world," and has created "a technical publication known as AACE International Recommended Practice No. 29R-03 Forensic Schedule Analysis, known simply as 29R-03 to the construction industry." (Decl. of Ted Bumgardner, ECF No. 94, p. 3:1-8). Per the AACE 29R-03, every analysis performed after a project is completed is a "retrospective" analysis. (AACE 29R-03, ECF No. 133-4, pp. 14-15) (distinguishing prospective and retrospective analysis based on when they are performed relative to project completion). Further, according to Bumgardner, his testimony in this case is based on three AACE methods from the AACE 29R-03. (ECF No. 94, p. 3:27-28). Even if he reliably followed the methods, which he did not due to lack of schedule updates, AACE 29R-03 explicitly classifies *all* methods

of forensic schedule analysis as retrospective:



Figure 2 – Taxonomy of Forensic Schedule Analysis (see enlarged size figure in Appendix B)

(AACE 29R-03, ECF No. 133-4, p. 14).

Thus, if the Court excludes as irrelevant expert testimony from Mr. Stuck, Ms. Enloe, or Mr. Perry *because* they used a so-called "retrospective" method of delay analysis, then by logical extension, Plaintiffs are conceding that the testimony and opinions of *their own expert*, Mr. Bumgardner, must likewise be excluded from trial for the same reason—he used a "retrospective" method of delay analysis performed after project completion. Indeed, under Plaintiffs' argument, the Court must find irrelevant and exclude from trial *any* schedule analysis purporting to quantify any delays after the project was allegedly completed because such analysis is, by definition, "retrospective". Plaintiffs cannot have it both ways.

**B. The Method Used by the JS Held Delay Experts is Reliable.**

Plaintiffs contend that the JS Held Delay Experts' methodology of delay analysis is unreliable because it "has not been recognized by any professional association or court". (Pl. Daubert Mot. p. 13:5-7). Plaintiffs argue that "courts have recognized the application of [critical path methodology] to construction delay disputes" and that the JS Held Delay Experts "ignored Critical Path Methodology ("CPM") widely considered the standard method for quantifying construction delays" and failed to use "one of the approved methods" of CPM delay analysis set forth in the

Association for the Advancement of Cost Engineering ("AACE")'s International Recommended Practice 29R-03 regarding Forensic Schedule Analysis ("AACE 29R-03") (Pl. *Daubert* Mot., p. 13:5-9, 14:14-22).

**1. Courts reject CPM-methods of delay analysis where CPM construction schedules do not exist for the duration of the project.**

There are two fundamental flaws with Plaintiffs' argument. First, because "the critical path can change and that items not originally on the critical path can become critical…*if the CPM is to be used to evaluate delay on the project, it must be kept current and must reflect delays as they occur*." *Fortec Constructors v. U.S.*, 8 Cl. Ct. 490, 505 (Ct. Cl. 1986) (internal citation omitted) (noting that a schedule update "obviously" does not consider delays in work that occur after the schedule update). Thus, when CPM construction schedules are not updated *for the entire duration of a construction project*—as is the case in this litigation--courts routinely reject the use of critical path methodology for quantifying delays. *Blinderman Const. Co. v. United States*, 39 Fed. Cl. 529, 585 (1997), *aff'd*, 178 F.3d 1307 (Fed. Cir. 1998) ("[I]nformed *assessments of the effect of delays upon critical path activities are possible only if up–to–date CPM schedules are faithfully maintained throughout the course of construction.*") (emphasis added); *Rustler Constr., Inc. v. D.C.*, 211 A.3d 187, 193 (D.C. 2019) ("Given the fluctuating nature of the critical path, *courts have held that accurate, informed assessments of the effect of delays upon critical path activities are possible only if up-to-date CPM schedules are faithfully maintained throughout the course of construction.*") (internal quotation omitted) (citation omitted); *George Sollitt Const. Co. v. United States*, 64 Fed. Cl. 229, 240–41 (Ct. Fed. Cl. 2005) ("Because the critical path changes over time, *critical path schedule updates are needed to analyze delays*.") (emphasis added).

