G. EDWARD RUDLOFF, JR. (SBN 56058)
DIANNE J. MECONIS (SBN 120895)
**FORAN GLENNON PALANDECH**
**PONZI & RUDLOFF PC**
200 Pringle Avenue, Suite 410
Walnut Creek, CA 94596
Telephone: (925) 357-8640
Facsimile: (510) 740-1501
E-mail: erudloff@fgppr.com
dmeconis@fgppr.com

MATTHEW S. PONZI (*Pro Hac Vice*)
CHRISTOPHER M.H. SNOW (*Pro Hac Vice*)
**FORAN GLENNON PALANDECH**
**PONZI & RUDLOFF PC**
222 North LaSalle Street, Suite 1400
Chicago, IL 60601
Telephone: (312) 863-5000
Facsimile: (312) 863-5099
E-mail: mponzi@fgppr.com
csnow@fgppr.com

Attorneys for Defendant ALLIANZ GLOBAL RISKS
US INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SM 10000 PROPERTY, LLC, a Delaware limited liability company and SWINERTON BUILDERS, INC., a California Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, an Illinois corporation, and DOES 1 through 10,<br><br>Defendants. | Case No. 19-CV-03054-PJH<br><br>**DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S DAUBERT MOTION TO PRECLUDE EXPERT TESTIMONY OF TED BUMGARDNER**<br><br>**DATE:** September 16, 2021<br>**TIME:** 2:00 p.m.<br>**CTRM.:** Zoom Webinar<br><br><br>State Court Complaint Filed: 10/1/2019<br>Removal Date: 6/3/2019<br>Trial Date: 10/18/2021 |

DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S DAUBERT MOTION
TO PRECLUDE EXPERT TESTIMONY OF TED BUMGARDNER; Case No. 19-CV-03054-PJH

### 1. Bumgardner's damages opinions are inadmissible: Plaintiffs fail to explain how Bumgardner's testimony meets any requirement for the admission of expert testimony under Fed.R.Evid. 702.

"Federal Rule of Evidence 702 governs the admissibility of expert opinion testimony." *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002). It is Plaintiffs' burden to establish that Bumgardner's damages opinions are admissible under Fed.R.Evid. 702. *Lust By & Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Plaintiffs' Opposition *does not* contend that Bumgardner's damages opinions are admissible under Fed.R.Evid. 702. After block quoting a different rule, Fed.R.Evid. 703, Plaintiffs argue only that his Damages Report (ECF No. 98-4) "satisfies the requirements of Federal Rule of Evidence ***703***." (*see* Pl. Opp. Br. at 21-23) (emphasis added). Plaintiffs make no argument—none—explaining how any of Bumgardner's damages testimony satisfies *any* of the four requirements of Federal Rule of Evidence ***702***, the rule that "governs the admissibility of expert opinion testimony." *Finley*, 301 F.3d at 1007 (9th Cir. 2002).

Contrary to Plaintiffs' position, Rule 703 is not a backdoor for Plaintiffs to bypass every requirement of Rule 702. Federal Rule of Evidence 703 "merely relaxes, for experts, the requirement that witnesses have personal knowledge of the matter to which they testify, *not whether the requirements of 702 are properly met*." *United States v. W.R. Grace*, 504 F.3d 745, 763 (9th Cir. 2007) (internal quotation and citation omitted) (emphasis added). Accordingly, Plaintiffs have failed to meet their burden of establishing that Bumgardner's damages testimony is admissible under Rule 702. Because there is no legal basis to admit Bumgardner's damages testimony, the Court should exclude all of Bumgardner's opinions in his expert report on damages (Damages Report, ECF No. 98-4) and preclude Bumgardner from offering any testimony or opinions whatsoever concerning Swinerton's claimed damages.

### 2. Bumgardner's Delay Opinions Are Not Relevant

Plaintiffs' Opposition asserts that the "[e]xclusion of expert testimony is only appropriate when such testimony qualifies as irrelevant or unreliable 'junk science'." (Pl. Opp. Br., ECF No. 160 at 6:1-2)(citation omitted). That is not the applicable legal standard. A trial court's

gatekeeping inquiry under Rule 702 "must be 'tied to the facts' of a particular 'case.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591, (1993)) ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute".) (internal quotation and citation omitted). "What is relevant depends on what must be proved" which, in this case, is controlled by California law. *See Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010), as amended (Apr. 27, 2010) (Nevada law); *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) ("[T]he court must determine whether there is a link between the expert's testimony and the matter to be proved.") (quotation and citation omitted) Here, Plaintiffs' Opposition does not dispute that, under California law and the insuring agreement of the Policy, SM 10000 has the burden of proving the Period of Delay (as defined by the Policy) *caused by* direct physical loss or direct physical damage to Insured Property from the Loss Event. (*see* Def. Mot., § 3.A.iii, ECF No. 133 at 14). It is *Plaintiffs'* burden to establish the link between Bumgardner testimony and how it will help the jury resolve a factual dispute at issue. Plaintiffs have failed to meet their burden.