Here, Swinerton's CPM construction schedules were not maintained throughout the course of construction. According to Plaintiffs' own delay expert Ted Bumgardner, the final schedule update was done on June 3, 2016 (Delay Report, ECF No. 94-2, p. 65), and it predicts all project activities reflected in schedule would complete on October 28, 2016. (Declaration of Granger Stuck, ECF No. 76-1, p. 5:23-25). Plaintiffs claim actual project completion occurred over a year

later, July 1, 2017. (Delay Report, ECF No. 94-2, p. 60-61). Thus, there is over a year of missing schedule updates between June 3, 2016 and July 1, 2017. This means, as even Plaintiffs' expert admits, that "there wasn't any critical path to analyze beyond the critical path, as stated in the June [2016] updates.") (ECF No. 143-05, Bumgardner Depo. Tr.: 211:18—212:2).

The lack of any CPM schedule updates beyond June 2016, just like the lack of CPM schedule updates in any other project, makes it "impossible to determine … whether a particular activity was critical or noncritical, on schedule or behind schedule." *Fortec*, 8 Cl. Ct. 490 at 505. This is evident in the report of Plaintiffs' own delay expert, Ted Bumgardner. (*See, e.g.*, Bumgardner Delay Report, ECF No. 94-2, p.62, 69 (admitting "[i]t was not possible to consider net losses over the entire period because of the limited number of schedules available" and "[t]he June 3, 2016 schedule shows that several … activities … might be delayed on level 40. … Based on the available schedule updates, it was not possible to track these activities for the final months of the project to determine whether the delay did materialize.")). Thus, while CPM-based methods cannot be utilized without the CPM-schedules, what remains for a delay analysis is all the other project documentation, which is what the JS Held Delay Experts based their analysis on.

Second, because CPM construction schedules were not maintained throughout the course of construction, Plaintiffs' argument that Stuck's analysis of Swinerton's existing CPM schedules is unreliable because he did not use "one of the approved methods" set forth in the AACE 29R-03 also fails. The AACE 29R-03 explicitly does not "establish a standard of practice" and is only "a reference of basic technical principles and guidelines *for the application of critical path method (CPM) scheduling in forensic delay analysis*." (AACE 29R-03, ECF No. 133-4, p. 11) (emphasis added). But as established above, courts have long-recognized that accurate and informed CPM-based methods of quantifying construction delays is "possible ***only if*** *up-to-date CPM schedules* ***are faithfully maintained throughout the course of construction***." *See Blinderman*, 39 Fed. Cl. at 585 (emphasis added); *Rustler*, 211 A.3d at 193; *George Sollitt Const.*, 64 Fed. Cl. at 240–41; *Fortec*, 8 Cl. Ct. at 505.

Although CPM-based scheduling analysis cannot be reliably applied in this case due to the lack of CPM-schedule updates throughout the project, there are other recognized methods. The AACE 29R-03 defines "forensic scheduling analysis" as "the study and investigation of events using CPM *or other recognized schedule calculation methods.*" (AACE 29R-03, ECF No. 133-4, p.11). Such methods "do not involve any *explicit* use of CPM logic and can simply be an observational study of start and finish dates of various activities." (AACE 29R-03, ECF No. 133-4, p. 40, 47) (emphasis in original).

In short, Plaintiffs' portrayal of CPM-based methods of delay analysis as the **only** reliable or recognized methods for identifying and quantifying construction delays is simply false. The reality in this case is precisely the opposite: *because* Swinerton failed to create and maintain CPM construction schedule updates beyond June 2016 through the end of construction, courts agree that it is not possible to accurately use CPM-based methods of delay analysis. *See Blinderman*, 39 Fed. Cl. at 585; *Rustler*, 211 A.3d at 193; *George Sollitt Const.*, 64 Fed. Cl. at 240–41; *Fortec*, 8 Cl. Ct. at 505.