### a. Plaintiffs represent to the Court that Keith Dancey is the author and creator of the Pre-Loss Schedule, establishing that every method Bumgardner used to measure the Period of Delay is irrelevant.

Plaintiffs' Opposition represents to the Court that Mr. Keith Dancey is "the author" of the Pre-Loss schedule, and was "created by Mr. Dancey based on the most recent condition of the project …[and] is also the best evidence of what the anticipated completion date of the project was before the loss event." (Pl. Opp. Br., ECF No. 160 at 11:17—12:3). Bumgardner's Delay Report assumes that the "project schedules utilize the term 'TCO' to signify the completion milestones" and that "the final pre-loss schedule update reflects the date on which the project would have completed but for the loss." (Delay Report, ECF No. 94-2 at 49, 74). Mr. Dancey, however, testified at deposition that ***"[s]chedule is referencing TCO dates, not actual milestone dates"*** and when specifically asked if he understood that "the milestones from the construction contract are the same thing as the TCO numbers in the construction schedules", he testified: "They are by definition

2

two different things." (Snow Decl. Ex. A, Dancey Depo. Tr.: 158:13—159:2). Elsewhere, Plaintiffs have represented to this Court that "the term TCO does not appear in the Policy and is not a relevant measure for the Period of Delay" and that under the "clear language of the [construction] contract [] the issuance of a TCO, standing alone, was not sufficient to achieve substantial completion". (Pl. *Daubert* Mot., ECF No. 130 at 17:22-23, 19:18-19).

Because the "author" and "creator" of Swinerton's Pre-Loss Schedule admits that the TCO dates in the Pre-Loss Schedule are not the construction contract milestones—contrary to Bumgardner's untested assumption at the heart of his opinion—and Plaintiffs admit that using the TCO dates "is not a relevant measure for the Period of Delay", all of Bumgardner's opinions and testimony are irrelevant. Bumgardner should not be permitted to present unfounded and false assumptions to the jury under the guise of expert testimony.

**b. Any testimony or opinion that the Period of Delay started before October 27, 2016 is irrelevant, confusing, and unfairly prejudicial.**

As this Court recognized in its summary judgment order ("Order"), "because the Scheduled Date of Completion affects the length of the Period of Delay, the parties dispute how to determine the Scheduled Date of Completion under the Section 12A(ii) prong" of the Policy definition. (Order, ECF No. 23:8-10). The Period of Delay is, per the Policy definition, "the period of time ***between the Scheduled Date of Completion*** and the actual date on which commercial operations or tenant / owner occupancy commenced or could have commenced …." (Policy, ECF No. 1-1, p. 68). Thus, because the Scheduled Date of Completion is *the date* that defines the beginning of the Period of Delay[1], there is no "Period of Delay" *before* the Scheduled Date of Completion. Plaintiffs do not assert otherwise. (See Pl. Mot. Summ. J., ECF No. 68 at 14) ("The Scheduled Date of Completion starts the Period of Delay."). To quote one of Plaintiffs' recent filings with the Court: "Plaintiffs assert that the Scheduled Date of Completion is October 27, 2016 per the most current schedule prior to the Loss Event." (Pl. Mot. to Bifurcate, ECF No.

---

[1] As noted above, under California law, the insuring agreement of the Policy places the burden on SM 10000 to prove that the Period of Delay was caused by direct physical loss or damage to Insured Property.

3
DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S DAUBERT MOTION
TO PRECLUDE EXPERT TESTIMONY OF TED BUMGARDNER; Case No. 19-CV-03054-PJH

128, p. 3:12-16)). Plaintiffs' Opposition does not contend otherwise, nor does Plaintiffs' Opposition dispute that Bumgardner's actual opinion is that the Scheduled Date of Completion under the Policy is October 27, 2016. (*see* Def. *Daubert* Mot., ECF No. 133 at 12).