**2. The used by JS Held Delay Experts is recognized and was published in AACE technical paper CDR-3356.**

Despite Plaintiffs' claim that Stuck's method "has not been recognized by any professional association", Plaintiffs openly acknowledge that the method "has been published … with the AACE entitled 'Comparison of Delay Analysis Methodologies in a Builder's Risk Context.'" (Pl. *Daubert* Mot., p. 17:2-4; *see* AACE INTERNATIONAL TECHNICAL PAPER CDR-3556, Comparison of Delay Analysis Methodologies in a Builder's Risk Context, ECF No. 131-1). One of authors of this AACE-publication is Jon Perry, one of Allianz's pre-litigation delay experts. (*Id.)* Plaintiffs identify Mr. Perry as an example of "an experienced professional[] at the top of the field" with "more than ten years of experience in the industry." (Pl. *Daubert* Mot. p.15:19-22). And according to Plaintiffs' own delay expert, Ted Bumgardner, the AACE "is the recognized authority for schedule analysis guidance throughout the United States and around the world." (Bumgardner Decl., ECF No. 94, p. 3:2-4). Plaintiffs challenge as unreliable a method explained

in a "technical paper" published by the global "authority for schedule analysis guidance". Plaintiffs' assertion that Stuck's methodology lacks recognition "by any professional association" is provably and demonstrably false.

**3. Observational methods of delay analysis are recognized and described in the AACE 29R-03 document Plaintiffs rely on.**

Under established law, expert opinion "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), as amended (Apr. 27, 2010). Here, that discipline is forensic delay analysis, which the AACE 29R-03 describes as a "technical field" that "relies upon professional judgment and expert opinion and usually requires many subjective decisions." (AACE 29R-03, ECF No. 133-4, p. 11). Plaintiffs do not challenge that Stuck is qualified to testify as an expert on any issues or opinions set forth in his Report. Instead, they make the argument that there is no basis in the published literature recognizing Stuck's method of delay analysis, primarily relying on seven pages from the 134-page AACE 29R-03. A review of the AACE 29R-03 as a whole reveals that Plaintiffs' position lacks merit.

Preliminarily, the AACE 29R-03 document that Plaintiffs rely on is explicitly "not intended to establish a standard of practice" and merely "identifies, defines, and describes the usage of various forensic schedule analysis methods in current use". (AACE 29R-03, ECF No. pp. 11-10). It is "an advisory document to be used in conjunction with professional judgment based on working experience and knowledge of the subject matter. It is not intended to be a prescriptive document that can be applied without exception … [S]ome cases require additional steps and some require less. Thus, a departure from the recommended protocols should not be automatically treated as an error or a deficiency as long as such departure is based on a conscious and sound application of schedule analysis principles." (AACE 29R-03, ECF No. 133-4, p.13). Further, a "basic premise and assumption" of AACE 29R-03 is that "[s]chedules are a project management tool that, in and of themselves, do not demonstrate root causation or responsibility for delays. Legal entitlement to delay damages should be distinct and apart from the [methods]

contained in this [recommended practice]." (AACE 29R-03, ECF No. 133-7, p. 12). "*Causation is established primarily on the quality of documents available for the analyst at the time of the schedule analysis*. Some documents are more reliable than others." (AACE 29R-03, ECF No. 133-4, p. 12).