Plaintiffs' Opposition contends that because Bumgardner is not being offered "to interpret" or "give meaning" to any policy language, his testimony and opinions that explicitly opine and seek to establish that the Period of Delay began before the alleged October 27, 2016 Scheduled Date of Completion are relevant and admissible. (Pl. Opp. Br., ECF No. 160 at 7-8). Plaintiffs' gamesmanship should be rejected. Bumgardner's Delay Report identifies three dates before October 27, 2016 (February 12, 2016, August 8, 2016 and September 7, 2016), each of which are explicitly "expressed" by Bumgardner as dates that mark the beginning of "the Period of Delay as defined by the policy". (Delay Report, ECF No. 94-2 at 76).

This Court's gatekeeping inquiry under Rule 702 must ensure that Bumgardner's testimony is relevant, which requires that his testimony be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute". *See* Fed. R. Evid. 702(a), Advisory Comm. Notes to 2000 Amendments; *Kumho*, 526 U.S. at 150 (1999); *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."); *G. v. Hawaii, Dep't of Hum. Servs.*, 703 F. Supp. 2d 1112, 1123 (D. Haw. 2010) (expert opinions "regarding the adequacy of the provider networks would not assist the trier of fact because it is no longer at issue in this matter.") Here, the question of whether the Scheduled Date of Completion and Period of Delay started *before* October 27, 2016 is no longer a factual dispute for the jury to resolve. Therefore, any testimony or opinion from Bumgardner that the Period of Delay started before October 27, 2016 is irrelevant, confusing, and unfairly prejudicial and inadmissible.

### c. Any testimony or opinion relating to the Period of Delay ending *after* January 1, 2017 is irrelevant, confusing, and unfairly prejudicial.

Under this Court's interpretation of the Period of Delay's endpoint stated in its summary judgment order, Allianz's "position that the term 'commence,' as used in that [Period of Delay] definition, means what it says (i.e., to begin) is not just reasonable—it's likely correct. From the

court's perspective, the only real question on the Period of Delay's endpoint is whether the 'commercial operations' or 'tenant/owner occupancy' served as the triggering event. Defendant could more-than-reasonably argue that the delivery of Ten Thousand's leasing office, which is intended to sign-up prospective tenant (seemingly a commercial operation), triggered that endpoint." (Order, ECF No. 113, p. 32:17-21).

Once again, Bumgardner's Delay Report ostensibly concludes with the "results of the analysis expressed as the Period of Delay as defined by the policy", which Bumgardner identifies as four possible end dates: July 1, 2016, March 9, 2017, April 20, 2017, and April 27, 2017. (Delay Report, ECF No. 94-2, p.76, Table 17 – Period of Delay Conclusion). Plaintiffs concede, as they must, that expert testimony "cannot be used to provide legal meaning or interpret the policies as written." (Pl. Opp. Br., ECF No. 160 at 7) (quoting *McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999). Allianz agrees. *McHugh*, 164 F.3d at 454; *see also Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir.1996) (stating that expert testimony is not proper for issues of law because the role of experts is to interpret and analyze factual evidence and not to testify about the law). Plaintiffs deny that Bumgardner is interpreting or providing legal meaning to the endpoint of the Period of Delay, but merely has an opinion "about the amount of delay that was incurred relating to each of the construction milestones that were set forth in the construction contract between the Plaintiffs, Swinerton and the owner SM 10000" and that his Delay Report "simply links his conclusions … to Plaintiffs' interpretation of the language utilized by the parties in the policy". (Pl. Opp. Br., ECF No. 160 at 7-8). However, contrary to their representations, Plaintiffs *are* attempting to use Bumgardner's testimony to interpret and provide legal meaning regarding to the endpoint of the Period of Delay.

Bumgardner's Delay Report first expresses and relies on the legal conclusion that the "policy language … identifies the end of the delay period as the date when the insured is able to 'commence commercial operations in the **manner originally planned**[2]'…." (Delay Report, ECF

---

[2] The language in **bold** *is* in the Basis of Indemnity section of the Delayed Opening Form but that has nothing to do with determining the Period of Delay—it merely limits the damages that may be claimed during the Period of Delay. *See* Def. Reply in Support of *Daubert* Mot. to Exclude Brian Bergmark, Sept. 2, 2021, ECF No. ___

No. 94-2 at 56) (emphasis added by Bumgardner). No such language, however, can be found in the definition of "Period of Delay", and no such requirement to trigger the endpoint of the Period of Delay is supported by this Court's interpretation of the Policy. (*See* Order, ECF No. 113, p. 32:16-23). But the manner in which SM 10000 originally planned to commence commercial operations is not an issue that requires determination by the jury. SM 10000 admitted in both a sworn interrogatory response, and in representations made directly to this Court, that it "originally planned to commence commercial operations in the leasing office upon completion of Milestone 1, as evidenced by the Construction Contract." (Pl. Mot. Summ. J., ECF No. 68 at 14:19-20; *see also* SM 10000 Response to Interrogatory No. 4, ECF No. 67-7, p. 4.).