Despite its express limitations, AACE 29R-03 explains that a forensic scheduling expert "*uses contemporaneous project documentation to determine which events may have caused delay (including event identification, start and completion dates, activities impacted by the event, etc.). The forensic schedule analyst then applies or relates these events in some orderly manner to the schedules employed on the project. Once the events are* added to, removed from, or *otherwise identified in the schedule, a determination can be made concerning whether any or all of the events caused the project to complete later than planned.*" (AACE 29R-03, § 5.2 Factor 2: Purpose of Analysis, ECF No. 133-4, p. 129). AACE 29R-03 also identifies two "basic methods" of schedule analysis, observational and modeled. In the "observational" analysis, the expert "is utilized for the purpose of interpretation and evaluation of the existing scheduling data only" by "examining a schedule, by itself or in comparison with another, without the analyst making any changes to the schedule to simulate any specific scenario." (AACE 29R-03, § 1.4.B. Taxonomy and Nomenclature, Layer 2: Basic Methods, ECF No. 133-4, p.15). In contrast, a modeled method "calls for intervention by the analyst beyond mere observation. In preparing a modeled analysis the analyst inserts or extracts activities representing delay events into or from a CPM network and compares the calculated results of the 'before' and 'after' states." (AACE 29R-03, ECF No. 133-4, 13-14).

Further, one of the "main approaches" for delay analysis "starts by compiling a set of [activity-level delays/variances[2], or] ALV's and then identifies the causes of those variances. Specific documents that are associated with the time-frame, activity description, and amount of ALV's are reviewed to see if they could have created this variance. This approach is applied in the

[2] An "activity level variance" or "ALV" in the AACE 29R-03 refers to a delayed start of a specifics schedule activity or the delayed completion (prolonged duration) of an activity relative to its planned duration. (see AACE 29R-03, § 2.4.A.1 and subsection (a), ECF No. 133-4, pp.34-36).

observational and the subtractive modeling methods." (AACE 29R-03, ECF No. 133-4, p. 36); *see also* Snow Decl. Ex. B, Society of Construction Law Delay and Disruption Protocol, *Different Methods of Delay Analysis*, pp. 32-33) ("Certain methods start with the identification and description of an event (a cause) and thereafter seek to establish its impact (the effect) – these are cause and effect type analyses. Other methods start with identifying critical delay (an effect) and thereafter seek to establish what might have caused that delay – these are effect and cause type analyses. . . . [A]fter completion of the works … the effect and cause methods are generally considered to be more forensically reliable because they consider any and all potential causes of the delay incurred.").

Mr. Stuck's Delay Report contains an extensive, 108-page delay analysis supported by over 100 exhibits comprising thousands of pages of project documentation. (Stuck Delay Report, ECF No. 65-2). Among other things, Mr. Stuck's report explains that he "reviewed the project documentation … to independently verify that the claimed substantial completion dates would have been achievable but for the loss event" and identified "a number of non-loss-related delay issues that occurred on the project that impacted the completion of all 4 contract milestones (TCO's)." (Stuck Delay Report, ECF No. 65-2, p. 32-33). Stuck also "reviewed the critical path to each TCO on the November 30, 2015 pre-loss schedule, the January 4, 2016 schedule, and the April 11, 2016 schedule update to assess what activities were driving the completion of each schedule milestone and determine whether the loss event and subsequent repairs had an impact on the completion of these milestones" (Stuck Delay Report, ECF No. 65-2, p. 78).

At deposition, Mr. Stuck further explained his method as follows: "So we go back through and start looking at project schedules and project data before the loss to understand the … plan for the work, the progress of the work, whether it was on schedule or not, understand where they're at at the time of the loss. And then we look at all the project documents that we receive through the course of the project to understand what the progress of work was to see if that did or didn't align with the schedule, to see if it followed the sequence of the schedule or not, to see if there are any other issues that may have impacted the project in accordance with the loss events and how they

impacted the project to determine that date." (Snow Decl. Ex. C, Stuck Depo. Tr.: 18:2—19:3).

Thus, Stuck performed what the AACE 29R-03 describes as an "observational" analysis of Swinerton's schedules and project documentation to reach and support his conclusions. Plaintiffs do not describe, in any detail, how the AACE 29R-03 does not recognize the analysis Stuck performed, and Plaintiffs do not challenge Stuck's qualifications to testify as an expert on any issue or opinion set forth in his report. And ***Plaintiffs' own expert has performed a delay analysis "based simply on review of contemporaneous project documentation"***. (Snow Decl., Ex A, Depo Ex. 284, ⁋9, lines 21-27). Indeed, in the absence of updated project schedules for the duration of the project, there is no alternative, CPM-based analysis that is even available.