Ignoring the undisputed and sworn statements form SM 10000 about its original plans for commencing commercial operations, Bumgardner's Delay Report declares, without any support, that "[i]n most projects, the project completion date is when commercial operations commence, or could commence" and offers the additional legal conclusion that "to be consistent with the terms of the DSU insurance policy, the date when units were actually completed and available for occupancy must be considered." (Delay Report, ECF No. 94-2 at 19, 56) (emphasis in original). Based on Bumgardner's improper and inadmissible legal interpretation of the Policy, he offers the opinion that "the project milestone states determined by the as-planned versus as-built analysis were utilized as the end dates for the Period of Delay for each milestone analyzed," and the completion of those construction contract milestones were directly "expressed as the Period of Delay as defined by the policy" in Bumgardner's Delay Report. (Delay Report, ECF No. 94-2 at 74, 76).

As noted above, under this Court's interpretation of the Period of Delay's endpoint, Allianz's "position that the term 'commence,' as used in that [Period of Delay] definition, means what it says (i.e., to begin) is not just reasonable—it's likely correct. From the court's perspective, the only real question on the Period of Delay's endpoint is whether the 'commercial operations' or 'tenant/owner occupancy' served as the triggering event. Defendant could more-than-reasonably argue that the delivery of Ten Thousand's leasing office, which is intended to sign-up prospective

tenant (seemingly a commercial operation), triggered that endpoint." (Order, ECF No. 113, p. 32:17-21). Here, with respect to commercial operations, there is no dispute that July 1, 2016 was the actual date Milestone #1 in Swinerton's contract was completed. (Delay Report, ECF No. 94-2, p.56) ("The [July 1, 2016] issue date of the first temporary certificate of occupancy was taken as the milestone 1 (TCO#1) completion date in the analysis."). And with respect to tenant occupancy, Bumgardner's Delay Report states that "[t]he first occupancy was January 1, 2017" (Delay Report, ECF No. 94-2 at 36); *see also* ECF No. 78-5, SM 1000 30(b)(6) Palermo Depo. Tr.: 144:12-14 (acknowledging people moved into the building around January 1, 2017). January 1, 2017 is when tenant occupancy actually began.

In light of the foregoing, the Period of Delay, as defined by the Policy, might be decided by the jury to end on July 1, 2016 (when commercial operations commenced or could have commenced) or, at the very latest, January 1, 2017 (when tenant occupancy actually commenced). Whatever incidental finishing touches Swinerton may have been addressing within the building after tenant occupancy actually commenced on January 1, 2017 is not relevant to the determination of the endpoint of the Period of Delay as defined by the Policy and interpreted in the Court's Order. (*See* Order, ECF No. 113, p. 32:16-23). As such, any testimony or opinions from Bumgardner that seeks to establish that the Period of Delay *ended* after January 1, 2017 is irrelevant, confusing, and unfairly prejudicial and, therefore, inadmissible. *See* Fed. R. Evid. 702(a), Advisory Comm. Notes to 2000 Amendments; *Kumho*, 526 U.S. at 150 (1999); *Daubert*, 509 U.S. at 591; *G.*, 703 F. Supp. 2d at 1123 (D. Haw. 2010).

### d. Bumgardner's As-Planned versus As-Built analysis and Windows Analysis methods are irrelevant. Neither method, alone, or together, establishes the cause of any portion of the Period of Delay.

Plaintiffs' Opposition does not dispute that SM 10000 has the burden of proving the Period of Delay (as defined by the Policy) *caused by* direct physical loss or direct physical damage to Insured Property from the Loss Event. (*see* Def. Mot., § 3.A.iii, ECF No. 133 at 14). Plaintiffs concede that the As-Planned versus As-Built method is inherently incapable of establishing causation, but contend that Allianz "misunderstands both the method and its purpose in Mr.