Finally, Plaintiffs again fault Stuck's delay analysis for being "retrospective" and "not a critical path analysis". (Pl. *Daubert* Mot. p.14:23-24). But per AACE 29R-03, a delay analysis is considered retrospective when "performed after the project is completed". (*See* ECF No. 133-4, pp. 14-15). In fact, AACE 29R-03 explains the "retrospective actual mode (hindsight)" for quantifying delay durations "relies on project documentation of actual chronological events that constitute the set of activities considered to be the cause or the effect of delays" and, importantly, "where the focus of the analysis is to identify actual schedule impact" a retrospective/hindsight analysis "***is preferred.***" (AACE 29R-03, ECF No. 133-4, p. 37). And Mr. Stuck explained at deposition that his analysis was not "really a critical path analysis" *because* his analysis was performed after the project was completed and, therefore, "there's no more critical path." (ECF No. 131-11 at p.14, Stuck Depo. Tr.: 134:5-16). Thus, Mr. Stuck performed a retrospective, observational delay analysis, as recognized by the AACE 29R-03 and used by at least one other person in the industry—***Plaintiffs' own expert***.

**4. Under Plaintiffs' own insurance industry materials, a "retrospective" delay analysis incorporating a "but for" test that removes "concurrent uninsured delays" is standard.**

Plaintiffs' *Daubert* Motion cities to insurance-industry publications explaining that delay analysis in the insurance context typically requires "a retrospective analysis" and the application

of a "but for" test. (*see Delay in Start Up insurance and Delay Analysis Techniques*, ECF No. 130-5, pp. 4-5) ("To the extent the delay is caused by a defect or other uninsured events there will be no claim for DSU resulting from the delay. Again, this comprises a further part of the 'but for' test – if 'but for' the insured event there would have been interference with the business then a claim cannot be made."). Plaintiffs contend, without any support, that the JS Held Delay Experts are "the only known practitioner" of a retrospective, observational method of delay analysis that includes a "but for" analysis. Plaintiffs offer no support because it doesn't exist—***their own delay expert testified at deposition*** that the phrase "but for" refers to a "somewhat common" analysis, "meaning to extract out an activity and see what happens ***or look at it even – even retrospectively, from observation, and determine, if you took that away, what happens, 'but for.'***" (Snow Decl. Ex. D, Bumgardner Depo. Tr. 120:12-17).

Another insurance publication Plaintiffs rely on states that "[d]elays can also occur to a project from events that are not covered by the physical damage insurance, such as slow progress or late supply of materials. Indemnity under the DSU policy will discount time lost to such circumstances. … Claim settlements will be subject to deduction of concurrent uninsured delays and the application of the policy deductible." (*Delay in Start Up Insurance*, ECF No. 130-6, p. 3). While Plaintiffs have challenged the application of a causal "but for" test with respect to determining the Policy's Scheduled Date of Completion, a "but for" test remains an integral, recognized, and valid component for evaluating "concurrent uninsured delays" within a delay analysis in the insurance context. As defined by the AACE 29R-03, "[c]oncurrent delays occur when two or more unrelated and independent events delay the project." (AACE 29R-03, ECF No. 133-4, p. 104). The "but for" test is illustrated by the AACE 29R-03 itself as follows:

> For example, assume that a forensic analysis confirms that the late installation of drywall caused a critical path delay to the completion of the project. This work was critical to the commencement of final painting and interior trim work. Further assume that the delay in the drywall was the result of two factors: first, the general contractor failed to procure its drywall subcontractor in a timely manner and second, there was a severe shortage of drywall to the region. ***These events are unrelated, but either one of them would have delayed the overall completion of the drywall. This test is sometimes called the "but-for" test. But-For the failure to procure the drywall subcontractor, the work would still have***

***been late because of the shortage of materials.***

(AACE 29R-03, ECF No. 133-4, p. 106) (emphasis added).