7

Bumgardner's analysis. Mr. Bumgardner acknowledged the limitation Allianz points out and took conscious steps to remedy it. … To address the limitations … Mr. Bumgardner used the Windows Analysis". (Pl. Opp. Br., ECF No. 160 at 13:19—14:7) (citation omitted).

Plaintiffs never identify what Allianz "misunderstands", because Allianz suffers from no misunderstanding whatsoever. SM 10000 wants to use Bumgardner to *quantify* an alleged gross delay in project completion under the construction contract between SM 10000 and Swinerton using the As-Planned versus As-Built method, confusingly and prejudicially label and equate that measurement with the "Period of Delay" as defined by the Policy, and then establish the *cause* of delays to project completion using the Windows Analysis method. SM 10000 concedes that "Bumgardner did not use the Windows Analysis method to measure the Period of Delay", nor "as a method for analyzing the entire project", but contends that he somehow used it to "enhance the accuracy of the As-Planned versus As-Built analysis"; "pinpoint delays that were experienced for the windows of time for which schedules are available" and "analyze potentially concurrent delays". (Pl. Opp. Br., ECF No. 160 at 14:1—16:8).

All of Plaintiffs' arguments suffer from the same fatal flaw: because Bumgardner's Windows Analysis ***does not*** identify a single day of the Period of Delay, nor a single delay to the completion of the project, it cannot logically explain how one, two, ten or any of the alleged 182-day delay in project completion generated by the As-Planned versus As-Built analysis was *caused by* direct physical loss or direct physical damage to Insured Property from the Loss Event. Indeed, Bumgardner's Windows Analysis does not express *any* opinion as to the *cause* of any delays in project completion or any interim completion milestones. (*see* Delay Report, ECF No. 94-2 at 66, 67-73). When asked at deposition how he incorporated his Windows Analysis into his As-planned versus As-Built Analysis, he answered: "It wasn't an incorporation into; it was another metric. And the windows analysis just helped us understand other things going on, and ultimately would lead to an understanding of whether these other things may have affected the project. … it was focused primarily on the period of the machine-room issues") (ECF No. 133-2, Bumgardner Depo. Tr.: 150:25—151:1).

Contrary to Plaintiffs' assertions, no delays to the completion date of the project were ever "pinpointed" with Bumgardner's Windows Analysis, and Plaintiffs' denial that it was impossible for Bumgardner to use the Windows Analysis method to quantify the impact of any "independent" delays to the project completion date is meritless. Plaintiffs *concede* that Bumgardner did not use the Windows Analysis method "as a method for analyzing the entire project" (Pl. Opp. Br., ECF No. 160 at 14:1—16:8), and the Delay Report itself *expressly states* that Windows Analysis "was not utilized to determine the number of days project completion was delayed." (Delay Report, ECF No 94-2 at 11). Bumgardner identified *zero* independent delays to project completion using the Windows Analysis method *because* a lack of schedule updates rendered the Windows Analysis incapable of identifying *any* delays to the completion of the project from any cause whatsoever. Any suggestion to the contrary is meritless.

Bumgardner's purported "combination" of these two methods is a complete myth, built on a merry-go-round of empty jargon with no actual analysis. The relevant issue for the jury to determine is the duration of the Period of Delay (as defined by the Policy) *caused by* direct physical loss or direct physical damage to Insured Property from the Loss Event. (Policy, ECF No. 1-1 at 67-68). Bumgardner's As-Planned versus As-Built Method does not establish the cause of the Period of Delay, nor even the cause of any delays to project completion that Plaintiffs intend to use at trial as a proxy for the Period of Delay. Neither does Bumgardner's Windows Method. Whether considered separate or together, Bumgardner's testimony and opinions based on As-Planned versus As-Built methods and Windows Analysis method are not relevant to the factual dispute to be proven at trial. Accordingly, the Court should exclude Bumgardner's testimony and opinions based on As-Planned versus As-Built methods or Windows Analysis method as irrelevant, confusing, and unfairly prejudicial. *See* Fed. R. Evid. 702(a), Advisory Comm. Notes to 2000 Amendments; *Kumho*, 526 U.S. at 150 (1999); *Daubert*, 509 U.S. at 591; *G.*, 703 F. Supp. 2d at 1123 (D. Haw. 2010).

### e. Bumgardner's testimony based on the Time-Impact method of delay analysis is irrelevant because the method produces hypothetical delays, not actual delays.