In short, the retrospective, observational method of delay analysis Mr. Stuck, Ms. Enloe, and Mr. Perry utilized to identify schedule delays and form opinions about delay causation based on all available project documentation, including the use of a "but for" test to identify independent delays unrelated to the physical damage from the Loss Event, are all recognized and valid principles and methods according to Plaintiffs' own referenced construction and insurance publications. Plaintiff's own expert Ted Bumgardner is aware of and has used the same principles and methods. For the reasons stated above, Plaintiffs' arguments that the principles and methods used by JS Held Witnesses are unreliable is conclusory, unsupported, and meritless. Plaintiffs' *Daubert* motion should be denied.

**5. Plaintiffs' disagreement with Stuck's conclusions about causation goes to weight, not admissibility.**

Plaintiffs' final argument about the alleged non-recognition of Stuck's method is that it is "one-sided" because "if the insurer concludes that a delay was not caused by the insured event, that conclusion necessarily works against the insured." (Pl. *Daubert* Mot., p. 16:14-18). There are at least two obvious flaws with this argument. First, Plaintiffs offer no explanation as to why a conclusion that a claimed delay was not caused by insured physical damage is evidence that Stuck's method is unreliably one-sided and/or not recognized by any relevant community or discipline.

Second, Plaintiffs' argument does not make any sense. Under California law, *SM 10000* has the burden of proving that its claimed loss falls within the coverage provided by the insuring agreement of the Policy's Delayed Opening Form. See *Garvey v. State Farm Fire & Cas. Co.*, 48 Cal.3d 395, 406 (Cal. 1989); *MRI Healthcare v. State Farm Gen. Ins. Co.*, 187 Cal.App.4th 766, 777-778 (Cal. App. 2010) . The insuring agreement of the Policy's Delayed Opening Form states, in part, that SM 10000 will be indemnified for certain categories of Delayed Start-Up Expenses "incurred during the Period of Delay, when such delay is caused by direct physical loss or direct

physical damage to Insured Property during the Period of Insurance, provided such loss or damage is indemnifiable under the Policy to which this extension is attached or would have been indemnifiable except for the application of the Deductible (emphasis added)." (*See* Order, ECF No. 113, p. 6:10-16) (emphasis added). Therefore, it is SM 10000's burden to establish the Period of Delay "caused by" the direct physical loss or direct physical damage to Insured Property from the Loss Event.

Obviously, because SM 10000 must prove its claimed delay ***was*** caused by direct physical loss or damage from the Loss Event, the conclusion that the claimed delay ***was not*** caused by direct physical loss or damage from the Loss Event would always "necessarily work against" SM 10000. The test under *Daubert* "is not the correctness of the expert's conclusions but the soundness of his methodology, and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (internal quotations and citation omitted). Plaintiffs' argument makes no sense and wholly fails to explain why Stuck's conclusions establish that the method used to reach them is unreliable. As a matter of law, Stuck's method is reliable *because* he considered and identified delays that were not caused by direct physical loss or damage from the Loss Event.

**6. Plaintiffs' remaining reliability arguments contradict the Court's summary judgment order or go to weight, not admissibility.**

Plaintiffs contend that "[b]ecause J.S. Held admits that a TCO date does not mean a given project is complete and that Ten Thousand was in fact not complete when it received TCO #4, J.S. Held's use of TCO #4 as the end of the Period of Delay is unreliable." (Pl. *Daubert* Mot., ECF No. 130, p. 20:20-22). This argument, however, has already been considered and rejected by the Court. In its summary judgment Order, the Court ruled that when considering the end of the Period of Delay, Allianz's "position that the term 'commence,' as used in that [Period of Delay] definition, means what it says (i.e., to begin) is not just reasonable—it's likely correct. From the court's perspective, the only real question on the Period of Delay's endpoint is whether the