Plaintiffs' Opposition denies that that Bumgardner's Time Impact analysis is irrelevant because "the AACE 29R-03 language Allianz quotes on this point is from the wrong section of the guidelines … Allianz … cites to Section 3.6 of the AACE 29R-03, which discusses the prospective use of the Time Impact method. The following section, Section 3.7, discusses the retrospective use of the Time Impact method used by Mr. Bumgardner." (Pl. Opp. Br., ECF No. 160 at 16:10-27). Contrary to Plaintiffs' representations, according to the Delay Report, Bumgardner himself defined "Time Impact Analysis" as "a prospective method that forecasts what the impact would have been if activities were not re-sequenced or accelerated" and the "main limitation of the time impact analysis is that it does not take into account actual activity execution after the loss event." (Delay Report, ECF No. 94-2 at 33, 38). At deposition, Bumgardner confirmed that he used the Time Impact Method only "to determine what the direct impact *might have been*" from the Loss Event. (ECF No. 133-2, Bumgardner Depo. Tr.: 150:2-17).

Plaintiffs' Opposition does not contend that Bumgardner's Time Impact method was (or can be) used to establish the *actual* Period of Delay caused by any direct physical loss or damage to Insured Property from the Loss Event, and does not explain how or why Bumgardner's testimony or opinions based on the Time Impact method are relevant to any issue in this case. Accordingly, the Court should exclude Bumgardner's testimony and opinions based on the "Time Impact" method as irrelevant, confusing, and unfairly prejudicial. *See* Fed. R. Evid. 702(a), Advisory Comm. Notes to 2000 Amendments; *Kumho*, 526 U.S. at 150 (1999); *Daubert*, 509 U.S. at 591; *G..*, 703 F. Supp. 2d at 1123 (D. Haw. 2010).

### 3. Alternatively, Bumgardner's Delay Opinions Are Unreliable

#### a. Bumgardner failed to follow his own guidelines to reliably apply the As-Planned vs As-Built method.

Plaintiffs Opposition does not dispute that the AACE 29R-03 protocols required Bumgardner, before the application of any delay analysis methods, to "[e]nsure that the full scope

of the project/contract is represented in the schedule." (AACE 29R-03, ECF No. 133-4 at 22). Plaintiffs, however, fail to produce any evidence that Bumgardner followed these protocols with respect to the Pre-Loss Schedule. The declaration from Bumgardner that Plaintiffs filed with their Opposition does not mention if the full scope of the project is represented in the Pre-Loss Schedule, nor that he deployed any method to ensure that it was. (*see* Bumgardner Decl., ECF No. 160-1). Bumgardner could not even say that the total scope of the elevator system actually is represented in the Pre-Loss Schedule. (*see* Bumgardner Decl., ECF No. 160-1, ¶4-6). Nor could he; Swinerton has already confirmed that the scope of elevator system activities contained in the Pre-Loss Schedule refers to the partial completion of two cars, not final completion of all five. (*see* ECF No. 133-7, Peter Ruiz 30b6 Depo. Tr. 52:7 – 55:7) (the dates in the Pre-Loss Schedule reflect the projected date of completing only two (of five) elevator cars, and without the ability to call out any of the fire alarm functions).

And now that Plaintiffs have disclosed Mr. Dancey as the "author" and "creator" of the Pre-Loss Schedule, there is no question that the Pre-Loss Schedule does not represent the full scope of the project necessary to complete any construction contract milestones. (Snow Decl. Ex. A, Dancey Depo. Tr.: 158:13—159:2) ("Schedule is referencing TCO dates, not actual milestone dates"); (Pl. *Daubert* Mot., ECF No. 130 at 17:22-23, 19:18-19) (under the "clear language of the [construction] contract [] the issuance of a TCO, standing alone, was not sufficient to achieve substantial completion").

Bumgardner failed to reliably apply the As-Planned versus As-Built method because he failed to reliably follow the basic prerequisite of ensuring that the full scope of project was, in fact, represented in the Pre-Loss Schedule. Stated differently, deploying no known methodology, his testimony blindly assumes, contrary to the undisputed facts of this case, the entire project scope is represented in the Pre-Loss Schedule. It wasn't. His comparison of "TCO" dates taken from Pre-Loss Schedule to the alleged actual completion dates of construction contract milestones is an invalid, apples-to-oranges comparison. It is complete junk and a deception, not a sketchy but

admissible opinion for a jury to weigh. The Court should exclude as unreliable any testimony or opinions based on the As-Planned versus As-Built method.