'commercial operations' or 'tenant/owner occupancy' served as the triggering event." (Order, ECF No. 113, p. 32:17-21). Swinerton's "completion" of construction work ***is not*** one of the potential end points of the Period of Delay. Thus, whether a TCO date does or does not mean a given project is complete is wholly irrelevant to the case. The phrase "Period of Delay" is defined by the Policy, in part, as "the period of time between the Scheduled Date of Completion and the actual date on which commercial operations or tenant / owner occupancy commenced ***or could have commenced*** …" (Policy, ECF No. 1-1, p. 68) (emphasis added). Thus, what is relevant is when 'commercial operations' or 'tenant/owner occupancy' commenced *or could have commenced*.

According to Stuck and the actual project records, "the actual date that all TCOs were received for the project was December 10, 2016, which is the date the fourth project occupancy milestone, or 'TCO #4', was received from the Los Angeles Department of Building and Safety." (Stuck Delay Report, ECF No. 65-2, p. 31). Everybody agrees that obtaining a TCO is a bid deal. As further explained at Stuck's deposition, "the TCO is the document that allows the owner to occupy the building … when you're on a project and you can get, you know, the electrical inspector, mechanical inspector, the fire department, everybody to sign off, and you get your TCO, you can occupy the building and use it for its intended purpose." (Snow Decl., Ex. C, Stuck Depo. Tr.: 83:5-84:11). Even in their Motion, Plaintiffs acknowledge that the significance of receiving a TCO means that a "building is in compliance with the bare minimum of safety and building codes required for legal occupancy." (Pl. *Daubert* Mot., ECF No.130, p. 17:24-25); *see also* ECF No. 82-3, Swinerton 30(b)(6) Depo. Tr.: 189:18-21 ("Yeah, so TCO is a big deal … you're able to occupy it as you wish."). Moreover, while Plaintiffs are claiming that construction completed on July 1, 2017 (*see* Bumgardner Delay Report, ECF No. 94-2, p. 60-61), there is no dispute that tenant occupancy *actually* commenced on January 1, 2017. (*See* ECF No. 133-2, Bumgardner Depo. Tr.: 146:18—149:18). Thus, there is no dispute that tenant occupancy *could and actually did* commence before the ultimate, final completion of Swinerton's construction work. Stuck's analysis is not unreliable for assuming that tenant/owner occupancy could have commenced before

all construction work was finally completed—that's what *actually* happened on the project as the Court has recognized.

**7. Plaintiffs' argument that obvious alternative causes were ignored is illogical and goes to weight, not admissibility.**

Plaintiffs illogically seek to preclude Stuck's "conclusion that other events besides the Loss Event caused the ultimate delay of the Project" based on his alleged failure to consider "the possibility" that the Loss Event "had a domino effect on other aspects of the Project" and *did* cause the ultimate delay of the Project. (Pl. *Daubert* Mot. p.20:25-28). At the outset, this argument goes to weight, not admissibility. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 978 F. Supp. 2d 1053, 1069 (C.D. Cal. 2013) ("The argument that he failed to consider other injuries that Mrs. St. John suffered after the collision goes to weight, not admissibility. Toyota may challenge Dr. Burton's opinions, and their factual bases, in cross-examination.") (citing *Hartley v. Dillard's, Inc*., 310 F.3d 1054, 1061 (8th Cir.2002) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.") (internal quotation marks and citation omitted)).

Plaintiffs first challenge the factual basis for Stuck's conclusion that the penthouse re-design "rather than the Loss Event" delayed concrete pours on Levels 40-42, the elevator machine room work on Level 42, and then the subsequent elevator work below the machine room. (Pl. *Daubert* Mot. p.22:8-10). Plaintiffs assert that this work "was in fact delayed by the need to obtain a replacement … tool that was destroyed in the Loss Event." (Pl. *Daubert* Mot. p. 22:13-16). Plaintiffs' argument goes to weight, not admissibility. *In re Toyota Motor Corp.* 978 F. Supp. 2d at 1069.