### b. Alternatively, Bumgardner failed to follow his own guidelines to reliably apply the Time Impact method.

If, as Plaintiffs now represent, Bumgardner attempted to use AACE 29R-03 Section 3.7 instead of 3.6 for his Time Impact analysis, then there is no doubt that Bumgardner failed to follow the protocols necessary to reliably apply this method. Unlike Section 3.6, Section 3.7 of AACE 29R-03 explicitly "[r]equires routine schedule updates *performed throughout project life*". (AACE 29R-03, ECF No. 133-4 at 83). Here, schedule updates do not exist for the final year of the project. The final schedule update was done on June 3, 2016 (Delay Report, ECF No. 94-2, p. 65), while Bumgardner claims actual project completion was July 1, 2017. (Delay Report, ECF No. 94-2, p. 60-61). There is simply no possible way for Bumgardner to reliably "follow the protocols" of Section 3.7 of the AACE 29R-03 if there were no schedule updates performed for the final year of the project. Accordingly, the Court should exclude as unreliable Bumgardner's testimony and opinions based on the Time Impact method.

### c. Alternatively, Bumgardner failed to follow his own guidelines to reliably apply the Windows Analysis method.

Bumgardner claims to have used method implemental protocol ("MIP") 3.3 for his Windows Analysis. (Delay Report, ECF No. 94-2 at 62). Plaintiffs' Opposition concedes that AACE 29R-03 states that "If, for example, the project records show that there exists **only** a baseline schedule but **no** schedule updates *for the duration of the project*, then the observational MIP's 3.3 and 3.4 cannot be utilized." (Pl. Opp. Br., ECF No. 160 at 15:13-15) (quoting AACE 29R-03, Dkt. 133-4 at 128) (bold emphasis added by Plaintiffs) (italic emphasis added by Allianz)[3]. In this case, Bumgardner's analysis interval using the Windows Analysis method was from January 2016 to June 2016. (Delay Report, ECF No. 94-2 at 62-66). The final schedule

---

[3] Plaintiffs actually misquote this sentence from AACE 29R-03 when making their reliability argument, putting a false period after "no schedule updates." and omitting the rest of the sentence that requires schedule updates "for the duration of the project" to utilize MIP 3.3. (Pl. Opp. Br., ECF No. 160 at 20:13-15)

update was done on June 3, 2016 (Delay Report, ECF No. 94-2, p. 65), and Bumgardner claims actual project completion was July 1, 2017. (Delay Report, ECF No. 94-2, p. 60-61). Schedule updates do not exist for the final year of the project. Plaintiffs' contention that because "some" schedule updates exist, Bumgardner was able to reliably follow the protocols for using MIP 3.3/Windows Analysis method lacks any support or merit. Plaintiffs notably fail to offer any response to the case Allianz cited which recognized that because "the critical path can change and that items not originally on the critical path can become critical…if the CPM is to be used to evaluate delay on the project, it must be kept current and must reflect delays as they occur." *Fortec Constructors v. U.S.*, 8 Cl. Ct. 490, 505 (Ct. Cl. 1986) (internal citation omitted).

Separately, Plaintiffs allege that Bumgardner used the Windows Analysis to "analyze potentially concurrent delays." (Pl. Opp. Br., ECF No. 160, p. 16:5-8). This too lacks merit. Under the AACE 29R-03, when "multiple analysis intervals[4] are used" to evaluate concurrency, "it is only after all the analysis intervals, covering the entire duration of the project, are evaluated that reliable results can be obtained by performing a 'grand total' calculation.." (AACE 29R-03, § 4.2.D.4. Frequency, Duration, and Placement of Analysis Intervals, ECF No. 133-4 at 109) (emphasis in original). Thus, according to AACE 29R-03, Bumgardner's "concurrency" evaluation using MIP 3.3/Windows Analysis is not a reliable method to evaluate concurrency because his Windows Analysis ended in June 2016 (ECF No. 133-2, Bumgardner Depo. Tr. 152:2-23) and, therefore, does not cover "the entire duration of the project".

Accordingly, the Court should exclude as unreliable: (1) any testimony or opinions from Bumgardner based on the Windows Analysis method, and/or (2) any testimony or opinions from Bumgardner that would or seeks to establish, rely upon, or otherwise relates to any actual or potential "concurrent delays".