Plaintiffs next challenge the factual basis for Stuck's opinions regarding the delays from the re-design of the elevator crash decks after the Loss Event. Plaintiffs' mischaracterize Stuck's testimony that as asserting that "Schindler could have reused the damaged crash decks … or that Schindler's decision to re-design them for higher safety standards was not a result of the Loss

Event." (Pl. *Daubert* Mot. p. 23:8-11). Stuck's Report, however, clearly states that the "design of the crash decks was revised after the loss event in lieu of *replacing the crash decks with the pre-loss design*" (Stuck Report, p. 53) (emphasis added).

Regardless, the *reason* the crash decks were re-designed is not relevant to the reliability of Stuck's delay analysis. The Policy excludes delays beyond the Scheduled Date of Completion directly or indirectly due to "alterations, additions, improvements, rectification of defects or faults, or elimination of any deficiencies carried out during the repair or replacement of lost or damaged Insured Property". (Policy, ECF 1-1, p. 70). Plaintiffs seek to establish at trial that the Scheduled Date of Completion was October 27, 2016, and that the Loss Event changed the critical path of the project and placed the Loss Event repair work on this new and changed critical path. Stuck's Report measures a 48-day delay in the start of Loss Event repair work because of the changes to the design of crash decks. (Stuck Report, p. 57). Plaintiffs are disputing the potential applicability of the Policy exclusion. Plaintiffs *do not* contest that Stuck's quantification of the delay in the commencement of repairs inside the shaft due to the re-design of the temporary crash decks is unreliable and, therefore, Plaintiffs' argument is irrelevant.

Stuck's Report identifies another delay unrelated to the Loss Event was that the installation of elevator fronts took three months longer than planned, due to non-loss-related delay issues with both deliveries and installation, which "impacted the completion of the elevator work and follow on trades." (Stuck Report, pp. 57-61). Plaintiffs assert that Stuck's conclusion is incorrect because "the Loss Event caused the installation of the elevator fronts to be delayed" as it "prevented access to the hoistway" in order to install the fronts. (Pl. *Daubert* Mot., ECF No. 130, p.24:1-6). Plaintiffs are arguing about a delayed *start* to installation, but Stuck's analysis and conclusion is about the "extended duration to complete this elevator front work", which is different than a delay to the start of the installation work. In any event, once again, Plaintiffs' argument goes to weight, not admissibility. *In re Toyota Motor Corp.* 978 F. Supp. 2d at 1069.

## III. <u>CONCLUSION</u>

Plaintiffs' Daubert challenge to the relevance and reliability of the testimony of the JS Held Delay Experts is without merit. The testimony and analysis is directly relevant to the issue of delay causation. Courts reject the reliability of CPM-based methods of delay analysis where, as is the case here, CPM construction schedules do not exist for the duration of the project. The method employed by the JS Held Delay Experts is an observational method that uses contemporaneous project documentation to determine which events may have caused delay. Plaintiffs do not contest that the JS Held Delay Experts are sufficiently qualified as experts under Fed.R.Evid. 702 to perform this analysis or otherwise quantify and determine the cause of delays during a construction project. The method used is expressly recognized by professional associations and the publications Plaintiffs filed with the Court. Plaintiffs' own expert has used the same observational method, and the specific challenges Plaintiffs have regarding the conclusions reached by the JS Held Delay Experts or the factual basis of their opinions are all issues that go to weight, not admissibility. Allianz respectfully requests that the Court deny Plaintiffs' *Daubert* motion.

DATED: August 26, 2021

**FORAN GLENNON PALANDECH PONZI & RUDLOFF PC**

By: *<u>/s/ Christopher M.H. Snow</u>*
G. Edward Rudloff, Jr.
Dianne J. Meconis
Matthew S. Ponzi (*Pro Hac Vice*)
Christopher M.H. Snow (*Pro Hac Vice*)

Attorneys for Defendant ALLIANZ GLOBAL RISKS US INSURANCE COMPANY