---

[4] "Analysis interval refers to the individual time periods used in analyzing the schedule under the various dynamic methods (MIP 3.2, 3.3, 3.4, 3.5, 3.7 and 3.9)." (AACE 29R-03, ECF No. 133-4 at 109).

> d. **Plaintiffs fail to identify or explain any method, facts, basis, or reasoning supporting Bumgardner's testimony that a "float period created by the loss event" exists and delays to Level 42 took place within such float period.**

Allianz's motion correctly and accurately pointed out that the Delay Report "contains no methodology, analysis, basis, reasons, facts, or data supporting his testimony that a 'float period created by the loss event' exists and that a 'change to the penthouse level that resulted in the level 42 delay took place within' that undefined float period. This opinion is nothing more than rank speculation and fails to meet a single requirement of Rule 702." (Def. Mot., § 3.B.v, ECF No. 133 at 24). Plaintiffs' Opposition contains no response whatsoever. Plaintiffs wholly fail to identify or explain how Bumgardner's opinions and testimony on the foregoing issues meet any of the requirements for the admission of expert testimony under Fed.R.Evid. 702. Accordingly, the Court should preclude Bumgardner from offering any evidence or testimony that seeks to establish, rely upon, or otherwise relates to the existence of any float period created by the loss event including, but not limited to, any evidence or testimony that any penthouse-level changes and/or the level 42 delay "took place within" a float period created by the loss event.

> e. **Plaintiffs fail to identify any *method* Bumgardner used to determine the Scheduled Date of Completion.**

In moving for summary judgment, Plaintiffs sought a declaration that the alleged milestone completion dates found in Swinerton's Pre-Loss Schedule establish the date on which, but for the insured loss or damage, commercial operations or tenant/owner occupancy would have commenced (i.e., the Scheduled Date of Completion under subsection (ii) of the Policy definition), "***provided it is proved at trial that those dates were current and correct***." (ECF No. 68, p. 17, lines 7-9) (emphasis added). In its summary judgment order ("Order"), the Court adopted Plaintiffs' proffered interpretation and declared that the Policy definition "requires a prospective analysis to determine" the Scheduled Date of Completion under subsection (ii) of the Policy definition. (ECF No. 113, p. 25, lines 14-18).

Bumgardner's Delay Report, in his one-page "Schedule Integrity" section, only offers an opinion relating to the "accuracy of the schedule logic" between three activities. (Delay Report,

ECF No. 94-2 at 45). There are no opinions expressed in Bumgardner's Delay Report as to whether any projected dates shown in the Pre-Loss Schedule were correct, or even reasonable. And the reason for such missing opinions is simple: the Pre-Loss Schedule does not actually represent the full scope of the project, as confirmed by its author and creator Keith Dancey. (Snow Decl. Ex. A, Dancey Depo. Tr.: 158:13—159:2) ("Schedule is referencing TCO dates, not actual milestone dates"). Plaintiffs' contention that Bumgardner is "entitled" to offer opinions about the correctness or reasonableness of the dates in the Pre-Loss Schedule is frivolous. He hasn't disclosed any such opinions in his Delay Report, nor any methodology used to generate such opinions. And his underlying assumption that the TCO dates in Swinerton's schedules are actually referencing the construction contract milestones is false according to the schedule's author and creator, Mr. Dancey. Under established law, the "prerequisite to making the Rule 702 determination that an expert's methods are reliable requires the district court to assure that the methods are adequately explained." *U.S. v. Valencia-Lopez*, 971 F.3d at 900 (9th Cir. 2020) (internal quotations and citation omitted). With respect to the Scheduled Date of Completion and the Pre-Loss Schedule, there are no opinions or methods for the Court to evaluate.

Accordingly, the Court should exclude as unreliable any testimony or opinions from Bumgardner that would or seeks to establish, rely upon, or otherwise relates to (1) the Scheduled Date of Completion or (2) the accuracy, correctness, or reasonableness of any TCO or milestone dates shown in the Pre-Loss Schedule.

DATED: September 3, 2021    **FORAN GLENNON PALANDECH PONZI & RUDLOFF PC**

By: _/s/ Christopher M.H. Snow_
G. Edward Rudloff, Jr.
Dianne J. Meconis
Matthew S. Ponzi (*Pro Hac Vice*)
Christopher M.H. Snow (*Pro Hac Vice*)

Attorneys for Defendant ALLIANZ GLOBAL RISKS US INSURANCE COMPANY